UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   09 CR 830 |
| | ) | |
| v. | ) | Judge Harry D. Leinenweber |
| | ) | |
| | ) | **UNDER SEAL** |
| TAHAWWUR HUSSAIN RANA | ) | |

## GOVERNMENT'S SANTIAGO PROFFER

The United States of America, by and through its attorney, Patrick J. Fitzgerald, United

States Attorney for the Northern District of Illinois, respectfully submits the following proffer of

evidence as to the admission at trial of certain coconspirator statements pursuant to Federal Rule of

Evidence ("Rule") 801(d)(2)(E).

## I.     INTRODUCTION

The superseding indictment in this case charges the defendant with conspiring to provide

material support to individuals who planned and carried out terrorist attacks in India and who were

planning to carry out a terrorist attack in Denmark.  Among other allegations, the superseding

indictment alleges that the defendant assisted co-defendant David Headley ("Headley") in using the

defendant's immigration business as a cover story for Headley's extended stays in Mumbai, India,

during which Headley carried out instructions to conduct surveillance in advance of the Mumbai

attacks in November 2008, attacks which resulted in approximately 164 deaths.  When Headley was

instructed once again to conduct surveillance, this time of a newspaper facility in Denmark, the

defendant once again assisted Headley, by among other means, using the defendant's business as

a cover story that would explain Headley's travel to Denmark and allow Headley to gain entry into

the newspaper facility.  In total, the defendant is charged in three counts of the superseding

indictment: Count Nine (Conspiracy to Provide Material Support to Terrorism in India); Count

Eleven (Conspiracy to Provide Material Support to Terrorism in Denmark); and Count Twelve

(Providing Material Support to Lashkar e Tayyiba).

More specifically, Count Nine alleges that the defendant conspired with Headley and others

to provide material support to the conspiracies charged in Counts One and Two of the superseding

indictment.  Counts One and Two allege that various members of Lashkar e Tayyiba planned and

carried out terrorist attacks in India, including the Mumbai attacks in November 2008.  In Count

Nine, the government has alleged that beginning no later than late 2005 and continuing through

October 3, 2009, the defendant conspired with Headley and others to provide personnel, tangible

property, money, and false documentation and identification, and to conceal and disguise the nature

of such support, to those who planned and carried out the Mumbai attacks.  To prove the existence

of the conspiracy charged in Count Nine, the government intends to offer, among other evidence,

the statements of its members, including the defendant, Headley, Zaki Lakhvi ("Zaki"), Muzzammill

Butt ("Muzzammill"), Sajid Mir ("Sajid"), Abu Qahafa ("Qahafa"), Abu Al Qama ("Al Qama"),

Abdur Rehman Hashim Syed ("Pasha") and Major Iqbal.[1]  Most of the statements that the

government intends to offer are admissible without reliance on the co-conspirator exception.  For

example, the instructions and suggestions offered by Zaki, Muzzammill, Sajid, Qahafa, Al Qama,

Pasha and Major Iqbal are not statements within the meaning of Rule 801(a).  In addition, the

defendant's own statements are not hearsay.  That said, the evidence demonstrates that the

---

[1]     As discussed more fully in Section II of this filing, the admission of a declarant's statements in furtherance of a conspiracy does not require a formal charge of conspiracy against that declarant.  Thus, the government may offer the statements of Zaki, Sajid and the others identified above in the absence of a formal conspiracy charge against them.

conspiracy charged in Count Nine existed, the declarants of the statements summarized below were members thereof, and their statements were made during the course of and in furtherance of the charged conspiracy. For this reason, the government submits that their statements also are admissible under Rule 801(d)(2)(E).

Count Eleven alleges that the defendant conspired with David Headley, Ilyas Kashmiri, Pasha, and others to provide material support to the conspiracy charged in Count Ten of the superseding indictment. Count Ten alleges that various individuals planned to murder and maim individuals at a *Jyllands-Posten* facility in Denmark. In Count Eleven, the government has alleged that beginning no later than October 2008 and continuing through October 3, 2009, the defendant conspired with Headley and others to provide personnel, tangible property and false documentation and identification, and to conceal and disguise the nature of such support, to those that were planning the attack in Denmark. As with the conspiracy to provide material support to attacks in India, the conspiracy to provide material support to the planned Denmark attack had members beyond the defendant and Headley, including those who played active roles in planning the attacks. To prove the existence of the conspiracy charged in Count Eleven, the government intends to offer the statements of its members, among others, the defendant, Headley, Sajid, Saulat Rana, Pasha and Ilyas Kashmiri. Similar to Count Nine, many of the statements that the government intends to offer to prove Count Eleven are admissible without reliance on the co-conspirator exception. Once again, however, the evidence demonstrates that the conspiracy charged in Count Eleven existed, the declarants of the statements summarized below were members thereof, and their statements were made during the course of and in furtherance of the charged conspiracy. For this reason, the government submits that their statements also are admissible under Rule 801(d)(2)(E).

3

In this *Santiago* Proffer, the government describes the law governing coconspirator statements, outlines its evidence establishing the charged conspiracies and sets forth the general categories of coconspirator statements for which a pre-trial ruling by the Court is requested. The government does not include all of its evidence that would go to show the existence of the conspiracies charged in Counts Nine and Eleven or all of the coconspirator statements that were made in furtherance of those conspiracies but is highlighting for the Court samples of its evidence in order to establish the existence of the charged conspiracies and the roles of the various coconspirators therein. Thus, this proffer does not list all of the government's witnesses and the evidence they will present.

## II. THE LAW GOVERNING THE ADMISSIBILITY OF COCONSPIRATORS' STATEMENTS

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The admission of a co-conspirator statement against a defendant is proper where the government establishes by a preponderance of evidence that: (1) a conspiracy or scheme existed; (2) the defendant and the declarant were members of that particular conspiracy or scheme; and (3) the statement was made during the course and in furtherance of the conspiracy or scheme. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002).

### A. The *Santiago* Proffer is the Approved Method of Proffering Co-Schemer Statements

In this Circuit, the preferred way for the government to makes its preliminary factual showing as to the admissibility of such statements is by filing a pretrial written proffer of the

government's evidence. *See, e.g., United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v. Irorere,* 228 F.3d 816, 824 (7th Cir. 2000).[2] In making its preliminary factual determinations, the Court must consider the statements themselves as evidence of a conspiracy and whether the statements the government seeks to admit were made in furtherance of that conspiracy. *See United States v. Brookins*, 52 F.3d 615, 623 (7th Cir. 1995); *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Indeed, the Court may consider all non-privileged evidence. *See United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996).

## B. Co-conspirator Statements Are Admissible as Nonhearsay Despite the Absence of a Formal Conspiracy Charge

Statements may be admitted under Rule 801(d)(2)(E) notwithstanding the lack of a formal conspiracy charge against any or all declarants. *See, e.g., United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130.[3] In addition, there is no requirement that each member of the venture share a criminal intent for the co-conspirator rule to apply to statements that members made in furtherance of the conspiracy. These two rules are based on the very nature of the coconspirator doctrine:

> The distinction should be noted between "conspiracy" as a crime and the co-conspirator exception to the hearsay rule. Conspiracy as a crime comprehends more than mere joint enterprise. It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act. . . . The co-conspirator exception to the hearsay rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of agency law. It may be applied in

---

[2]*Accord, e.g.,United States v. Haynie,* 179 F.3d 1048, 1050 (7th Cir.1999); *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992).

[3]*See also, e.g., United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (conspiracy charge not a condition for admitting statements under Rule 801(d)(2)(E)); *accord, United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990); *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989); *United States v. LeFevour*, 798 F.2d 977, 983 (7th Cir. 1986).

both civil and criminal cases. . . . Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.

\* \* \*

The substantive criminal law of conspiracy, though it obviously overlaps in many areas, simply has no application to this evidentiary principle. Thus, <u>once the existence of a joint venture for an illegal purpose, or for a legal purpose using illegal means, and a statement made in the course of and in furtherance of that venture have been demonstrated by a preponderance of the evidence, it makes no difference whether the declarant or any other "partner in crime" could actually be tried, convicted and punished for the crime of conspiracy.</u>

*United States v. Gil*, 604 F.2d 546, 549-550 (7th Cir. 1979) (citations omitted and emphasis added).

This distinction was explored in *United States v. Coe*, 718 F.2d 830 (7th Cir. 1983). In *Coe*, the court explained that a so-called co-conspirator statement's admissibility does not depend on the substantive law of conspiracy:

Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . . Recognizing this, some courts refer to the coconspirator exception as the "joint venture" or "concert of action" exception. . . . A charge of criminal conspiracy is not a prerequisite for the invocation of this evidentiary rule. . . . Indeed, it may be invoked in civil as well as criminal cases. . . .

The proposition that the government did have to establish by a preponderance of independent evidence was that [the individuals] . . . were engaged in a joint venture-- that there was a "combination between them . . . ."

*Coe*, 718 F.2d at 835 (citations omitted).[4]

---

[4]     *See also Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917) (explaining origin of the co-conspirator rule in the law of partnership: "the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them.").

6

### C.    The Supreme Court's *Crawford* Decision Has Not Changed the Admissibility of Co-Conspiracy Statements

The Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), changed much of the law concerning out-of-court testimonial statements, but it did not affect the admissibility of co-conspirator statements. In *Crawford*, the prosecution introduced a tape-recorded statement made before trial by the defendant's wife to law enforcement. *Id.* at 38. At trial, however, the wife was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not have an opportunity to cross-examine her. *Id.* at 40. The Court ruled that admission of the statement violated the Confrontation Clause, holding that where the government offers an unavailable declarant's hearsay that is "testimonial" in nature, the Confrontation Clause requires actual confrontation, that is, cross-examination, regardless of how reliable the statement may be. *Id.* at 51-52. As examples of "testimonial" statements, the Court listed prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. *Id.* at 68.

