UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | 09 CR 830 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| | ) | |
| TAHAWWUR HUSSAIN RANA | ) | **UNDER SEAL** |

**GOVERNMENT'S MOTION TO ADMIT EVIDENCE AND
RESPONSE TO DEFENDANT'S MOTION *IN LIMINE***

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully requests that this Court permit the

government to present evidence described in this motion and deny defendant Tahawwur Rana's

Under Seal Motion *In Limine*.

## I.      BACKGROUND

The second superseding indictment ("indictment") charged defendant Tahawwur Rana

("Rana") with three crimes.  First, in Count Nine, Rana is charged with conspiring with several

individuals, including David Coleman Headley ("Headley"), to provide material support and

resources to conspiracies to commit terrorist acts in India.   Second, in Count Eleven, Rana is

charged with conspiring with several individuals, including Headley and Abdur Rehman Hashim

Syed ("Pasha"), to provide material support and resources to conspiracies to commit terrorist acts

in Denmark.  The government alleges that Rana, Headley, Pasha, and others conspired to avenge the

publication of cartoons of the Prophet Mohamed by the Danish newspaper *Morgenavisen Jyllands-

Posten* ("*Jyllands-Posten*").  Third, in Count Twelve, Rana and four codefendants are charged with

providing material support or resources to *Lashkar e Tayyiba* ("*Lashkar*"), a foreign terrorist

organization.

Rana, a resident of Chicago, Illinois, owned Fist World Immigration Services ("First World"), an immigration services business. (Indictment at 2). The indictment alleges, *inter alia*, that: Headley advised Rana of Headley's surveillance of potential targets in India and Denmark and the planning of attacks in those locations (*Id.* at 4, 11, 14, 21, and 27); Headley and Rana discussed the attacks in Mumbai (*Id.* at 11, 14, 21, 26, and 29); Rana allowed Headley to use First World as a cover story for Headley's surveillance of targets in India and Denmark (*Id.* at 4, 14, 21, and 27); Rana provided Headley with false documents to support Headley's purported association with First World (*Id.* at 4, 21, and 27); Rana advised Headley regarding how to obtain a visa for travel to India (*Id.* at 5); Major Iqpal, a coconspirator, passed messages to Headley through Rana (*Id.* at 11 and 14); Rana, posing as Headley, sent an email to *Jyllands-Posten* pretending to be interested in placing an advertisement in the newspaper on behalf of First World (*Id.* at 22 and 27); and that Rana agreed to help Headley fund the attack against *Jyllands-Posten* (*Id.* at 26 and 29).

The indictment also alleges that in or about August 2008, *al Qaeda* released a video calling for further attacks against Danish interests in retaliation for the publication of cartoons of the Prophet Mohamed. (*Id.* at 19). Headley obtained a copy of this *al Qaeda* video in approximately January 2009, from co-defendant Pasha (*Id.* at 23), and Headley provided the *al Qaeda* video to Rana in approximately July 2009. (*Id.* at 25 and 28).

On October 18, 2009, the FBI executed a search warrant at Rana's residence in Chicago, Illinois. Agents seized, among other things, nine pieces of literature and media related to jihad, *Lashkar*, and/or terrorism, including: a book entitled "The Rules and Regulations of Jihad and Its Encyclopedia Islamic Jihad"; a book entitled "After Faith the Most Important and Precise Duty

Defensive Jihad Assault Against the Enemy and Recover of Occupied Muslim's Territories"; a book entitled "The Judeo-Christian Mischief and the International Jihad Movement"; an al Qaeda video entitled "Past and Present"; an al Qaeda video entitled "Denmark Embassy"[1]; and four audio recordings of religious speeches made by *Lashkar* members.