The rule in *Crawford* does not apply, however, to statements that are not hearsay.[5] Thus, the Seventh Circuit has squarely held that *Crawford* does not apply to – and did not change the law relating to – co-conspirator statements. In *United States v. Jenkins*, 419 F.3d 614 (7th Cir.), *cert. denied*, 126 S. Ct. 782 (2005), the Seventh Circuit noted:

As to the Confrontation Clause argument, *Crawford* does not apply. The recordings

---

[5]     The rule in *Crawford* also does *not* apply where:  (1) a statement, though testimonial in nature, is not offered for the truth of the matter asserted, 541 U.S. at 59 n.9; (2) the declarant testifies at trial and is subject to cross-examination regarding the prior statement, *id.* at 59 n.9; (3) the statement is non-testimonial, *id.* at 60; or (4) the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination, *id.* at 59. Another exception to the confrontation requirement applies where the defendant procured the declarant's unavailability, that is, "forfeiture by wrong-doing," *see id.* at 62; Fed. R. Evid. 804(b)(6).

> featured the statements of co-conspirators. These statements, by definition, are not hearsay. *Crawford* did not change the rules as to the admissibility of co-conspirator statements.

419 F.3d at 618; *accord, United States v. Tolliver*, 454 F.3d 1160, 1165 (7th Cir. 2006). Because

co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and

those statements may be admitted without offending the Sixth Amendment.

### D.     The Proper Standard for Admissibility Is Preponderance of the Evidence

A district court's preliminary determination of admissibility for purposes of Rule

801(d)(2)(E) is distinct from the standard required in determining on appeal whether sufficient

evidence exists to uphold a jury verdict. The standard to be applied in the context of admissibility

under Rule 801(d)(2)(E) is a preponderance-of-the-evidence standard. *Lindemann*, 85 F.3d at 1238

(*citing Bourjaily*, 438 U.S. at 175-76).

### E.     Principles for Determining Membership in and Existence of the Criminal Conspiracy

#### 1.     The Court May Consider the Proffered Statements Themselves

A district court may consider the proffered statements themselves in determining the

existence of a conspiracy, and a defendant's participation in it. *Bourjaily,* 483 U.S. at 180; *United

States v. de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990).

#### 2.     Both Direct and Circumstantial Evidence Can Be Considered

A district court can also consider both direct and circumstantial evidence to determine the

existence of a conspiracy. *See United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991);

*United States v. Patterson*, 213 F. Supp. 2d 900, 910-11 (N.D. Ill. 2002), *aff'd*, 348 F.3d 218, 225-26

(7th Cir. 2003).[6] Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983); *see also Lindemann*, 85 F.3d at 1238 (secretive nature of conspiracies one reason for conspirator exception to hearsay rule).

### 3.     Requirements for Determining if a Person has Joined the Conspiracy

A defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met or has agreed with every co-conspirator. *See United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); *see also Rodriguez*, 975 F.2d at 411 (defendant must have intended to join and associate himself with the conspiracy's criminal design and purpose). The government need not prove, however, that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Sims*, 808 F. Supp. 620, 623 (N.D. Ill. 1992). As the Supreme Court has said:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . . The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. . . . If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

---

[6]     Even though the government need not prove the crime of conspiracy for the co-conspirator doctrine to apply, criminal conspiracy cases are helpful in stating the types of evidence that are sufficient to show conspiracy. If the government meets the higher standard for criminal conspiracy, *a fortiorari*, the evidentiary standard is met.

*Salinas v. United States*, 522 U.S. 52, 63-4 (1997) (citations omitted).[7]  A defendant may be found to have participated in a conspiracy even if he joined or terminated his relationship with others at a different time than another defendant or co-conspirator.  *See United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.1985).[8]  A district court may consider the conduct, knowledge, and statements of the defendant and others in establishing participation in a conspiracy.  A single act or conversation, for example, can suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise.  *See, e.g., Sims*, 808 F. Supp. at 623.[9]  Statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern.  *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987).  A co-conspirator who has become inactive nevertheless is liable for his co-conspirators' further statements unless he openly disavows the conspiracy or reports it to the police.  *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).  *See also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).

---

[7]     *See also United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985); *United States v. Morrow*, 971 F. Supp. 1254, 1256-57 (N.D. Ill. 1997).

[8]     A defendant, even if not an "agreeing" member of a conspiracy, may nonetheless be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy, *see United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *Sims*, 808 F. Supp. at 623 n.1, even if the defendant was not charged with aiding and abetting, *see United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir.1985).

[9]     Similarly, efforts by an alleged co-conspirator to conceal a conspiracy may support an inference that he joined the conspiracy while it was still in operation.  *See Redwine;* 715 F.2d at 321; *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. 1981).

F.      **Statements Made in Furtherance of the Conspiracy**

In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable-basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the co-conspirator exception. *See, e.g., Johnson*, 200 F.3d at 533 (citing *United States v. Stephenson,* 53 F.3d 836, 845 (7th Cir. 1995)).

The Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *See, e.g.*, *United States v. Cozzo*, No. 02 CR 400, 2004 U.S. Dist. LEXIS 7391 (N.D. Ill. April 16, 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" is admissible under Rule 801(d)(2)(E). *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994) (*quoting United States v. Johnson*, 927 F.2d 999, 1001 (7th Cir. 1991)); *accord*, *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:  (1) to identify other members of the conspiracy and their roles, *United States v. Roldan-Zapata,* 916 F.2d 795, 803 (2d Cir. 1990); *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); (2) to recruit potential co-conspirators, *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999); (3) to control damage to an ongoing conspiracy, *United States v. Van Daal Wyk,* 840 F.2d 494, 499 (7th Cir. 1988); *Kapp*, 2003 U.S. Dist. LEXIS 3989, at *3; (4) to keep co-conspirators advised as to the progress of the conspiracy, *Potts*, 840 F.2d at 371; *Kapp*, 2003 U.S. Dist. LEXIS 3989, at *3; (5) to conceal the criminal objectives of the conspiracy, *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); (6) to plan or to review a co-conspirator's exploits,

11

*United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a co-conspirator can be trusted to perform his role. *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990); *Van Daal Wyck*, 840 F.2d at 499. The Seventh Circuit has also said that "[s]tatements made to keep co-conspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson,* 53 F.3d at 845 (*accord*, *United States v. Curtis*, 37 F.3d 301, 307 (7th Cir. 1994).

### 1. Statements Made to Execute the Conspiracy

Statements made by co-conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *Cox*, 923 F.2d at 527. Statements such as these, which are "intended to promote the conspiratorial objectives," should be admitted pursuant to Rule 801(D)(2)(E).[10] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy.[11] Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. *See Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

### 2. Statements Regarding the Conspiracy's Activities

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because co-conspirators make such statements to guide each other

---

[10] *United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *accord, United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994).

[11] *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987).

toward achievement of the objectives of the conspiracy. *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992). Similarly, statements that are part of the information flow between co-conspirators made in order to help each co-conspirator perform his role are "in furtherance" of the conspiracy. *See, e.g.*, *Godinez,* 110 F.3d at 454; *Garlington*, 879 F.2d at 283-84; *Van Daal Wyk,* 840 F.2d at 499. Statements to assure that a co-conspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. *See, e.g.*, *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *de Ortiz*, 907 F.2d at 635-36 (7th Cir. 1990).

### 3.    Statements to Recruit Coconspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. *Curry*, 187 F.3d at 766; *Godinez*, 110 F.3d at 454.[12]

### 4.    Statements Regarding the Activities of Other Coconspirators Designed to Inform or Reassure the Listener

Statements made by coconspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499 (wholesaler instructed his courier not to deliver any additional quantities of cocaine to the defendant, a dealer).

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname. . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

*Pallais*, 921 F.2d at 688. The same logic dictates that discussions concerning a conspiracy's

---

[12]     *See also, e.g., United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *Garlington*, 879 F.2d at 283.

successes are admissible as statements in furtherance of the conspiracy. *See id.; Van Daal Wyk*, 840 F.2d at 499. Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (description of past drug deals). Likewise, statements made to reassure and calm the listener may further the conspiracy, *see Garlington*, 879 F.2d at 284 ; *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989) (upholding admission of statements designed to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy).

Importantly, when a coconspirator tells another coconspirator about information learned from a third coconspirator which is "part of the flow of information" furthering the conspiracy, that statement is admissible under the coconspirator exception. *United States v. Wesson*, 33 F.3d 788, 796 (7th Cir. 1994). In *Wesson*, the defendants, including Wesson and his mother (a Chicago police officer), were charged with crimes related to a heroin distribution ring. In particular, Wesson's mother was alleged to have conspired with her son to distribute heroin by, *inter alia*, providing him with information concerning police activity near the drug distribution locations. *Id.* at 790. At trial, a coconspirator and member of the heroin ring – Jeffrey Smith – testified that Wesson told him when to change drug selling locations due to police activity. *Id.* at 791. Smith was asked how Wesson got that information, to which he responded that Wesson said he got the information from his mother. *Id.* Wesson's mother argued that Smith's testimony was impermissible double hearsay. *Id.* at 795. The Seventh Circuit disagreed, concluding that only Wesson's assertion to Smith that his mother told him about police activity was hearsay (albeit, admissible under Rule 801(d)(2)(E), as described below). *Id.* at 796. The original statement by Wesson's mother to Wesson about the police activity was not hearsay since that particular statement was not being admitted for the truth

14

of the matter asserted. *Id.* Because Smith and Wesson's mother were members of the conspiracy, and the statement by Wesson to Smith about the information he received from his mother was part of the flow of information between coconspirators which furthered the conspiracy, Smith's hearsay statement was admissible pursuant to Rule 801(d)(2)(E). *Id.*

### 5. Statements Relating to the Progress and Past Accomplishments of the Conspiracy

Statements made by coconspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371; *Molt*, 772 F.2d at 368-69. Similarly, statements regarding a coconspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

### 6. Statements to Conceal the Criminal Objectives of the Conspiracy

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes. *See, e.g., United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995); *Kaden*, 819 F.2d at 820; *United States v. Bouzanis,* No. 00 CR 1065, 2003 U.S. Dist. LEXIS 16218, at *21 n.5 (N.D. Ill. Sept. 15, 2003). "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Stephenson*, 53 F.3d at 845; *Van Daal Wyk*, 840 F.2d at 499.

### G. Alternative Bases for Admissibility of Statements

15

The government believes that the statements of co-conspirators set forth in this proffer should be admitted as non-hearsay under the co-conspirator doctrine.  There are alternative bases, however, for admission of many of the statements.  These bases do not require a Rule 801(d)(2)(E) analysis.