## II.   ANALYSIS

### A.   The Court Should Admit Evidence of Rana's Relationships with Headley and Pasha.

The government moves *in limine* to introduce evidence of the extensive contact between Rana and Headley and Rana and Pasha. The proposed evidence is admissible for at least two reasons. First, the evidence is admissible as direct evidence in order to establish the relationship among co-conspirators Rana, Headley, and Pasha. *See* FRE 401 and *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010) ("direct evidence of a crime is almost always admissible against a defendant."). *See e.g., United States v. Johnson*, 248 F.3d 655, 664-65 (7th Cir. 2001) (prior non-criminal acts admissible to establish coconspirators relationship and rebut defense without regard to Rule 404(b)).[2] Likewise, the evidence is admissible as direct evidence in order to rebut any defense that Rana was not friends with or had little contact with those individuals. As discussed below, this evidence is not unduly prejudicial under FRE 403.

Second, the evidence of Rana's relationships with Headley and Pasha is admissible under

---

[1] On June 2, 2008, a car packed with explosives blew up outside Denmark's embassy in Islamabad, Pakistan in an act of terrorism to avenge cartoons of the Prophet Mohamed. *See* Kim Barker, *Blasts Hits Denmark's Embassy, at Least 6 Killed By Powerful Car Bomb in Pakistani Capital*, Chicago Tribune, June 3, 2008. *See also* Indictment at 19.

[2] *Johnson* was decided using the intricately related doctrine. A doctrine no longer used in this Circuit. *See Gorman*, 613 F.3d at 718-19.

FRE 404(b) because it is offered for a relevant, non-propensity purpose, namely, the nature and

extent of Rana's relationship with both Headley and Pasha, which supports an inference that Rana

and Headley and Rana and Pasha trusted each other, and that Headley and Pasha relied on Rana's

support as a coconspirator in aiding the charged attacks.

### 1.    Rule 404(b) Legal Standard

Before discussing the non-propensity uses of this evidence in detail, the government sets

forth the applicable law on Rule 404(b).  Rule 404(b) provides a non-exhaustive list of purposes for

which evidence is admissible:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of
> a person in order to show action in conformity therewith. It may, however, be
> admissible for other purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

The Seventh Circuit has repeatedly instructed that, under Rule 404(b), evidence of other acts is

admissible so long as the evidence is not introduced to show the defendant's bad character.[3]

In explaining the scope of Rule 404(b), the Seventh Circuit has emphasized that Rule

404(b)'s purpose "is simply to keep from the jury evidence that the defendant is prone to commit

crimes or is otherwise a bad person . . . . No other use of prior crimes or other bad acts is forbidden

by the rule, and the draftsmen did not try to list every possible other use." *Taylor*, 522 F.3d at 735-

36.  Thus, Rule 404(b) permits evidence of other crimes to be introduced not only for the explicitly-

listed purposes, but also for any other relevant purpose, such as "the need to avoid confusing the

---

[3] *See, e.g., United States v. Taylor*, 522 F.3d 731, 734-36 (7th Cir. 2008) (among other examples, prior drug sales admissible to explain coded term); *United States v. Conner*, 583 F.3d 1011, 1021-22 (7th Cir. 2009) (prior drug sales admissible to show intent); *United States v. Edwards*, 581 F.3d 604, 609 (7th Cir. 2009) (prior drug sales admissible to show possession); *United States v. Canady*, 578 F.3d 665, 671-72 (7th Cir. 2009) (prior criminal uses of firearm admissible to show possession of the same firearm).

jury." *Id.* at 736. For example, in a drug case, "the fact that a defendant's buyers had dealt with him previously could explain how they were able to identify him, why they picked him for the controlled buy, and why he was willing to deal with them." *Id.* at 734.

Furthermore, although the Seventh Circuit has now criticized the "inextricably intertwined" doctrine as a basis for admitting evidence of other crimes, the Court has also held, at the same time, that "[a]lmost all evidence admissible under the 'inextricably interwoven' doctrine is admissible under one of the specific exceptions in Rule 404(b), or under the judge-made 'no confusion' exception . . . ." *Taylor*, 522 F.3d at 735; *Canady*, 578 F.3d at 672 ("almost all evidence that is admissible under this doctrine would fall within one of the exceptions in Rule 404(b), and this case is no different"). To be sure, rather than invoke a non-Rule based doctrine, applying Rule 404(b) has the virtue of focusing the analysis on non-propensity purposes and avoids the vice of the jury considering the other-crimes evidence without a proper limiting instruction. *Conner*, 583 F.3d at 1024. But evidence that would have been formerly admissible under the "inextricably intertwined" doctrine will almost always serve a non-propensity purpose and be admissible under Rule 404(b).