### 1.        Defendant's Own Statements

A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the co-conspirator statement rule.[13]  *Maholias*, 985 F.2d at 877.  A defendant's own admissions, moreover, are relevant to establishing the factual predicates for the admission of co-conspirator statements against him.  *See, e.g., Godinez*, 110 F.3d at 455; *Potts*, 840 F.2d at 371-72.[14]

### 2.        Statements by a Person Authorized by Defendant to Make the Statement or Statements Made by an Agent of the Defendant

Pursuant to Rule 801(d)(2)(C), a statement made by a person specifically authorized to speak for the defendant is equivalent to an admission by the defendant.  Further, pursuant to Rule 801(d)(2)(D), a statement made by an agent of the defendant is a vicarious admission of the defendant if the statement is made within the scope of the agency and during the course of the relationship.

---

[13]        Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

[14]        Other sections of Rule 801(d)(2) provide alternative bases of admissibility that may apply.  Rule 801(d)(2)(B), for example, provides for the admissibility of "adopted" statements.

### 3.      Non-hearsay Statements

The co-conspirator statement analysis also is not triggered when the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a) and when it is not hearsay. This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion."

Thus, a statement that is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985); *United States v. Mendez-Perez*, 9 F.3d 1554 (9th Cir. 1993) (unpublished opinion) (an instruction is not hearsay). Similarly, a question or inquiry is not a statement and therefore does not invoke Rule 801(d)(2)(E). *See, e.g., United States v. Wright*, 343 F.3d 849, 865-66 (6th Cir. 2003) (question is not hearsay because it "merely seeks answers and usually has no factual content."); *United States v. Lewis*, 902 F.2d 1176, 1179 (5 th Cir. 1990) (questions and inquiries are not hearsay because "they do not, and were not intended to, assert anything"). In addition, when words are being introduced as a verbal act, or as background for an alleged statement, they are not admitted for the truth of the matter asserted. For that reason, they are not hearsay, and may be admitted. *See, e.g., United States v. Robinzine*, 80 F.3d246, 252 (7th Cir. 1996). Accordingly, statements by alleged co-conspirators may be admitted into evidence without establishing the *Bourjaily* factual predicates, but with corresponding limiting instructions, when such statements are offered simply to show, for example, the existence, illegality, or nature and scope of the charged conspiracy.[15]

---

[15]      *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69. In some cases, statements by an alleged co-conspirator will include a combination of declarations offered for the truth of the

### III.   THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE CONSPIRACY CHARGED IN COUNT NINE

As noted above, Count Nine alleges that the defendant conspired with Headley and others to provide material support to the conspiracies charged in Counts One and Two of the superseding indictment. Counts One and Two allege that members of Lashkar e Tayyiba planned and carried out terrorist attacks in India, namely, the Mumbai attacks in November 2008. Among other evidence of the conspiracy charged in Count Nine, the government intends to offer the testimony of Headley, documents and records relating to Headley's travels to India and the establishment of the Mumbai office, certain email communications between coconspirators made before, during and after the Mumbai attacks (but all during the course of the charged conspiracy), and recorded conversations.

The evidence, as summarized below, will establish the existence of the conspiracy charged in Count Nine. It further will establish that its members made statements during the course of and in furtherance of the conspiracy. The government intends to offer the statements of the defendant, Headley, Zaki, Muzzammill, Sajid, Qahafa, Al Qama, Pasha and Major Iqbal. While many, if not most, of these statements are admissible as non-hearsay because they are not assertions of fact (*e.g.,* they are instructions, suggestions and questions), are not offered for the truth of the matter asserted, or are the defendant's own statements, the government submits that such statements may also be admissible under Rule 801(d)(2)(E). To the extent that the statements outlined below are offered pursuant to Rule 801(d)(2)(E), they constitute classic examples of the information flow among conspirators.

---

matters asserted and declarations offered for other non-hearsay purposes.

### A.  **Headley's Training with Lashkar & Introduction to Lashkar Members**

Starting in or around February 2002, co-defendant David Headley began attending training camps in Pakistan for the designated foreign terrorist organization, Lashkar.  By December 2003, Headley had attended five separate courses, and had been trained in, among other topics, Lashkar's philosophy, the use of weapons and grenades, combat tactics, survival skills and counter-surveillance methods.  After completing several camps, Headley became acquainted with a senior member of Lashkar, Zakir Lakhvi ("Zaki"), who was responsible for Lashkar's military operations.  Headley was anxious to be assigned to an operational assignment in Kashmiri, but Zaki told Headley that he was saving Headley for a different assignment.

In or around July 2004, Headley attended a leadership course with Lashkar senior and junior leadership.  At that course, Zaki made a presentation regarding the killing of an Indian citizen who accepted money from Lashkar, but was then believed to have provided information about Lashkar to the Indian military.  Zaki showed a computer animation depicting how the killing was carried out.  Also during that course, Headley attended meetings with Hafiz Saeed (the head of Lashkar), Zaki, and others.  During the meeting, Headley recommended filing a lawsuit challenging Lashkar's designation as a Foreign Terrorist Organization.  Zaki explained to Headley that a lawsuit was a bad idea because it could lead to the public airing of Lashkar's activities.

### 1.  **Headley's Lashkar Handlers**

Following completion of the camps and leadership course, Lashkar assigned a series of "handlers" to Headley.  Initially, Headley was assigned to the handler Yakub.  Headley complained to Zaki and others that Yakub did not give him any assignments.  Thereafter, Headley was assigned to Muzzammill Butt, another senior leader within Lashkar.  Working for Muzzammill Butt was an

individual named Sajid Mir ("Sajid"). Eventually, Sajid, identified in the superseding indictment as Lashkar Member A, became Headley's "handler." Sajid was a resident of Pakistan, and a leader within Lashkar. Sajid was one of the main architects for the planning and preparation that led to the terrorist attacks in Mumbai in November 2008 and Sajid first assigned Headley to perform surveillance in Denmark in order to plan an attack there, as discussed more fully below.

### 2. Former Lashkar Member Pasha

Headley met another Lashkar member – co-defendant Abdur Rehman Hashim Syed, to whom Headley and the defendant referred as "Pasha" – while attending a mosque frequented by Lashkar members. Pasha was a retired Pakistani military officer who, at one point, was active in Lashkar, including participating as a trainer at one of its training camps. Through their discussions over the years, however, Headley learned that Pasha had a number of disagreements with Lashkar members over its philosophy and commitment to jihad. This led Pasha to begin working with co-defendant, Ilyas Kashmiri. Kashmiri is an influential leader of another terrorist organization, Harakat ul Jihad al Islami (HUJI). At least as early as 2007, Kashmiri based his operations in the Federally Administered Tribal Areas of Western Pakistan (FATA), an area which served as a haven for terrorist organizations, including *al Qaeda*, and has publicly announced his affiliation with this terrorist organization.

### B. Headley's Introduction to Major Iqbal

In or about 2006, Headley traveled to the FATA area with Pasha. During the trip, Headley and Pasha were stopped and questioned by Pakistani authorities. Headley was questioned by an individual who identified himself as Major Ali. Headley told Major Ali about his training with Lashkar. Major Ali then asked Headley for his contact information. Several days later, Headley was

contacted by an individual who identified himself as Major Iqbal. Over the next several years, as described in more detail below, Headley met with Major Iqbal and his associates many times. During these meetings, Headley was trained in various topics, including spotting and assessing people, recognizing Indian military insignia and movements, dead drops and pick up points, and clandestine photography.

### C. Headley's Mumbai Assignment

In late 2005, Headley met with Sajid, Muzzammill, and another senior Lashkar member, Abu Qahafa (identified in the indictment as Lashkar Member B), who instructed Headley to travel to India. While in India, they instructed Headley to act as though he were American, and to conceal his Muslim faith and his ties to Pakistan. Around this time, Headley met with Zaki and discussed changing his given name, Daood Gilani, in order to carry out the instructions. Zaki asked Headley where he was born. When Headley informed Zaki that he was born in the United States, Zaki expressed happiness with this fact because having not only a United States passport, but a United States passport indicating a birth place in the United States, would not arouse suspicion when Headley traveled.

### 1. Headley's Name Change

In or around February 2006, Headley traveled from Pakistan to Philadelphia, and changed his name to "David Coleman Headley." Headley proceeded to obtain a United States passport issued in this name, and identifying his place of birth as the United States. Headley, in fact, was born in Washington, D.C., but moved at a very early age to Pakistan, where he was raised and where he attended school. In particular, Headley attended the Hasan Abdal school in Pakistan, where he was classmates with the defendant.

**2.      Defendant's Agreement to Establish a Cover Business in Mumbai**

In or about early summer 2006, Headley again met with Lashkar leaders Sajid, Muzzammill, and Abu Qahafa.  At this meeting, the Lashkar leaders informed Headley that his specific assignment was to travel to Mumbai, India.  Having heard Headley over the years talk about his friendship with the defendant, Tahawwur Rana, and the fact that the defendant ran an immigration business, Sajid and Muzzammill asked Headley if he would open an immigration office in Mumbai as cover for why he truly was there.

After receiving his specific assignment from Lashkar to travel and stay in Mumbai, Headley met with Major Iqbal.  Major Iqbal was already aware of Headley's assignment, despite the fact that Headley had not yet told Major Iqbal about it.  Headley and Major Iqbal discussed the idea of opening an immigration office in Mumbai.  Major Iqbal told Headley that he believed this to be a perfect cover story for why Headley was there considering the amount of respect that such a business would be afforded.  Major Iqbal offered to provide money to pay for the expenses of such an office.

In or around June 2006, Headley traveled to Chicago and stayed with the defendant.  By this time, Headley already had shared with the defendant some specifics about his Lashkar training.  Headley already also had told the defendant about changing his name for the purpose of concealing his Muslim faith and ties to Pakistan.  When Headley stayed with the defendant in or about June 2006, Headley told the defendant about his conversations with Sajid and other Lashkar leaders, as well as with Major Iqbal, and about his assignment to conduct surveillance in Mumbai.  Headley asked the defendant for his permission to open a Mumbai office for the defendant 's business, First World Immigration.  Headley explained to the defendant that the Mumbai office would be a cover

22

story for his true activities and related that Major Iqbal had offered to pay for the expenses of opening the office.  The defendant agreed.

In addition to allowing the use of his business, the defendant assisted Headley in opening the office in Mumbai in several ways.  Among other steps, the defendant directed an individual associated with First World Immigration, to prepare documents identifying Headley as its representative.  The defendant also assisted Headley in obtaining a visa for his travel to India.  On the application for this visa, Headley misrepresented his true given name, his father's true given name and the true purpose of his travel.