In admitting evidence under Rule 404(b), courts apply the following four part test: whether the evidence (1) is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) is similar enough and close enough in time to be relevant to the matter in issue; (3) is sufficient to support a jury finding that the defendant committed the similar act; and (4) has probative value which is not substantially outweighed by the danger of unfair prejudice. *United States v. Moore*, – F.3d –, 2011 WL 1405221 (7th Cir. April 14, 2011). All four factors are met here with respect to communications and contacts between Rana and Headley and Rana and Pasha.

5

2.    **Analysis Under Rule 404(b)**

a.    **The Proposed Evidence Is Offered for Non-Propensity Purposes and Is Admissible under Rule 404(b).**

In this case, the government alleges that Rana conspired to provide material support to conspiracies to commit two terrorist attacks. The government must prove that Rana joined the conspiracies, knowing or intending that the material support or resources provided, or concealed or disguised, were to be used in preparation for, or in carrying out the attacks. Seventh Circuit Committee (1999) 5.08; *Conner,* 583 F.3d at 1023 ("[b]y pleading not guilty to the charge and denying any wrongdoing," the defendant "placed the burden on the government to prove each element of the crime beyond reasonable doubt.").

Even in cases involving the admission of prior criminal acts to establish coconspirators relationships, the Seventh Circuit has found the evidence admissible. In *Conner*, the Seventh Circuit noted that "we have often found a defendant's other drug transactions relevant for purposes other than propensity, such as knowledge, intent, and lack of mistake." *Id.* Similarly, in *United States v. Gougis*, 432 F.3d 735, 743 (7th Cir. 2005), the court found that prior theft evidence "was significant to an understanding of the nature of the coconspirators' preexisting relationship and helped explain [appellant's] participation in the present conspiracy with [two of his codefendants]."[4] *See also Wantuch*, 525 F.3d at 518 (prior bad acts evidenced the coconspirators' relationship, and "outlined how the relationship of trust and cooperation between [the coconspirators] was born, developed and

---

[4] The district court in *Gougis* found that the prior theft argument was admissible under the no longer applicable "intricately related" doctrine, and in the alternative, as other acts evidence under Rule 404(b) on the issues of intent and absence of mistake. *See* 432 F.3d at 742. The Seventh Circuit did not address the Rule 404(b) finding because it found the "intricately related" doctrine as sufficient to sustain the district court. *Id.*

eventually led to their respective roles in the conspiracy.").[5]

Here, the government intends to introduce evidence of frequent contact and non-criminal conversations between Headley and Rana, during the operation of the conspiracies, in order to establish their relationship. Evidence of the existence and extent of their relationship supports an inference that Headley and Rana trusted each other, that Headley relied on Rana in planning the terrorist acts, and that Rana knowingly participated in such planning. Such evidence also rebuts Rana's anticipated defense that he was taken advantage of by Headley, or he was a mere unwitting associate of Headley. The evidence of Headley and Rana's contacts and non-criminal communications are directed at matters in issue (*e.g.* Rana's intent, Rana's knowledge, and rebutting Rana's defense(s)), and not Rana's propensity to commit the crime charged.

Similarly, the government intends to introduce evidence of emails and phone conversations between Rana and Pasha regarding various topics, including immigration, to establish the extent of their relationship. The nature and extent of these communications supports an inference that Rana and Pasha trusted each other, and that Rana knowingly joined Pasha's efforts to aid and coordinate terrorist attacks in India and Denmark. In one email, for example, Rana directed Pasha to "[d]elete this email after reading. Go and delete the 'Sent Mail' folders." (FBI_183-000559). In this email, Rana discussed student visas and problems that can be encountered if a student with a visa stops attending school. (*Id.*) Rana's "delete . . . after reading" salutation evidences an immense level of trust between Rana and Pasha. Regardless of why Rana sent the email, he knew he could trust Pasha

---

[5] *Wantuch* was decided in 2008 and used the intricately related doctrine.

to keep it confidential.[6]

Thus, the proposed evidence is directed toward establishing a matter in issue (*e.g.*, Rana's intent, Rana's knowledge, and rebutting Rana's anticipated defense of being an unwitting participant) other than Rana's propensity to commit the crime charged.