**D.      Headley's Surveillance Activities and Meetings with Coconspirators**

After receiving the defendant's approval and assistance for the use of First World Immigration as a cover for his activities on behalf of Lashkar in Mumbai, Headley returned to Pakistan in or about July or August 2006, where he met with Major Iqbal and informed him of the defendant's approval.  Major Iqbal provided Headley with  $25,000 to cover expenses to establish and operate the First World Immigration office in Mumbai, as well as for Headley's living expenses while in Mumbai.  Major Iqbal instructed Headley to travel to India, but not to go through Pakistan. He further instructed Headley to get settled in Mumbai, open the business office, and then take photographs and videotapes of various locations, particularly public areas and areas related to the Indian military.

While in Pakistan, Headley also met with Lashkar leaders Sajid and Muzzammill on at least two occasions.  Headley told them that the defendant agreed to using First World Immigration as a cover for his activities in Mumbai.  Headley also showed Sajid and Muzzammill the visa he had obtained for travel to India.  Sajid instructed Headley on how to travel to and from Mumbai, and

what locations would be the subject of his surveillance, including the Taj Mahal Hotel. During Headley's second meeting with Sajid and Muzzammill, Zaki was present. Zaki wished Headley good luck with his assignment to perform surveillance in Mumbai.

### 1. Headley's First Trip to Mumbai for Surveillance Purposes & Subsequent Discussions with Coconspirators

In or about September 2006, Headley traveled to Mumbai for the first time. Headley rented a room in the home of an elderly couple who was unaware of Headley's affiliation with Lashkar. Headley visited and made videotapes of several locations, including the Taj Mahal hotel and a military cantonment. In or about October or early November, Headley set up an office for First World Immigration in Mumbai, which was called the Immigrant Law Center (ILC).

In approximately December of 2006, Headley returned to Pakistan. He met with Major Iqbal and debriefed him on the surveillance completed in Mumbai. In addition, Headley provided Major Iqbal with a memory card containing the videos he had taken in Mumbai. Major Iqbal returned the memory card to Headley in the next day or so. Soon thereafter, Headley met with Sajid and Muzzammill to debrief them on his activities in Mumbai. Headley provided Sajid with the same memory card, which Sajid kept, as well as maps of Mumbai. Later, Headley again met with Sajid and Abu Qahafa, who was also present at this meeting. Headley, Sajid, and Abu Qahafa discussed Headley's surveillance work in Mumbai. Sajid instructed Headley to return to Mumbai and take detailed videos of the Taj Mahal hotel. More specifically, Sajid instructed Headley to take video of the second floor of the hotel where the conference and ball rooms were located, as well as the stairs leading to those locations. Furthermore, Sajid told Headley to perform surveillance of the police station closest to the hotel. Sajid also told Headley that he (Sajid) had discussed Headley's work in Mumbai with Major Iqbal.

24

Before returning to Mumbai, Headley met again with Major Iqbal. Like Sajid, Major Iqbal instructed Headley to take detailed footage of the Taj Mahal hotel, including the conference rooms. Major Iqbal explained to Headley that the Taj Mahal hotel hosted conferences which were attended by India's top scientists and engineers. Major Iqbal further instructed Headley to surveil public and government areas in India. Major Iqbal told Headley that he (Major Iqbal) had discussed Headley's assignment in Mumbai with Sajid.

### 2. Second Surveillance Trip to Mumbai & Subsequent Discussions with Coconspirators

Headley's second trip to Mumbai occurred from approximately February through May 2007. As instructed, Headley took more video and photos of the Taj Mahal. Headley also made surveillance footage of the Oberoi Hotel, although he was not instructed to do so, because of its proximity to the Taj Mahal hotel.

When Headley returned to Pakistan after the second trip to Mumbai, he met first with Major Iqbal. Headley provided Major Iqbal with two memory cards, one containing videos of Mumbai, and the other containing videos of a different location. Major Iqbal and Headley also discussed Headley's acquaintance with Raja Rege (a prominent member of the Shiv Sena party) and Rahul Bhatt (a prominent actor in India and the son of a well-known film-maker in Bollywood, a term for the Indian film industry). Headley explained that he had befriended these individuals. Major Iqbal requested that Headley get closer to Shiv Sena, possibly by joining the organization, and suggested that Headley stay engaged with these people.[16] Soon thereafter, Major Iqbal returned the memory card with videos of Mumbai to Headley. Headley then met with Sajid, Muzzammill, and Abu

---

[16]    In a recorded conversation which is more fully set forth below, Headley and the defendant discussed both Bollywood and Shiv Sena as "targets" for potential attack.

Qahafa. Headley provided Sajid with the memory card and debriefed the group on his surveillance in Mumbai. Later, after Sajid had the opportunity to watch the videos made by Headley, they met to discuss the videos. They discussed entrance and exit points from the Taj Mahal hotel, as well as the jewelry store located in the hotel. Sajid instructed Headley to make additional video of the jewelry store.

Headley kept the defendant informed of his activities in Mumbai. In or around June 2007, after his trip to Mumbai and to Pakistan, Headley returned to Chicago and met with the defendant. Headley told the defendant about some of his activities in Mumbai, including taking video surveillance of the Taj Mahal hotel. Further, Headley related to the defendant his discussions with Sajid and Major Iqbal, and described their reaction to the work that Headley was performing. Headley also explained that he had befriended in Mumbai an individual associated with the Shiv Sena political party. Headley believed the Shiv Sena party to be anti-Muslim. Headley talked with the defendant about organizing a fundraiser for Shiv Sena in Chicago as a way to strengthen Headley's ties with this individual. The defendant did not object to organizing this fundraiser.

After visiting Chicago, Headley traveled to Pakistan, where he met with Major Iqbal and Sajid on several occasions. Major Iqbal asked Headley to obtain a schedule of conferences to be held at the Taj Mahal hotel. He also gave Headley a cell phone that could record video and instructed him on how to surreptitiously use it, which Major Iqbal referred to as "clandestine photography."

### 3. Third Surveillance Trip to Mumbai & Subsequent Discussions with Coconspirators

In or about September 2007, Headley made his third trip to Mumbai to conduct surveillance. During this trip, as instructed, he took further surveillance of several locations, including the Taj

Mahal.  Headley also visited the Indian National Defense College based on a previous instruction from Pasha.

Headley returned to Pakistan in approximately November 2007.  While in Pakistan, Headley met with Major Iqbal several times.  As with the previous meetings, Headley debriefed Major Iqbal on his surveillance activities and provided him with a memory card containing the most recent videos.  Major Iqbal gave Headley approximately $20,000 worth of Indian currency for his expenses in India.  Major Iqbal told Headley that once the attack on the Taj Mahal was complete, he wanted Headley to travel to Delhi, India, to perform surveillance of military facilities, again using an office of First World Immigration as a his cover.

Headley also met several times with Sajid while he was in Pakistan.  During one of those meetings, Zaki, Abu Qahafa, Muzzammill and a person who Headley believed to be a member of the Pakistani military were also present.   During that particular meeting, they discussed potential landing sites for a team of attackers who would arrive in Mumbai by sea.  Zaki stated that he wanted the attackers to land directly in front of the Taj Mahal hotel, but Headley advised that this landing site was too dangerous given the close proximity of Indian military to the hotel.  Zaki responded by stating that despite the danger, "I see it happening."  Another landing site approximately 40 miles outside of Mumbai was also discussed, but Sajid objected because of his concern that the attackers would be unable to find their way to Mumbai.  Ultimately, Zaki instructed Headley to return to Mumbai and conduct additional surveillance of potential landing sites.

Before returning to Mumbai, Headley again met with Sajid and Abu Qahafa (as well as one other Lashkar member), during which they reviewed Google Earth images of the waters surrounding Mumbai. Headley later was provided a GPS device.  Both Sajid and Abu Qahafa showed Headley

how to record locations with this device. Once again, Headley was provided with instructions as to the specific areas that he was to record.

### 4. Fourth Trip to Mumbai & Subsequent Discussions with Coconspirators

In or about April 2008, Headley returned to Mumbai. As instructed, he conducted surveillance of potential landing sites, and took boat rides around the Mumbai harbor, using the GPS and making videos. Headley also performed surveillance of the Chhatrapati Shivaji Terminus (CST) train station. Additionally, based on instructions from Major Iqbal, Headley visited a nuclear power plant in India to conduct surveillance. After completing these surveillance activities, Headley returned to Pakistan and met with Zaki, Sajid, Abu Qahafa, and another Lashkar member. Abu Qahafa downloaded the contents of the device and used Google Earth to view images of the locations. Headley recommended a landing point for the attackers near a small fisherman's bay on the coast of Mumbai. Headley further recommended that, after landing, the attackers could use taxis to reach their attack locations. Zaki again expressed his preference that the attackers land right in front of the Taj Mahal hotel. Sajid told Headley that the attack would have to wait until September at the earliest when the waters between Pakistan and India would be calmer. As before, Headley also reported to Major Iqbal about what he had done, also providing to him copies of videos that he had made. Further, Headley related to Major Iqbal the discussions that he had with Lashkar regarding the planning of and preparation for the attacks.

In or about the summer of 2008, Headley traveled to Chicago and stayed with the defendant. Headley described to the defendant the surveillance that he had conducted, including the Taj Mahal hotel and train station. Headley told the defendant about his boat trips, as well as the meetings with

Sajid and others regarding the attackers' planned ingress by sea and the recommended landing points. Headley told the defendant about Zaki's idea of having the attackers land in front of the Taj Mahal hotel. Headley told the defendant planned attacks in Mumbai were being delayed to wait for calmer waters. Further, Headley related to the defendant his surveillance of the nuclear power plant at Major Iqbal's instruction. The defendant told Headley that Major Iqbal had called him. Headley told the defendant about Major Iqbal's request that Headley perform surveillance in Delhi, India, and open an office of First World Immigration as cover.

Headley also kept the defendant, as well as coconspirators Major Iqbal and Sajid, apprised of his relationship with Raja Rege, a member of Shiv Sena. In May 2008, Headley and Major Iqbal engaged in an email exchange regarding Headley's friendship with Raja Rege. On May 20, 2008, Major Iqbal wrote that "what all advantages we can get from this person except strengthening our cover . . . will this all be generating any worthwhile information related to military or forces . . . is rana sahib interested and capable to handle this all." Headley also discussed Raja Rege via email with Sajid. On May 21, 2008, Sajid wrote a list of questions about Raja Rege, including "does doctor sahib knows about it and if yes What he says?" Several days later, Headley sent an email to Raja Rege telling him that he should come to America for a fundraiser.