### b. The Proposed Evidence Is Relevant to Matters at Issue.

The prior acts in question – Rana's contacts and communications with Headley and Pasha – are, as just discussed, relevant to matters at issue in the trial of Rana and occurred during the pendency of the conspiracies. The Seventh Circuit has recognized:

> [T]he [similarity] test "need not be unduly rigid" and the prior and instant acts need only be "sufficiently alike to support an inference of criminal intent." The two acts must share common characteristics relevant to the purpose for which they are introduced. Thus, the term "similarity" has been loosely interpreted and loosely applied.

*United States v. Montani*, 204 F.3d 761, 768 (7th Cir. 2000). Put another way, "questions about 'how similar is similar enough' . . . do not have uniform answers; these answers . . . depend on the theory that makes the evidence admissible, and must be reached on a case-by-case basis." *United States v. Torres*, 977 F.2d 321, 326 (7th Cir. 1992), quoting *United States v. Beasley*, 809 F.2d 1273. 1277 (7th Cir. 1987).

The government's relevance theory focuses on Rana's knowledge, intent, and rebutting his defenses. Plainly, there is a sufficient nexus between the prior acts, contacts and communication between Rana and Headley and Rana and Pasha, and the government's relevance theory that Rana, a trusted confidant of Headley and Pasha, knowingly conspired with them and affirmatively

---

[6] As discussed below, the government does not intend to introduce this email (or others) as evidence that defendant Rana was involved in immigration fraud.

supported the object of the conspiracies to commit terrorist attacks in India and Denmark. Planning these criminal attacks required trust and confidence amongst the coconspirators.  Indeed, Headley, Pasha, and the other coconspirators could not rely on just any business or businessman to support and provide cover for the operations planned and carried out in India and Denmark. The government's evidence of Rana's communications with his coconspirators will establish his relationship with Headley and Pasha, which will support an inference that the coconspirators could and did trust Rana and rely on his support for their terrorist activities.

        **c.**       **The Proposed Evidence Is Sufficient to Support a Jury Finding that Rana Committed the Prior Acts.**

The government intends to prove the relationship between Rana and Headley and Rana and Pasha through various types of evidence, including:  (1) phone calls between Rana and Headley and Rana and Pasha; (2) recorded conversations between Rana and Headley; (3) emails exchanged between Rana and Headley and Rana and Pasha; and (4) the testimony of Headley. Undoubtedly, this evidence is sufficient to support a jury finding that Rana and Headley and Rana and Pasha did, in fact, have the contact and communication alleged by the government.

        **d.**       **The Proposed Evidence Has Probative Value Which Is Not Substantially Outweighed by the Danger of Unfair Prejudice.**

Finally, this Court must consider whether the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *United States v. Harris*, 536 F.3d 798, 809 (7th Cir. 2008).  Under this inquiry, the general rule is that the balance should be struck in favor of admission. *United States v. Hughes*, 310 F.3d 557, 565 (7th Cir. 2002). As the Seventh Circuit has stressed, "'most relevant evidence is, by its very nature,

prejudicial, . . . [but] evidence must be *unfairly* prejudicial to be excluded.'" *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008), quoting *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir.1995) (emphasis in original). "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Wantuch*, 525 F.3d at 518.

Here, the proposed evidence demonstrates the nature of the a relationships between Rana, Headley, and Pasha. On the other side of the balance, there is little (if any) danger of unfair prejudice. There is nothing inherently emotional or prejudicial about the volume and extent of the communications, or communications regarding immigration, visas, or general non-criminal communication between confidants, nor is there any danger of the propensity inference barred under FRE 404(b). Simply put, the nature and extent of the communications do not provide the jury an opportunity to decide the case on an emotional or improper basis. To the extent any danger of unfair prejudice exists, a limiting instruction can mitigate the danger.