After visiting Chicago, Headley returned to Pakistan and met several times with Sajid and Abu Qahafa. Sajid instructed Headley to return to Mumbai again and returned the GPS device to Headley. Sajid instructed him to enter the coordinates for a long list of locations that included the Taj Mahal hotel, the CST train station, the Chabad House (a Jewish community center) and the Siddi Vinayak temple. Sajid told Headley that he could not have enough video of the Taj Mahal hotel. In addition, Zaki met with Headley to give him encouragement regarding the planned attack. Zaki

told Headley that their work in Mumbai would heal the breasts of believers and give Muslims in India something to be happy about. During this trip to Pakistan, Headley also met with Major Iqbal, who provided Headley with Indian currency to use for expenses. Headley and Major Iqbal discussed closing the office of First World Immigration in Mumbai and sending Headley to Delhi to perform surveillance there.

### 5. Fifth Surveillance Trip to Mumbai & Subsequent Discussion with Coconspirators

In or about July 2008, Headley returned to Mumbai for the fifth time to carry out instructions and surveillance activities. Headley conducted surveillance of a number of locations, including the Taj Mahal hotel, Oberoi Hotel, Leopold Café, Chabad House, the train station, various potential landing sites, and a Hindu temple, where Headley purchased approximately 15 red bracelets commonly worn by followers of the Hindu faith. While Headley was performing this final surveillance in advance of the Mumbai attack, Major Iqbal attempted to contact Headley through the defendant and obtain a status on his efforts.[17] More specifically, on July 1, 2008 Major Iqbal emailed the defendant stating:

> hi how are you me iqbal friend of gallani.[18] kindly confirm me
> by return mail that you have received my mail id.

On July 7, 2008, RANA responded, stating: "Acknowledge, Dr. Rana." Major Iqbal then responded,

---

[17]     Headley has explained that while he was in India, he avoided having direct contact with his handlers in Pakistan, including Sajid and Major Iqbal, for reasons of operational security.

[18]     As noted above, "Gilani" is Headley's birth name. The FBI has assessed that "gallani" is a reference to Headley. Major Iqbal, in fact, sent an email to one of Headley's accounts (before the defendant responded), stating that he had sent this "mail id to dr tawar bu he has not yet repleyed."

"me iqbal how r u I wanted to know any progress made on the project . thanks." That same day, a message was sent from the defendant's email account to one of Headley's email account which was a copy of an older message from an unrelated individual.  Embedded in the middle of this message, however, was "me Bala Ji [dear Bala] how r u I wanted to know any progress made on the project."

Once his surveillance was completed, Headley returned to Pakistan and gave Sajid the GPS device so that its contents could be downloaded.  Headley and Sajid watched the surveillance videos together and discussed Headley's recommendations based on his surveillance.  Headley gave Sajid the approximately15 red bracelets he had purchased and recommended that the attacks wear the bracelets during the attack in order to disguise themselves.  Once the GPS was downloaded, Headley kept possession of it.  Headley also met with Major Iqbal, and again debriefed him not only on what he had done, but also his discussions with Lashkar leaders.

From July to November 2008, Headley met with Lashkar leaders, including Sajid and Abu Qahafa, several times and learned additional details regarding the planning of the attacks.  Sajid discussed ways the attackers could rob the jewelry store in the Taj Mahal hotel and how those stolen items could be taken out of Mumbai and sold.  Sajid stated that Zaki planned the Mumbai attack and wanted to control all aspects of the assault.  Sajid explained to Headley that the attackers – who were referred to as the "boys" – were training in a camp in Pakistan under Sajid and Abu Qahafa's supervision, and that Abu Qahafa was with the boys every step of the way.  Sajid told Headley that they were training 12 attackers, but only planned to use 10.  As a part of their training, Sajid told Headley that the attackers were being taught to swim and given nautical training.  Later, Sajid told Headley that six of the boys did not know how to swim and Sajid, at Headley's suggestion, bought the boys life vests.

In or around September 2008, Headley had a meeting with Sajid and Abu Qahafa (while driving within Pakistan) during which Sajid informed Headley that Lashkar had dropped earlier plans for the attackers to attempt escape, and instead decided that they would fight to the death. Abu Qahafa stated that he thought this plan was better because it would cause the boys to fight harder. Sajid explained that once the boys knew that they were going to die in the attack, Hafiz Saeed, Zaki, and others gave lectures to the boys about the glory of martyrdom. During these lectures, Saeed told the boys that being shot would feel like a pin prick, blood stains would be like rose petals, and that angels would come down to take their souls.

Sajid and Headley continued to meet throughout approximately September, October, and November, and Sajid told Headley about many of the details of the attack preparations. At one point, Sajid gave Headley a cell phone and asked him to take it as close to the Indian border as possible to test the reception. When Headley reported back that the phone got reception, Sajid told Headley that the "boys" would carry cell phones during the attack and that their numbers would be masked with some technique. During another meeting, Sajid told Headley that the "boys" would travel to Mumbai by boat and that they would over-take an Indian fishing vessel and take it to Mumbai. Sajid also told Headley that the "boys" would be using the landing point in Mumbai that Headley had suggested based on his surveillance and would find the location based on the GPS unit. In addition, Sajid told Headley that Zaki had decided to add the CST train station as a target.

During a meeting with Sajid in September, Sajid told Headley that the attack would occur on the 27th night of Ramadan, which in 2008 would occur on September 29. Around this time, Headley received a text message from Sajid stating something to the effect of "the game is afoot." After Ramadan, however, Sajid came to Headley's home in Pakistan and explained that the boat

carrying the attackers got stuck on a rock and was destroyed. Sajid told Headley that everyone on board survived, in part because they had life vests. Headley subsequently met with Pasha and told him about the failed attempt. Pasha said that the failed attempt was a sign that God was not happy with Lashkar.

Sajid told Headley that there would be a second attempt at the Mumbai attack in October 2008. Soon thereafter, Sajid told Headley that the second attempt failed. Sajid explained that Lashkar had rented a boat for the attempt. After two or three days, the attackers spotted an Indian fishing vessel and attempted to open fire on it, but the vessel escaped. Sajid said that the "boys" were demoralized and sent back to a safe house in Karachi. In or around mid-November, Sajid related to Headley that the team of attackers were in Karachi, Pakistan, readying for a third attempt at the attack on Mumbai.

### E.    The Mumbai Attacks

During the time periods between Headley's trips to Mumbai, Headley occasionally met with Pasha. Headley shared with Pasha the details of his surveillance efforts, and what he had learned of Lashkar's plans. Pasha made several comments in such discussions, including a suggestion to Headley that he encourage Lashkar to target the Chabad House.

By mid to late November 2008, Headley had learned from the defendant that he (the defendant) was planning to travel to Mumbai and Dubai. Pasha wanted to speak with the defendant about the immigration business. Knowing that Pasha would also be in Dubai, Headley arranged a meeting between Pasha and the defendant. Headley asked Pasha to warn the defendant not to return to Mumbai because he had heard from Sajid that the team of  attackers were once again readying for the attacks.

On or about November 26, 2008, Headley received a text message from Sajid with words to the effect of "turn on your t.v." Headley then learned that the attacks had begun.  After receiving the text from Sajid, Headley also told Pasha, Major Iqbal and Saulat Rana the news about the attacks starting.

Starting on November 26, 2008, ten attackers carried out multiple assaults with firearms, grenades and improvised explosive devices against multiple targets in Mumbai, India, including the Taj Mahal hotel, the Oberoi hotel, Leopold Café, the Chabad House and the CST train station. Headley had performed surveillance of each of these locations.  The attackers came ashore at a small fisherman's bay on the coast of Mumbai, the same location that Headley had recommended.  Certain attackers took taxis to reach their locations and, along the way, secreted improvised explosive devices under the drivers' seat.  Some of these devices later exploded in other parts of Mumbai. Over the course of three days, the attackers killed approximately 164 persons, including six United States nationals.

### 1.	Recorded Calls between Lashkar Controllers & the Attackers

Sajid, Abu Qahafa and another individual, Abu al Qama (identified as Lashkar Member C in the superseding indictment) directed the attackers' efforts during the assaults by maintaining telephone contact with the attackers through a voice over internet account.  The Government of India intercepted and recorded over 200 telephone conversations between this group of controllers and the attackers.  Headley has identified the voices of Sajid, Abu Qahafa and Abu al Qama in a select group of recordings played for Headley (ones in which the controllers did not identify themselves). In other recorded telephone conversations not played for Headley, a linguist has isolated the voice that Headley identified as Sajid and determined that this same individual repeatedly used the name

"Wasi" in his communications with the attackers.[19]

For example, in the following recording between an attacker at the Chabad House and a controller, Headley has identified the voice Sajid as the controller:

| | |
|---|---|
| SAJID: | Has the job been done yet or not? |
| Attacker: | Now – in front of you – that is why I was waiting for your *call*, so it is done in front of you. So, that you – |
| SAJID: | Then – |
| Attacker: | [UI] *phone* [UI] |
| SAJID: | – do it, start with Allah's name. |
| Attacker: | Yes, *hold.* |
| SAJID: | Do it, start with Allah's name. The noise is not -- |
| | [Loud blast in background] |
| SAJID: | [UI] now, it came. |
| Attacker: | *Hello* |
| | * * * |
| SAJID: | Yeah, one done so far, right? |
| Attacker: | Both, at the same time. |
| SAJID: | Both have been done? |
| Attacker: | Yes |
| SAJID: | Both of them silenced, right? |

---

[19]     Headley knew Sajid to use, "Wasi" and "Ibrahim" as nicknames. When arrested, Headley was in possession of a list of phone numbers, including one for Sajid with the name "Wasi" written next to it. Further, in email and phone communications with others, Headley referred to Sajid as "Wasi" and "Ibrahim."

| | |
|---|---|
| Attacker: | One by me, one by Umar, both at the same time. [UI] Allah is great. |
| SAJID: | Can you speak a little louder? |
| Attacker | Both of them by me and Umar at the same time with a single bullet. |

Headley has identified Abu Qahafa's voice in another recorded call with an attacker:

| | |
|---|---|
| ABU QAHAFA: | And, what is assigned to you, do it with full heart while taking out all worries. This death comes to every individual. May Allah -- |
| Attacker: | [UI] |
| ABU QAHAFA: | –meaning–that death comes for which [UI] wished [UI] from Allah. And, I think-- |
| Attacker: | Right. |
| ABU QAHAFA: | –making you understand–I am just saying everything to gain good deeds. You have read them yourselves, listened to all discussions on these, and you know about all their authenticities. In the end, may Allah give you a high rank. May he make us-- |
| Attacker: | [UI] |
| ABU QAHAFA: | –among those following behind you–while giving sacrifices. And,–take complete care of your buddy. If you get tired, go ahead and massage each other. And,–to each other–completely–make each other realize that you will stay ahead of him, and you will take more risk than him. With this, Allah's help will also come, and on the Day of Judgement, whoever gives more sacrifices will have higher ranks, by Allah's willing. |
| Attacker: | [UI] |
| ABU QAHAFA: | And, make prayer. Whatever you want to say to whomever, to a responsible one–the–without any |

hesitation.