For all of the foregoing reasons, this Court should admit the evidence of Rana's communications with his coconspirators.

**B.      The Court Should Reject Rana's Motion In Limine to Exclude Evidence of "Immigration Fraud."**

Rana contends, without identifying any evidence, that the government "may seek to introduce evidence suggesting that [d]efendant engaged in immigration fraud or other business misconduct through the operation of an immigration business." Contrary to Rana's Under Seal Motion *In Limine*, the government does not seek to introduce communication between Rana and Pasha that on its face evidences "immigration fraud," nor does the government intend at trial to try Rana for

immigration fraud.

As discussed at length above, the government intends to introduce contacts and communications between Rana and Pasha, consisting of emails and phone calls, concerning various topics, including immigration. The emails at issue do not patently evidence "immigration fraud or other business misconduct." If these communications are the target of Rana's Motion *In Limine*, they admittedly could be evidence of a crime, if Rana was involved in immigration fraud with Pasha. The substances of these communications, however, provide the jury no opportunity to conclude that Rana and Pasha were engaged in immigration fraud. The jury would need more information and context in order to make such a decision. The government will offer no evidence to prove or suggest that these communications evidence prior or contemporaneous fraudulent activity.

To the extent Rana seeks to bar evidence of "business misconduct," his claims must be rejected. As clearly articulated in the indictment, the government contends that Rana misused his business to create cover for Headley's surveillance and travel. Rana, among other things, created (or had created) false documents and allowed Headley to open a clandestine surveillance outpost in Mumbai under the guise of a legitimate immigration business. Rana's misuse of First World to provide cover to Headley is direct and relevant evidence of overt acts in furtherance of the conspiracies and of the material support Rana provided to *Lashkar*. *See* Fed R. Evid. 401 and 402. Accordingly, the "business misconduct" evidence should be admitted over Rana's overly broad objection, and Rana's Motion *In Limine* should be denied.

### C. The Court Should Admit Videos and Pictures of the Mumbai Attacks and Deny Defendant's Motion *In Limine* concerning Graphic Depictions of the Mumbai Attack.

Rana asks this court to exclude certain "graphic depictions" of the attacks, such as "gory and gruesome depictions of the deaths during the Mumbai attack." (Rana's Motion *In Limine*, "MIL", at 2-3). The government intends to offer still photographs, overhears of calls between attackers and their handlers, maps, and similar evidence of the November 26-28, 2008, attacks in Mumbai.  The government, however, intends to offer limited evidence of the events of November 26-28, 2008, and such evidence will not exploit the death and gruesome events caused by the conspiracy.

It is well settled that the government may present the evidence of its own choice, and evidence that tells a complete story.  *See Old Chief v. United States*, 519 U.S. 172, 187-88 (1997) (presenting a stipulation or admission may fail to meet jurors' expectations, and "a party seemingly responsible for cloaking something has reason for apprehension, and the prosecution with its burden of proof may prudently demur at a defense request to interrupt the flow of evidence telling the story in the usual way.").  As outlined above, "relevant evidence is, by its very nature, prejudicial," yet it must be "*unfairly* prejudicial to be excluded." *Vargas,* 552 F.3d at 557. Courts determine unfair prejudice by asking whether the jury will be induced "to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Wantuch*, 525 F.3d at 518.

The government has alleged that Rana participated in a sophisticated, international conspiracy to provide material support to the Mumbai attacks in November 2008.  More specifically, the government has alleged that Rana, who was aware Headley and *Lashkar* were planning attacks, established an immigration office to give Headley cover, and advised Headley on obtaining a visa to travel to India, passed messages to Headley, all done to further the conspiracy's objective.

None of the proposed evidence will be gruesome in nature. The government intends to admit certain evidence of the Mumbai attacks, including photographs, and overhears of phone calls between attackers and their controllers. The proposed evidence will allow the government to establish the scope, breadth, and sophistication of the attacks. This evidence further supports an inference that the attacks were the result of material support provided by an elaborate, international conspiracy, and that the attacks required intensive planning, scouting, and coordination.