Attacker:                    Alright, by Allah's willing.

[Voices of other individuals in background on ABU QAHAFA'S side]

ABU QAHAFA:                   And, gI've the other brothers–give the other brothers
                             my Salaam, stay strong, create strength in your words.
                             You have left this--

Attacker:                    [UI]

ABU QAHAFA:                   –world.  By Allah's willing, heaven is much better
                             than this.

Attacker:                    Alright.

ABU QAHAFA:                   And, Allah will definitely fulfill his promises, like he
                             has  fulfilled them now.

Attacker:                    Alright, give me permission–

ABU QAHAFA:                   [UI]

Attacker                     –to leave now.–

In addition, Headley identified the voice of Abu al Qama in the following excerpt from a

recorded call with two attackers, during which Abu al Qama provided instructions to the attackers,

including instructions related to contact with the media:

ABU AL QAMA:                  Peace be upon you.

Attacker:                    And, peace be upon you.  Yes, how are you?

ABU AL QAMA:                  [UI]  boy,  your  interveiw  is  being  broadcast
                             continuously. [UI] they [UI]--

Attacker:                    [UI]

ABU AL QAMA:                  [UI]

Attacker:                    Allah Almighty [UI]

37

ABU AL QAMA:      [UI]

Attacker:      –protected from [UI]

Attacker:      By Allah's willing.  It will --

ABU AL QAMA:      [UI]

Attacker:      – be more, by Allah's willing.

ABU AL QAMA:      And ... Uh how is he ... [named attacker]?

Attacker:      Thanks to Allah, he is good.  Here, talk to him.

ABU AL QAMA:      Let me.

***

ABU AL QAMA:      [named attacker]?

Attacker 2:      Peace be upon you.

****

Attacker 2:      [UI] how are you?

ABU AL QAMA:      Should we get you to speak with the media too?

Attacker 2:      Yes.

ABU AL QAMA:      Huh?

[Background Noises]

Attacker 2:      Yes.

ABU AL QAMA:      You know what questions they ask?  After one-two they ask as to what your demand is, your demand? Meaning, what is your demand?

[UI]

Attacker 2:      Right.

ABU AL QAMA:      And, one who [UI] states it all . . .

38

| | |
|---|---|
| Attacker 2: | Right. |
| ABU AL QAMA: | And, they ask questions like who are you, where are you from? Pakistan-India? And, with full confidence, say, from Hindustan's Hyderabad Deccan. |
| Attacker 2: | Right. |
| ABU AL QAMA: | Why are you hesitating from this? |
| [Pause] | |
| ABU AL QAMA: | Just like this ... when they ask as to how many people you are ... where are you? What are you doing? |
| Attacker 2: | Right. |
| ABU AL QAMA: | So, will you be able to answer these questions? Are you -- |
| Attacker 2: | [UI] |
| ABU AL QAMA: | – listening? They ask little difficult questions. |
| Attacker 2: | By Allah's willing. I will. [UI] |
| [Background noises] | |
| * * * | |
| ABU AL QAMA: | Okay, my dear, have something – recorded for your family members, some advice, something for your fellows ...[UI] – something. |
| Attacker 2: | For my house, my advice is that by Allah's willing, my martyrdom will not go to waste. Allah Almighty will reap good fruits for this. So, they have no need to be worried. -- |
| [Voices in background on Abu al Qama's side] | |
| Attacker 2: | – To my fellows, this is advised ... that it is Allah Almighty's promise that Al – he who says that our God |

39

is Allah and then stands strong by it, --

[Voices in background on Abu al Qama's side]

Attacker 2:           – he will have no fears and sadness, which I am seeing with my own eyes today.

ABU AL QAMA:       Okay, my dear, how are you feeling there?

[Voices in background on Abu al Qama's side]

Attacker 2:           Thanks to Allah, I am feeling happiness.

[Pause]

Attacker 2:           [UI]

ABU AL QAMA:       How many enemies have you killed?

[Voices in background on Abu al Qama's side]

Attacker 2:           What?

[Voices in background on Abu al Qama's side]

[Pause]

Attacker 2:           What?

[Voices in background on Abu al Qama's side]

ABU AL QAMA:       I will call you again, alright?--

Attacker 2:           [UI]

ABU AL QAMA:       – You are not to talk to the media until I tell you do so.

[Voices in background on Abu al Qama's side]

Attacker 2:           Right.

ABU AL QAMA:       Peace be upon you.

Attacker 2:           And, peace be upon you.

## 2.     Discussion Among Coconspirators After the Attacks

A few days after the attacks, Headley met with Sajid in Lahore. Sajid shared with Headley many details of the attacks. In particular, Sajid told Headley that, despite news reports, there were only 10 attackers. Sajid explained to Headley how Abu Qahafa had trained the attackers on the use of explosives and how he (Sajid) had instructed the attackers to place explosives in cabs in order to cause confusion amongst the Indian officials responding to the attacks. Sajid also told Headley that one of the attackers had been arrested and that Sajid had tried to free the attacker by instructing an attacker at the Chabad House to contact the Israeli embassy and attempt to trade hostages for the attacker. Sajid explained that he had chosen the Leopold Café as an attack location because it was close to the Taj Mahal hotel and had instructed the attackers to move to the hotel after attacking the café.

In a later meeting with Sajid, he related to Headley that certain attackers had not followed his instructions, and had failed to sink the boat that was hijacked for their ingress to Mumbai. Sajid related that one of the attackers mistakenly left on this boat a satellite phone that had been provided to him. Indian authorities located this boat, recovered this phone, and provided it to the FBI for forensic analysis. Stored in the phone's contacts were two numbers identified as "Wasi." The phone had been used to contact "Wasi" on November 24, 2008, and had recovered a call from "Wasi" on November 25, 2008.

In or about December 2008, Headley traveled to Chicago and met with the defendant. Headley told the defendant that the locations attacked in Mumbai were the same locations that Headley had scouted and video taped. Headley also told the defendant he had discovered the landing site used by the attackers. In response, the defendant told Headley that the Indians deserved

it.

Also in or about December 2008, Headley and Pasha communicated about the fact that Headley's relative in Philadelphia was interviewed by law enforcement. Headley expressed concern, considering his involvement in the Mumbai attacks. In this context, Pasha asked Headley about Rana. More specifically, Pasha asked Headley "how's the dr's [the defendant's] reaction on what all is happening, is he terrified or relaxed." Headley later responded that the defendant, was "very relaxed," and "trying to do Zihan saazi[20] stating if this happens you should act like this and if that happens you should do that and fear nothing except God."[21]

On or about September 7, 2009, Headley and the defendant took a long car ride, which was recorded and the government intends to introduce portions of the conversation at trial. During the car ride, they talked about a number of things, including the Mumbai attacks. The defendant stated that he talked with Pasha about the Mumbai attacks in Dubai before the attacks began. The defendant further stated that the nine attackers who died should receive the award called Nishan-e-Haider, which is Pakistan's highest military award for gallantry. The defendant asked Headley if he had been in contact with Sajid, and Headley confirmed that he had.[19] The defendant stated that if there were a medal for top command, Sajid should receive it. Headley related that he already had passed the defendant's compliments to Sajid. The defendant and Headley also discussed targets for

---

[20] "Zihaan saazi" is the act of one person preparing another to perform another action.

[21] As described more fully in Section IV, in that same email, Pasha and Headley discussed Headley's anticipated trip to Denmark for the purposes of the conspiracies charged in Counts Ten and Eleven.

[19] The particular communication referenced by Headley is discussed more fully in Section IV of this *Santiago* Proffer.

potential terrorist attacks, including Shiv Sena (the political party in India), Denmark, Bollywood (a reference to the Indian film industry) and Somnath (a temple in India).  Later, Headley added another potential target, the National Defense College in Delhi.

### F.     Lashkar's New "Investment" Plans for India

As described further below, Headley and Sajid continued to communicate by email throughout parts of 2009.  On or about July 3, 2009, Headley received an email from Sajid, who told Headley that he wanted to speak with him about "some new investment plans," a coded reference to the planning of another terrorist attack.  On or about July 8, 2009, Headley sent an email to Sajid that stated, in part, "[y]ou were saying all plans were 'postponed indefinitely' anyway so I thought maybe I should relax a bit."  Sajid responded, indicating in part that his plans were to "see Rahul," which was a coded reference to India, and that "matters are good enough to move forward."  Headley and Sajid continued to exchange emails throughout July 2009, with Headley asking whether the "Northern Project," another code for the planning of the Denmark attack, was still postponed and whether the "visit to Rahul's place" [India] was for "checking out real estate property like before," referring to Headley's earlier surveillance activity in Mumbai.

In March 2009, Headley prepared to return to India to carry out Sajid's instructions.  On March 3, 2009, before he left for India to continue surveillance efforts, Headley sent an email to the defendant.  Because he was concerned about returning to India so shortly after the Mumbai attacks, Headley sent a will to the defendant with instructions on how to handle his affairs if he was arrested. In response, the defendant acknowledged receipt of the will and sent a coded message directing Headley to use a different email account.  More specifically, the defendant stated:

> One of my brothers in Brigadier **Mov**adat Hussain Rana and the other is Sibte Hassan Rana **monie.**  They are in Rawalpindi.  I really admire emails making it instant half

mulaquat especially **yahoo** as it seems superior to hotmail. Talk to you later.