Moreover, the government has alleged that following the Mumbai attacks, Rana continued to conspire to materially support terrorism, this time in Denmark. In particular, the government alleged that: in December 2008 and January 2009, Rana was advised by Headley of the plan to attack the *Jyllands-Postens* facility in Copenhagen, and Rana approved Headley using First World to assist in performing and as cover for, this activity (Indictment at 21 and 27); in January 2009, Rana and Headley had business cards made that identified Headley as a representative of First World (*Id.*); on or about January 29, 2009, Rana, posing as Headley, sent an email to the *Jyllands-Posten* pretending to be interested in placing an advertisement in the newspaper (*Id.* at 21, 22, and 27); in later summer 2009, Rana agreed to help Headley fund the plot to attack the *Jyllands-Posten* newspaper in Copenhagen (*Id.* at 19 and 26); and in September 2009, Rana spoke with Headley about the purported death of coconspirator Ilyas Kashmiri ("Kashmiri") and the implications of his death would have on the plan to attack the *Jyllands-Posten* in Copenhagen (*Id.*).

Rana engaged in each of the above-listed activities following his knowledge of the Mumbai attacks.[7] The atrocious nature and scale of the Mumbai attacks garnered intense international media

---

[7] Rana supported the conspiracies to commit terrorist acts in both India and Denmark in generally the same manner: by, *inter alia*, knowingly permitting his business, First World, to be used as cover for Headley's surveillance. Thus, evidence of Rana's conspiracy to provide material support to the

coverage. This proposed evidence will also support an inference that Rana knew and intended to materially support the Copenhagen attacks, because following the Mumbai attacks he, at a minimum, knew that Headley, Pasha, Lashkar, and other coconspirators had the means and desire to carry out international terrorism. Moreover, this proposed evidence further rebuts Rana's anticipated defense of lack of knowledge, being taken advantage of, and/or being an unwitting associate of Headley.

While this evidence is undoubtedly prejudicial, it is not unfairly so. Accordingly, the evidence should be admitted, and Rana's Motion *In Limine* should be denied.

### D. The Court Should Admit the Books, Audio Recordings, and Videos Found in Rana's Home, and Deny Rana's Motion *In Limine*.

The government intends to introduce limited portions of certain books, audio recordings, and video found in Rana's home. Rana asks this Court to bar the evidence because it is "irrelevant" to the crimes charged and unfairly prejudicial. (MIL at 3-6). Rana's claims lack merit, and the evidence should be admitted as direct evidence of Rana's knowledge, intent, and motive.

As discussed above, the government must prove that Rana joined two conspiracies, knowing or intending that the material support or resources provided, or concealed or disguised, were to be used in preparation for, or in carrying out attacks in India and Denmark. (Indictment Counts Nine and Eleven). The government must also prove that Rana knowingly supported Lashkar, a foreign terrorist organization. (Indictment Count Twelve). Based on the nature of the charges, Rana's intent, knowledge, and motive are at issue. Any evidence the government submits to prove Rana's knowledge, intent, and motive will necessarily be unpleasant and involve religiously motivated

---

conspiracy in Mumbai would be admissible even in a trial of only the Denmark conspiracy (Count Eleven) under a number of the exceptions to Rule 404(b), as discussed above, including plan, knowledge, identity, *modus operandi*, and absence of mistake or accident.

14

terror.