(Emphasis supplied). Records reveal that the mov.monie@yahoo account was created on or March

6, 2009. The account was opened under the name "Mr Mov Monie" with a date of birth of February

13, 1962, exactly one digit off from the month, date and year of the defendant's actual birth date.

Later, on March 6, Headley also emailed the defendant from this address, stating:

> Dr. Rana, I forgot to mention, Pasha seems a little upset that you may not be
> responding to his requests in a timely fashion. So please call him when you can to
> put his mind at ease. Dave.

In March 2009, Headley traveled to India, and performed surveillance of various locations

in India, including Chabad Houses and the National Defense College in Delhi. After returning to

Pakistan and debriefing Pasha on his surveillance efforts, Headley told Pasha that if they could

arrange an attack on the National Defense College, they could kill more brigadiers than had been

killed in all of the wars between India and Pakistan.

## IV. THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE CONSPIRACY CHARGED IN COUNT ELEVEN

Count Eleven alleges that the defendant conspired with Headley and others to provide

material support to the conspiracy charged in Count Ten of the superseding indictment. Count Ten

alleges that various individuals were conspiring to murder and maim individuals at a newspaper

facility in Denmark. Among other evidence of the conspiracy charged in Count Eleven, the

government intends to offer the testimony of Headley, documents and records relating to Headley's

travels to Denmark, and certain email communications and recorded conversations regarding the

conspiracy's activities related to the plot in Denmark.

The evidence, as summarized below, will establish the existence of the conspiracy charged

in Count Eleven. It further will establish that its members made statements during the course of

and in furtherance of the conspiracy. The government intends to offer the statements of the defendant, Headley, Sajid, Pasha, Saulat Rana and Ilyas Kashmiri. While many, if not most, of these statements are admissible as non-hearsay because they are not assertions of fact (*e.g.,* they are instructions, suggestions and questions), are not offered for the truth of the matter asserted, or are the defendant's own statements, the government submits that such statements may also admissible under Rule 801(d)(2)(E). To the extent that the statements outlined below are offered pursuant to Rule 801(d)(2)(E), they constitute classic examples of the information flow between conspirators.[20]

## A.  __The Denmark Plot__

Even before the Mumbai attacks took place, Sajid began planning for an attack on the Danish newspaper *Jyllands-Posten* that, in 2005, had published cartoons depicting the Prophet Mohammed. In about October 2008, in one of the only meetings in which Headley met with Sajid and Major Iqbal together, Sajid related to Major Iqbal that he had received instructions to avenge the cartoons. Major Iqbal responded that he was surprised that an attack had not happened already.

In or around November 2008, Headley met with Sajid in Karachi, Pakistan. At this meeting, Sajid instructed Headley that he was to perform surveillance in Denmark. Sajid provided Headley with information about the cartoons and Denmark, including pictures of Kurt Westergaard (one of the cartoonists) and Fleming Rose (the cultural editor), and instructed Headley to perform detailed surveillance of the facilities of the newspaper *Jyllands-Posten* in Copenhagen and Aarhus, Denmark. Sajid had a list of further instructions, and Headley took notes of what Sajid said. In December

---

[20]     Headley's statements to the defendant regarding his introduction to Lashkar members and other associates, and his training, as set forth in Section III (sub-sections A-C) are also relevant and admissible statements to prove the conspiracy as charged in Count Eleven. Those statements are therefore incorporated into Section IV by reference herein.

2008, Headley typed this list into an email with the title "Mickey Mouse," referring to the cartoons. The FBI has obtained this email. When Headley later told Sajid that he had named the project "Mickey Mouse," Sajid informed him that there was already a project underway with that name. Therefore, Sajid instead referred to the planning for the attack in Denmark as the "Northern Project."

After his meeting with Sajid, Headley informed Pasha about the assignment that he had received. Pasha suggested to Headley that if Lashkar would not go through with the Denmark attack, he knew someone who would. Pasha did not mention the person by name at that time, but Pasha previously had mentioned to Headley that he was working with a person with direct contact with *Al Qaeda*. Headley later learned that this person was Kashmiri.

In December 2008, Headley again met with Sajid and discussed a potential attack on the newspaper. Headley suggested that the attack focus on those responsible for the cartoons, referring to Westergaard and Rose. Sajid responded that "all Danes are responsible" and said that he wanted to burn down Denmark. Sajid provided money to Headley to pay for the expenses of his surveillance trip to Denmark, and read Headley a list of instructions.

### 1.    Headley Informs Major Iqbal of the Denmark Plot

After meeting with Sajid, Headley met with Major Iqbal in December 2008. He told Iqbal about his specific Denmark tasking from Sajid and Major Iqbal responded that the cartoons were an emotional issue and expressed his approval with the attack plan. Headley also told Saulat Rana about his assignment in Denmark.

### 2.    The Defendant Learns of the Denmark Plot

Headley returned to the United States later that month and stayed with the defendant in

Chicago. Once in Chicago, Headley told the defendant about his new assignment from Sajid. Headley told the defendant what Sajid had said, and informed him that he would be traveling to Denmark to visit the *Jyllands-Posten* facilities. Headley told the defendant that Sajid had given him money for expenses for the trip to Denmark. Headley also told the defendant that he had discussed his assignment with Pasha, and related Pasha's comment that if Lashkar did not go through with it, he knew someone who would. The defendant responded that he was angry about the cartoons, and this was long overdue.

### 3. The Defendant Agrees to the Cover Story in Denmark

At the end of December, the defendant traveled to Canada. At about this time, Headley exchanged a series of email communications with Pasha. In late December 2008 and early January 2009, Headley exchanged several emails with Pasha regarding his preparations. For example, on December 16, 2008, Headley emailed Pasha that he "will be going for the Mickey Mouse project in the north in the middle of next month." On December 24, 2008, Headley emailed Pasha that he was "[p]lanning for MMP" and asked Pasha to send him "info about it" on another email address. Pasha responded on December 24, 2008, stating that Headley should "try to go as early as possible to MMP." On December 25, 2008, Pasha further responded "no need to use that [email] address yet.. first u visit MMP than we will discuss and c the concerned person if needed, and if your friends decline, we'll do that."

As described more fully in Section III, in December 2008, Headley and Pasha communicated about the fact that Headley's relative in Philadelphia was interviewed by law enforcement and Headley expressed concern about the interview, considering his involvement in the Mumbai attacks. In the same email, Headley and Pasha communicated about the Denmark plot. More specifically,

47

Headley related that he needed to "consult" the defendant and noted that he will "spend a week or so the first time to get a feel of the property," referring to his anticipated trip to Denmark.

In January 2009, the defendant returned from Canada and Headley sought, and obtained, the defendant's permission to once again use the immigration business as cover for why he truly was visiting Denmark. Headley told the defendant that he would gain entry into the newspaper's facilities by expressing interest in placing an advertisement in the newspaper. The defendant told Headley that he approved of using First World Immigration as a cover in Denmark. To further this plan, the defendant and Headley went to a printing shop in Chicago, and had business cards made identifying Headley as a consultant for the Immigrant Law Center, the defendant's business.

### B. First Surveillance Trip to Denmark

In mid-January 2009, Headley visited Denmark, and performed surveillance of two separate *Jyllands-Posten* facilities. Headley took extensive video of King's Square in Copenhagen, where one of the newspaper facilities was located, as well as a parade of soldiers that marched through the streets of Copenhagen and near the newspaper facility. As planned, Headley gained access into the facility by falsely telling newspaper representatives that he wished to place an ad in their newspaper for his business.

While in Denmark, Headley exchanged emails with the defendant. In a January 20, 2009, email, out of a concern that his cover could be blown, Headley asked the defendant to contact First World employees at the Toronto and New York offices and instruct them to make sure "to remember me [Headley]" because those locations were listed on the business cards that they had created. Headley feared that a *Jyllands-Posten* representative would contact those offices. Also on that date, Headley told the defendant in an email that he would be leaving Copenhagen to:

48

go to another city in this country for my vacation. I havent decided which one, maybe arhus. So please tell ALL our offices if they receive a call about me, to please confirm my job there.

After leaving Denmark, Headley returned to Pakistan and separately met with Sajid, Major Iqbal and Pasha. Headley debriefed Sajid in detail, and showed him the video that he had taken, to which Sajid remarked that they could throw a grenade at the parade of soldiers and steal their weapons. Sajid asked Headley if a "stronghold" style of attack, similar to the Mumbai attacks, would work at the *Jyllands-Posten* building in Copenhagen and Headley said that it would. Sajid showed Headley a written report that he had prepared for Zaki concerning the planning for the attack.

Headley also showed his surveillance video to Major Iqbal, however, Major Iqbal was more concerned with the attention that the Mumbai attacks had received and instructed Headley to lay low. Headley also provided the videos to Pasha, who again sought to convince Headley to leave Lashkar and carry out the attacks with the assistance of Kashmiri instead. After talking more with Pasha over the course of a few days, Headley agreed to meet with Kashmiri. Pasha gave Headley an Al Qaeda video that discussed the cartoons and the bombing of Denmark's embassy in Islamabad.

### C.  Kashmiri's Participation in the Denmark Plot

#### 1.  First Meeting with Kashmiri

In or around February 2009, Headley, Pasha and two other individuals traveled approximately 12 hours to the FATA to meet with Kashmiri. During the car ride, Pasha told Headley that he had discussed the potential attack in Copenhagen with Kashmiri and had supplied Kashmiri with Headley's surveillance videos of Copenhagen. At this meeting, Kashmiri congratulated Headley on the Mumbai attacks. Kashmiri told Headley that he already had seen the

Denmark videos that Headley had made. Headley explained that Lashkar was interested in carrying out the attack, but Kashmiri told him that Lashkar's participation in an attack was not necessary. Kashmiri stated that the cartoons were published with malicious intent, and talked about driving a truck filled with explosives into the *Jyllands-Posten* building. Headley responded that he did not think this was the best idea and explained how to gain access to the building. After discussing the possible ways to carry out the attacks, Kashmiri told Pasha and Headley that he had the manpower to carry out the attacks.