Rana's possession of the books, audio recordings, and videos found in his residence (including, a book entitled "The Rules and Regulations of Jihad and Its Encyclopedia Islamic Jihad," a book entitled "After Faith the Most Important and Precise Duty Defensive Jihad Assault Against the Enemy and Recover of Occupied Muslim's Territories," a book entitled "The Judeo-Christian Mischief and the International Jihad Movement," a video entitled "Past and Present," a video entitled "Denmark Embassy," and four audio recordings of religious speeches made by *Lashkar* members) support an inference that he understood Islamic terrorism, and more specifically, he understood Islamic-terrorists' efforts to avenge the Prophet Mohamed cartoons published by *Jyllands-Posten*. These materials are admissible as direct evidence under Federal Rules of Evidence 401 and 402, as this evidence makes it more probable that Rana: understood the efforts and purpose of attacking Denmark and avenging the cartoons; was willing to provide cover to Headley's espionage of the *Jyllands-Posten* facility; sent an email to the newspaper to assist Headley's surveillance; and that Rana otherwise assisted the conspiracy. Moreover, Rana's possession of the Denmark Embassy video supports an inference that Rana was upset about the cartoons, and that he understood the effort to avenge the purported blasphemy. Rana's possession of the Denmark video also partially corroborates his statements (to Headley and law enforcement) about the cartoons. (*See* Gov. Santiago Proffer at 47 and 52; Amended Complaint at ¶114).

In *United States v. Hammoud*, the Fourth Circuit determined that video tapes regarding Hezballah found within the defendant's apartment were not unduly prejudicial. *Hammoud*, 381 F.3d 316, 340-42 (4th Cir. 2004), vacated on other grounds by 543 U.S. 1097 (2005), relevant portions reinstated by 405 F.3d 1034 (4th Cir. 2005). The court noted that the government had to

15

"demonstrate that [the defendant] knew of Hizballah's unlawful activities, and the contents of the videos were probative evidence of Hammoud's knowledge." *Id.* at 342. The court further noted that "there was no less prejudicial alternative for the Government in proving [the defendant's knowledge] of Hizballah's activities." *Id.*

Similarly, in *United States v. Salemah*, the Second Circuit held that the admission of a document entitled "Facing the enemies of God," among other pieces of evidence, found within the defendant's residence was not unduly prejudicial. *Salemah*, 152 F.3d 88, 110-11 (2d Cir. 1998). The court held that, "[a]lthough it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted." *Id.* 111. The court also held that "evidence that provides background information necessary to the jury's understanding of the nature of the conspiratorial agreement properly is admitted 'to furnish an explanation of the understanding or intent with which certain acts were performed.'" *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).

In addition, in *United States v. Belfast*, the Eleventh Circuit upheld the admission of rap lyrics found in the defendant's luggage at the time of his arrest. *Belfast*, 611 F.3d 783 (11th Cir. 2010). The defendant was the son of former Liberian president Charles Taylor and headed Liberia's Anti-Terrorism Unit ("ATU"). *Id.* at 793. The defendant was charged with committing torture in Libera and illegally using firearms. *Id.* at 799. The Eleventh Circuit found the lyrics probative of the defendant's association with the ATU and continued membership with ATU. *Id.* The court noted that both of those facts were "relevant to the indictment's allegation that [the defendant] was associated with the ATU." *Id.* The court also found them probative because of the defendant's attack on the credibility of a government witness who testified about the defendant's control over the ATU.

16

*Id.  See also United States v. Vosburgh*, 602 F.3d 512, 537-38 (3d Cir. 2010) (images of legal child erotica were probative as they suggested the defendant had a sexual interest in children and disproved that the defendant unknowingly possessed illegal child pornography, and the risk that the material was unduly prejudicial was low because the district court offered a limiting instruction).

Accordingly, this Court should admit the books, audio recordings, and videos recovered from Rana's residence, and this Court should deny Rana's Motion *In Limine*.  Rana's concern of an undue prejudicial effect will be avoided by the limited nature of this evidence.

Moreover, to the extent Rana purports to lack knowledge of these books, recordings, and videos, has alternative interpretations of the Urdu used in the materials, or he used the materials for innocuous or academic pursuits, Rana will have the opportunity to cross the government's witness(es), through whom the evidence is offered, and he will have an opportunity to present evidence regarding the materials in his case in chief.

## III.    CONCLUSION

For the reasons set for above, the government respectfully requests that this Court grant its motion to admit evidence under Rule 404(b) and as direct evidence and deny the defendant's motion *in limine*.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s/ Sarah E. Streicker
DANIEL J. COLLINS
VICTORIA J. PETERS
SARAH E. STREICKER
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604