In addition to their discussion about Denmark, Kashmiri related that the "elders" (who Headley understood to be *al Qaeda* leadership) were upset about the Israeli army's actions in Gaza the previous month. Kashmiri instructed Headley to return to India and conduct surveillance of Chabad Houses located throughout India. After the meeting with Kashmiri, Pasha related more specific instructions to Headley. Pasha identified a number of cities and location that Headley should surveil beyond the Chabad houses, including the National Defense College in Delhi. Pasha had previously told Headley that he (Pasha) had conducted surveillance of the National Defense College with Sajid years earlier. Pasha later provided about 55,000 rupees to cover the expenses of this trip.

### 2.     Lashkar Puts the Denmark Plot on Hold

While in Pakistan, Headley met separately with Sajid. Sajid told Headley that he wanted Headley to attend another three month Lashkar training course. Also at this time, Sajid informed Headley that Lashkar was putting its plan to attack the newspaper on hold because of the increased scrutiny on Lashkar after the Mumbai attacks. Upon learning this, Headley decided to focus on planning for the attack with Pasha and Kashmiri. Around the same time, Headley met with Major

Iqbal, who informed him that the investigation into the Mumbai attacks was intense.  Major Iqbal instructed Headley to remove any incriminating materials from his house, and to avoid contact with him.

### 3.     Instructions from Kashmiri Regarding the Denmark Plot

In or about April 2009, Pasha told Headley that they would be returning to the FATA to again meet with Kashmiri.  Pasha told Headley that Kashmiri had met with an associate to talk about the attack.  In May 2009, Headley, Pasha and a relative of Headley's, Saulat Rana, traveled to the FATA to meet with Kashmiri.  During a meeting with Kashmiri, he (Kashmiri) told Headley that he was eager to carry out the attacks, and instructed Headley to make contact with his (Kashmiri's) associate in Europe.  Kashmiri stated that his European associates could provide Headley with money, weapons and manpower for the attack on the newspaper.  Kashmiri provided a phone number for the associates, and stated that one of the associate's friends was willing to carry out a suicide attack.  Kashmiri told Headley to meet with them, give the friend a good pep talk and instruct him to prepare a martyrdom video.  Kashmiri told Headley that he envisioned a total of about 3 or 4 attackers taking over the second floor of the *Jyllands-Posten* facility in Copenhagen. Kashmiri  suggested that the attackers should behead hostages and throw their heads out the window, stating that this would receive great attention and would ensure that response forces would kill the attackers. Kashmiri stated that he did not want the attackers to survive.  Kashmiri provided money to Headley to cover the travel expenses of the meeting with his associates.  Kashmiri told Headley that the "elders" – who Headley understood to be Al Qaeda's senior leadership – wanted the attacks to happen as soon as possible.

In June 2009, Headley returned to Chicago and related the above-mentioned details regarding

the planning of the Denmark attack during Headley's May meeting with Kashmiri to the defendant. The defendant responded that this [referring to the attack] would be a big deal. Headley also told the defendant about his March surveillance efforts in India, including his surveillance of the National Defense College.

While in Chicago, Headley attempted to contact Kashmiri's associate, but was unsuccessful. Headley was concerned that he had the incorrect contact information for this associate and wanted to get in touch with Pasha. At around this same time, however, Headley learned that Pasha had been taken into custody by Pakistani authorities. Headley, therefore, instructed Saulat Rana, who was still in Pakistan, to make contact with an individual who could arrange a meeting with Kashmiri and then travel to meet with Kashmiri. Headley instructed Saulat Rana to tell Kashmiri about Pasha's arrest and ask Kashmiri for different contact information for Kashmiri's associate. Prior to hearing from Saulat Rana, however, Headley already had reached and spoken with this associate by telephone. Headley arranged travel to Europe to meet with Kashmiri's associate and another individual.

Around this time, the defendant was scheduled to travel from Chicago to Australia. Before he left, the defendant told Headley that his brother would be sending the defendant $5,000 for Zakat, which is the act of purifying one's wealth by donating to charity. Headley and the defendant discussed using the money for Headley's expenses in Denmark and the defendant agreed to give Headley the money for this purpose.

### D.   Headley's Second Surveillance Trip to Denmark

Later in July 2009, Headley gave the defendant the Al Qaeda video that Headley previously had received from Pasha discussing the cartoons and the bombing of the Denmark embassy in Islamabad. On July 26, 2009, Headley traveled to Europe to meet with Kashmiri's associates.

Headley told them that Kashmiri said they could provide manpower, weapons and a certain amount of money to support the attack. Kashmiri's associate told Headley that they did not have the full amount of money, but gave Headley about one-fifth of the full amount. The second associate told Headley that he knew what the target was, but did not know how they would be able to carry out an attack on the target. This second associate explained to Headley that it would be difficult to get manpower for the attack and that neither of them had access to weapons. Headley understood that this second associate would be going to visit Kashmiri and discuss the Denmark attack in further detail.

Headley then traveled to another European location to meet with a person who Pasha thought might be able to assist with the Denmark attack. This individual declined to be involved because he believed that he was under surveillance by the government. Headley then traveled to Copenhagen, Denmark, and performed additional surveillance of the *Jyllands-Posten* building, as well as other locations. Headley took video of the locations where he thought the Danes would post snipers in response to a stronghold attack. While in Copenhagen, Headley made some effort to locate Fleming Rose and Westergaard. Headley visited, but did not enter, a synagogue which he though to be attended by Rose.

On or about August 5, 2009, Headley returned to the United States. Following his return, Headley briefed the defendant in detail about his meeting with Kashmiri's associates. Headley also told the defendant about the surveillance he had completed in Denmark, including his video taping of the parade of military officers in Copenhagen.

Further, Headley continued to communicate by email with Sajid. Headley told Sajid (in code) that he had traveled to Copenhagen. On or about August 8, 2009, Headley related to Sajid that

the defendant had heard portions of the intercepted phone calls between the Mumbai attackers and the controllers (by this date, it had been revealed in open press reports that Indian authorities had intercepted these calls), and the defendant had given Sajid the name Khalid bin Waleed, which was meant to be a high compliment.[21]

In August and continuing into September, while Headley was in Chicago, Headley had several telephone conversations with Pasha. Certain of these conversations were recorded and the government intends to introduce them at trial. For example, on or about August 22, 2009, Headley spoke with Pasha by telephone, and discussed, in part, the parade of soldiers in Copenhagen that Headley had videotaped. Headley related that he spoke to a soldier and asked whether the soldiers carried real ammunition, who stated that they did. Headley told Pasha that he had related his conversation with the soldier to the defendant as well.

On or about August 28, 2009, Headley spoke with Pasha by telephone. Headley and Pasha spoke in coded language regarding the establishment of an email account. Headley told Pasha that he had formed an account on the "same system" and instructed Pasha to write his colleague's name (Haroon) and that colleague's younger brother's name (Khurram) and write "1" with it. Because of confusion over the order of words and numbers used to create this account, they actually spoke three separate times about this account.

As already discussed in part in Section III, on or about September 7, 2009, Headley and the defendant took a long car ride. During the car ride, they talked about a number of things, including the Mumbai attacks (as set forth in Section III) and other potential targets for attacks. Their

---

[21]     Khalid bin Waleed was a commander for the military forces of the Prophet Muhammed.

conversation was recorded and the government intends to introduce portions of the conversation at trial. During the car ride, the defendant stated that he talked with Pasha about the Mumbai attacks in Dubai before the attacks began.  The defendant asked Headley if he had been in contact with Sajid, and Headley confirmed that he had (referring to the above discussed email exchange).  The defendant stated that if there were a medal for top command, Sajid should receive it.  Headley related that he already had passed the defendant's compliments to Sajid, as discussed above.  The defendant and Headley also discussed targets for potential terrorist attacks, including Shiv Sena (the political party in India), Denmark, Bollywood (a reference to the Indian film industry) and Somnath (a temple in India).  Later, Headley added another potential target, the National Defense College in Delhi.

### E.    Reported Death of Kashmiri

On or about September 13, 2009, Pasha told Headley in a telephone conversation using coded language that Kashmiri had been killed.  (This report, as it turned out, was false.)  Headley and Pasha discussed that the "doctor" may have "gotten married," which was code for Kashmiri may have been killed.  Headley speculated that their planning would be suspended as a result, but Pasha disagreed.

The next day, Headley told the defendant in a phone conversation that the "doctor" may have "gotten married," using the same coded language that he had used with Pasha. The defendant responded with words to the effect that "pray that this should not have happened."

In a telephone conversation on or about September 17, 2009, Headley told Pasha that, in light of Kashmiri's reported death, they would need to return to discussing the project with Sajid, to whom Headley referred as "Ibrahim."  Headley complained that Sajid and Major Iqbal were focused

on India, stating that "their eyes are again in that direction." Pasha responded in code, using the term "investment" to refer to potential attacks.

In a telephone conversation on September 21, 2009, Pasha informed Headley that the news of Kashmiri's death was inaccurate. Headley referred to his upcoming travel to Pakistan, and asked, using code, whether he would be able to meet with Kashmiri. Pasha responded that he would, and related that Kashmiri had asked about Headley.

On October 3, 2009, as Headley was preparing to leave for Pakistan, he spoke with the defendant about setting up another coded email account. They agreed that the first portion of the name would be "liaqatwing," referring to the wing of the school they both attended, and discussed how the number that would follow "liaqatwing" would change over time based on a simple math formula that they practiced. Later that same day, Headley was arrested at O'Hare Airport as he prepared to board a flight to Pakistan. Among other items found in his possession was a memory stick containing approximately 13 short videos of the surveillance which he had performed in Copenhagen in August 2009. Further, the FBI recovered a set of notes that Headley had written for himself on the stationary of the hotel at which he stayed in Europe following his first meeting with Kashmiri's associates.

## V.     CONCLUSION

The above is an outline of the evidence that the government will introduce at trial.  The

government respectfully submits that the evidence recited above establishes by a preponderance of

the evidence that: (1) the charged conspiracies existed; (2) the defendant and above referenced

declarants were members of the charged conspiracies; and (3) their statements were made during

the course of and in furtherance of the conspiracies or are otherwise admissible.

<div style="margin-left:auto">

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s/ Daniel J. Collins
DANIEL J. COLLINS
VICTORIA J. PETERS
SARAH E. STREICKER
219 South Dearborn Street,5th Floor
Chicago, Illinois 60604
(312) 886-3482

</div>

April 11, 2011