UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  09 CR 830 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| TAHAWWUR HUSSAIN RANA | ) | |

## GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT

The United States of America, by and through its attorney, Gary S. Shapiro,

Acting United States Attorney for the Northern District of Illinois, respectfully submits

the following Objections to the Presentence Report:

### Introduction

The first step in the sentencing process is a proper calculation of an advisory

Sentencing Guideline range.  The government proposed to the Probation Department

a conservative calculation of the applicable guideline range.[1]  The government

submitted that the correct offense level is 46 and the correct criminal history category

is VI, which produces a range of life before consideration of the statutory maximum

sentences for the counts of conviction.  Once the statutory maximums are considered,

the correct advisory guideline range is reduced to 360 months' imprisonment.  USSG

§ 5G1.1.  While disagreeing with the government on two issues, the Probation

---

[1]     While it is appropriate for the court to consider acquitted conduct where, as
here, it has been proven by a preponderance of the evidence, the guideline sentencing range
in this case far exceeds the statutory maximum of 30 years' imprisonment even without
considering that the evidence proved that defendant joined the conspiracy charged in Count
Nine, knowing that his support was used to bomb and kill as charged in Counts One and
Two. *United States v. Waltower,* 643 F.3d 572, 574 (7th Cir. 2011).

Department also concluded that the applicable guideline range is 360 months' imprisonment.

Title 18, United States Code, Section 3553(a) sets forth the factors to consider when determining a sentence that is sufficient, but not more than necessary. District courts, while not bound by the Sentencing Guidelines, must take them into account in calculating a defendant's sentence. *See Booker v. United States,* 543 U.S. 220, 250 (2008). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). As described in its separate filing addressing the § 3553 factors, the government submits that, under the circumstances of this case, the sentence recommended by the correctly calculated guidelines – 30 years' imprisonment – is supported by the § 3553 factors and will achieve the goals of sentencing.

## ANALYSIS

### I. The Proper Calculation of Rana's Guideline Range

#### A. Base Offense Levels

Probation correctly determined the base offense levels applicable to Counts Eleven and Twelve to be 33 and 26, respectively. PSR, ¶¶46, 56. Further, Probation correctly determined that the specific offense characteristics of Count Twelve required a 2-level enhancement for an adjusted offense level of 28. PSR, ¶57. The defendant has not objected to these calculations.

### B. Terrorism Enhancement (Guideline §3A1.4)

The government submits that the 12-level enhancement provided for in Guideline § 3A1.4 is applicable to defendant's sentence on both Count Eleven and Count Twelve. The Probation Officer agreed with respect to defendant's conviction for providing material support to Lashkar (Count Twelve), a conclusion supported by overwhelming evidence. PSR, ¶ 58. Although finding that the terrorism enhancement arguably applied to defendant's conviction for conspiring to provide material support to the conspiracy to commit terrorist acts in Denmark (Count Eleven), the Probation Officer declined to apply the enhancement to Count Eleven in order to "err on the side of being conservative." PSR, ¶ 50. The government objects to the Probation Officer's conclusion as to Count Eleven. The evidence proved that defendant's support of the conspiracy to commit a terrorist attack in Denmark – an attack that defendant knew would result in the gruesome death of Danish people and a stronghold fight to the death between Danish forces and the attackers – was calculated to retaliate against the Danish government for its actions (or inactions) with respect to the publication of the Prophet Mohammad cartoons and to influence or affect the Danish government through acts of violence.

### 1. Legal Standard

The Guidelines require a twelve level increase in the offense level and an adjustment to criminal history category VI where the defendant's offense "is a felony that involved, or was intended to promote, a federal crime of terrorism." Guideline § 3A1.4. The terrorism enhancement applies because defendant's crimes were felonies

3

that each involved "a federal crime of terrorism." The term "federal crime of terrorism" is defined by statute as an offense that is a violation of one of a number of specified statutes (including 18 U.S.C. §§ 2339A and 2339B) and that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* 18 U.S.C. § 2332b(g)(5); Guideline § 3A1.4, Application Note 1 ("federal crime of terrorism has the meaning given that term in 18 U.S.C. § 2332b(g)(5)"); *see also United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009).

Thus, in order to apply the enhancement, the Court first must consider whether defendant's crimes were violations of any of the specified statutes listed in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) expressly identifies both statutes that defendant was found guilty of violating (18 U.S.C. §§ 2339A and 2339B) as offenses supporting the terrorism enhancement. As such, there is no question that defendant's convictions were for crimes that may trigger the application of the terrorism enhancement. *See Ashqar*, 582 F.3d at 825.

Having satisfied the statutory threshold, the Court next must determine if the preponderance of evidence demonstrates that either or both of defendant's offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Ashqar*, 582 F.3d at 824 (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011). In analyzing whether defendant's crimes were "calculated to influence or affect the conduct of government by

4

intimidation or coercion, or to retaliate against government conduct," the Court's analysis "focuses on the intended outcome" of defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115 (citation omitted); *see also Awan*, 607 F.3d at 317 (calculated means "planned – for whatever reason or motive – to achieve the stated object.").

Accordingly, courts have applied the terrorism enhancement in material support cases where the defendant: (a) knew that the objective of the terrorist group or plot he supported was to influence, affect, or retaliate against the conduct of government through violence; and (b) intended that the support he provided to the terrorist group/plot would be used toward that end. *See, e.g., Awan*, 607 F.3d at 317 (where defendant was convicted of violating 18 U.S.C. § 2339A, terrorism enhancement was applicable because evidence proved that defendant knew the objective of the terrorist group he supported was to influence the Indian government through violence and knew that the money he provided to the group would be used toward that end; the fact that defendant lacked any political motivation to influence the Indian government was irrelevant); *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

In making this determination, the Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence. *United States v.*

*Mohammed*, 693 F.3d 192, 201-202 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in the record–which Mohammed does not dispute he made–from which it [the district court] drew plausible inferences."); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of the terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). In addition, the Court should identify the evidence supporting the Court's conclusion with respect to the application of the terrorism enhancement. *See Chandia*, 675 F.3d at 334 (*citing Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008)) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").[2]

As to Count Eleven, the evidence demonstrated beyond a preponderance that defendant knew the objective of his co-conspirators was to retaliate against and influence the Danish government for its perceived role in the publication of the Prophet Mohammed cartoons, and defendant intended that the support he provided would be used toward that end. *Awan*, 607 F.3d at 317. Further, as to Count Twelve, the evidence similarly demonstrated beyond a preponderance that defendant knew the goal of Lashkar was to retaliate against and influence the Indian and Danish governments,

---

[2] The Seventh Circuit has yet to consider whether a sentencing court must make specific factual findings in order to apply the terrorism enhancement. For the purposes of this sentencing memorandum only, the government assumes that the Seventh Circuit would follow the guidance set forth by the Fourth Circuit on this issue in *Chandia*.

6

and defendant intended that the support he provided would be used toward that end. *Id.* Thus, the Court should apply the 12-level enhancement to both counts of conviction.

### 2. The Terrorism Enhancement Applies to Count Eleven

### a. The Prophet Mohammad Cartoons

By way of background, a Danish newspaper published cartoons depicting the Prophet Mohammad in or about September 2005. *See* Stipulation No. 9. In February 2008, the same newspaper, the *Jyllands-Posten,* re-published at least one of the cartoons. The publication of the cartoons set off protests at Danish embassies, Danish businesses, and other places around the world. For example, the cartoonist, Kurt Westergaard has been threatened and attacked as a result of the cartoons. *See* "'South Park' and the Informal Fatwa," Ayaan Hirsi Ali, Wall Street Journal (Apr. 27, 2010) (attached hereto in GX Articles). These threats and acts of violence have affected the Danish government in that it is estimated that the Danish government has spent millions of dollars protecting his safety. *Id.*

The outrage in response to the cartoons has extended far beyond the cartoonist for the *Jyllands-Posten.* Soon after the cartoons were published in 2005, the Prime Minister of Denmark, Anders Fogh Rasmussen, issued a statement in response to a letter from ambassadors to Denmark from various Middle Eastern countries defending the freedom of expression and emphasizing that the Danish government does not influence the press. *See* Letter from Anders Fogh Rasmussen, Oct. 21, 2005 (attached hereto in GX Articles). The press reported that Prime Minister Rasmussen also

refused to meet with the ambassadors, stating that "I won't meet with them because it is so crystal clear what principles Danish democracy is built upon that there is no reason to do so." *See* "After the Danish Cartoon Controversy," Middle East Quarterly (Winter 2007) at 4; *see also* "Anatomy of the Cartoon Protest Movement," Washington Post (Feb. 16, 2006) at 2 (attached hereto in GX Articles).

In defending the freedom of expression, and not stopping the publication and re-publication of the cartoons, the Danish government was viewed as supporting and, at the very least, failing to act, against the cartoons. Indeed, protests of Danish interests around the world started in early 2006 and intensified after the cartoons were republished in 2008. For example, Danish businesses were boycotted in the Middle East, resulting in severe losses to Danish businesses. *See* "South Park and the Informal Fatwa," Ayaan Hirsi Ali, Wall Street Journal (Apr. 27, 2010); *see also* "Cartoon Row Hits Danish Exports," BBC News (Sept. 9, 2006) (attached hereto in GX Articles). Danish flag burnings, riots, and violent acts against Danish interests occurred around the world. *See* "After the Danish Cartoon Controversy," Middle East Quarterly, at 4-5 (Winter 2007) (in 2006, Muslim protesters torched Denmark's embassies in Beirut and Damascus, "[s]everal Muslim countries officially endorsed a boycott of Danish goods launched by religious organizations. Protestors from Gaza to Jakarta burned Danish flags and effigies of Rasmussen [the Danish Prime Minister]."). Protests occurred at Danish embassies in Iran, Syria, Lebanon, and other countries. *See id.*; "Muslim Cartoon Fury Claims Lives," BBC News (Feb. 6, 2006) (attached hereto in GX Articles). In Syria, protestors called for the Danish ambassador to leave

the country and set fire to the Danish Embassy. *See* "Anatomy of the Cartoon Protest Movement," at 7; *see also* "Bin Laden Threatens Europe Over Muhammad Cartoons," The Washington Post (March 20, 2008) (Bin Laden warned Europeans that they will face a "severe reckoning" for repeatedly publishing the Prophet Mohammad cartoons).

Most notably, on June 2, 2008, a suicide car bomb attack occurred at the Danish Embassy in Islamabad, Pakistan, which killed at least six people. *See* "Al-Qaida claims it attacked Denmark Embassy," NBC News.com article, www.msnbc.msn.com/id/24976215. News reports of the incident indicated that Al-Qaida issued a signed statement taking credit for the attack, and stating that the attack was carried out by an al-Qaida martyr and that Pakistani jihadists helped to prepare and execute the plot. The statement said that the attack was carried out to fulfill the promise of Osama bin Laden to exact revenge over the reprinting in the Danish newspapers of the Prophet Mohammad cartoons in February 2008. As discussed in more detail below, defendant had in his living room in Chicago a video glorifying this deadly attack and calling for further revenge on the people of Denmark. GV Exhibit Denmark Video.[3]

Against this backdrop, and just months after the attack on the Danish Embassy in Pakistan, defendant began conspiring to support the next deadly, terrorist plot against Denmark in retaliation for the Prophet Mohammad cartoons.

---

[3] Exhibits with the prefix "GV" were attached to the Government's Version of Offense Conduct.

### b. The Objective of the Conspiracy Was to Retaliate Against "All Danes" and the Danish Government

The evidence demonstrated beyond a preponderance that defendant's conduct in conspiring to provide material support to the conspiracy to commit terrorist acts in Denmark was calculated to influence or affect the Danish government or to retaliate against the Danish government. As a starting point, the Court can conclude that defendant knew that he was providing material support to a conspiracy that had the purpose of committing violent, terrorist acts in Denmark in order to retaliate against, as well as influence and affect, the government of Denmark. Indeed, the jury instructions for Count Eleven required that, in order to convict the defendant of that count, the jury find that defendant became a member of the conspiracy "knowing or intending that the material support or resources provided, or concealed or disguised, were to be used in preparation for, or in carrying out," the conspiracy to murder and maim in Denmark. R. 284 at 26. The instructions further required that, in order to find the defendant joined the conspiracy, the government had to prove that defendant was aware of its purpose and willingly participated in it. R. 284 at 27.

Thus, in convicting defendant of Count Eleven, the jury necessarily concluded that defendant knowingly and willingly joined the conspiracy to provide material support to the conspiracy to commit murder in Denmark and that defendant did so knowing and/or intending that such material support be used to prepare for or carry out violent, terrorist acts in Denmark. The jury's verdict was amply supported by the evidence presented at trial, as already set forth at length in the government's Response

10

to Defendant's Motion for Judgment of Acquittal, R. 325 at 4-24, and the Court's Opinion denying defendant's Motion for Judgment of Acquittal, R. 332 at 10-14.

That the purpose of the planned attack on the *Jyllands-Posten* facility in Denmark was to retaliate against the conduct of the Danish government with respect to the publication of the Prophet Mohammad cartoons, and influence the Danish government by violence, was made clear by the totality of the evidence presented.

Indeed, the principal architects of the planned attack in Denmark – Sajid Mir (on behalf of Lashkar) and Ilyas Kashmiri (on behalf of al Qaeda and HUJI) – both made statements clearly reflecting the purpose of the attack went far beyond retaliation against the newspaper. Specifically, in December 2008, just after the deadly attacks in Mumbai, Sajid Mir ordered Headley to travel to Denmark to perform surveillance for yet another attack, this time in Denmark. Tr. 325. When it was suggested that only the cartoonist and the editor of the *Jyllands-Posten* be targeted, Sajid quickly rejected this suggestion. *Id.* Sajid made clear that the intent behind the attack was to affect the entire nation of Denmark by telling Headley, "all Danes are responsible for this [the cartoons]." *Id.*

Kasmiri shared Lashkar's view that the attack go beyond the newspaper employees. After learning in approximately May 2009 that Lashkar was putting its plans for the terrorist attack in Denmark on hold indefinitely, Headley met with Kashmiri to discuss the planned attack. Tr. 424, 433. Headley already had shared with Kashmiri surveillance video of various locations around Copenhagen, including the nearby Danish military forces. Kashmiri explained to Headley that he did not

11

want the attackers to simply kill newspaper employees. Instead, Kashmiri planned that the attack be a "stronghold" option in which the attackers overtook the building and then fought to the death against the responding Danish forces. Tr. 434. Kashmiri, in fact, wanted the attackers to behead hostages and throw the heads onto the street for the very purpose of heightening the response from Danish authorities. Tr. 435.

Thus, in the eyes of the defendant's co-conspirators, the purpose of the attack was not limited to the particular Danish civilians who printed the cartoons. Although the Danish government did not print the cartoons, the fact that the cartoons were allowed to be published in 2005, re-published in 2008, and freedom of the press and speech were supported by the Danish government, was viewed by defendant's co-conspirators as a failure by the Danish government to take action. Accordingly, Lashkar and Kashmiri's planned attack on the *Jyllands-Postens* was designed to retaliate against "all Danes."

   c. **Defendant Intended that the Support he Provided to the Plot to Attack the *Jyllands-Posten* Be Used Towards Lashkar and Kashmiri's Aim to Retaliate Against the Danish Government**

The evidence proved by a preponderance that, in knowingly supporting the conspiracy to commit violent, terrorist acts in Denmark calculated to influence, affect, or retaliate against the Danish government, defendant intended for the support he provided to be used towards that end. The evidence of defendant's intent includes defendant's own statements. For example, in late 2008, Headley and the defendant met in Chicago to discuss the attacks in Mumbai, as well as Headley's new assignment

for Lashkar. Tr. 334. Headley told the defendant about his conversations with Sajid, including the instruction to go to Denmark and gather information for an attack. Tr. 353-54. Defendant was happy to hear of Headley's mission and told Headley that an attack in Denmark in retaliation for the Prophet Mohammad cartoons was "long overdue." Tr. 353-354. Notably, defendant supported Headley's mission for Lashkar in Denmark already knowing the horrific results of Lashkar's work in India.

Later, when Headley told defendant about Kashmiri's gruesome plan to make sure that the attackers fought to the death with Danish forces, defendant responded "good" and words to the effect that "this would be a huge event in the media." Tr. 438. Importantly, defendant already knew the intended effect and result of getting the media to cover a "stronghold" terrorist attack. The Mumbai attacks, where attackers set up a stronghold at the Taj Mahal Hotel and the Chabad House and engaged the responding Indian forces over the course of days, was a huge event in the media. In a recorded conversation, defendant reveled at the fact that the attack had struck:

> . . . a fear in the hearts of Indians. Anything could happen, anywhere. Whatever has happened here [Mumbai], can happen with anyone at anytime. Every person has become fearful of Pakistan.

GX TR 09/07/2009F at 19. Moreover, during a recorded conversation with Headley just weeks prior to his arrest, defendant and Headley referred to the "target" of the planned attack as "Denmark," making clear that defendant's support of the planned attack was calculated to retaliate against and influence the government of Denmark. GX TR 09/07/2009E.

During his October 2009 post-arrest interview with law enforcement, defendant

13

acknowledged that he was aware that a newspaper in Denmark had published cartoons depicting the Prophet Mohammad and expressed his strong disagreement with the cartoons. *See* GX Post-Arrest.[4] Defendant stated that there was "a resentment in the whole world" to the cartoons. *Id.* at 56. He further stated that the cartoons "were a very bad idea," that they should never have been done because "in Islam, you shouldn't make a picture of the Prophet." *Id.* Referencing the cartoons published by the *Jyllands-Posten*, defendant stated "I would definitely condemn that." *Id.* at 61.

Defendant further acknowledged that he had discussed the publication of the cartoons with Headley and how they believed the publisher of the *Jyllands-Posten* should have refused to publish the cartoons. Indeed, defendant admitted that he knew Headley believed that those responsible for the cartoons should be "hanged," and had remarked "death to them." GX TRANA Transcript 6 (trial exhibit). Defendant even read a message that Headley had posted to a Yahoo group that stated he was disposed towards violence against the cartoonists from Denmark. *Id.*

Furthermore, defendant indicated during his post-arrest interview that he and Headley discussed that the Danish government, and not just the cartoonist and publisher, were responsible for the cartoons. Specifically, defendant and Headley discussed how a person responsible for the cartoons was "promoted" to "NATO Chief,"

---

[4] At trial, Special Agent Parsons testified regarding the defendant's post-arrest interview and several portions of that interview were admitted into evidence during Agent Parsons' testimony. *See* GX TRANA Transcripts 1-7 and GX TRANA Video. The particular portion of the post-arrest cited above was not admitted at trial and it attached hereto as GX Post-Arrest.

a decision with which they disagreed because he "did a bad thing" with respect to the cartoons. *See* GX Post-Arrest at 64. The person to whom defendant was referring was Anders Fogh Rasmussen, who, as noted above, was the Prime Minister of Denmark when the cartoons were published and was viewed by many as supporting the cartoons by defending the freedom of the press to publish the cartoons. In approximately August 2009, Anders Fogh Rasmussen became the Secretary General of NATO. Based upon this evidence, the Court can reasonably infer that defendant and Headley believed the head of the Danish government, Prime Minister Rasmussen, to be at least in part responsible for the Prophet Mohammad cartoons.

In addition to defendant's own words, his actions also prove that his crime was calculated to influence, affect, or retaliate against the government of Denmark. Specifically, defendant possessed a variety of jihadist materials in his own home in Chicago, Illinois.[5] Among these jihadist materials was a video found in defendant's living room.[6] *See* GV Exhibit Denmark Video and GV Exhibit Denmark Video Transcript. The video, which is entitled "Bombing of Denmark Embassy," explicitly calls for violent action against Denmark in retaliation for the Prophet Mohammad cartoons, and appeals directly to Muslims living in western nations, such as the defendant.

---

[5]     As discussed more fully below, during the execution of a search warrant at defendant's home, authorities also recovered four audio recordings of religious speeches made by Lashkar members and three jihadist books.

[6]     Pasha gave this video to Headley and Headley gave it to the defendant. TR. 400, 401, and 445.

The video is narrated by Abu Yahya al-Libi, an al Qaeda operational leader and spokesman. The call to action against Denmark, and other European countries, is emphasized within the first minute of the video:

> The war being fought with the Christian-Zionist enemy at present is actually a link of the war fought between truth and falsehood which has been going on since the beginning of time and will continue til eternity. . . . the publication series of the printing of the Prophet's cartoons began also, which were printed in Danish newspapers at first and then most European countries joined in this grievous sin also, on the pretext of freedom of speech and reverence for the law.

GV Exhibit Denmark Video Transcript at :30 - 1:00.

Early in the video, footage of then Prime Minister of Denmark Anders Fogh Rasmussen is featured prominently. He is quoted as defending the cartoons as an expression of the freedom of speech. The video contains footage of a full-screen Danish flag set against a background of flames.

Next, the video features the martyrdom video of the so-called "warrior of Islam" who carried out a suicide bombing on the Denmark Embassy in Islamabad, Pakistan, on June 2, 2008. GV Exhibit Denmark Video Transcript at 44:00. The suicide bomber was filmed talking about his desire to be a martyr and warning of more attacks against the people of Denmark: "I will say this to the followers of the Cross, to the people of Denmark, that by the command of Allah, this is not the first or last revenge. Allah willing, Sheikh Osama bin Laden and Muslim warriors will not let you relax." Transcript at 44:30-45:00. The video then shows a computer-generated simulation of the attack on the Danish embassy. Next, the video shows news film footage of the aftermath of the bombing, including scenes of the Danish flag being burned.

16

This video, which prominently features the Danish Prime Minister and glorifies the attack on the Denmark Embassy in Pakistan in June 2008, is compelling proof that the planned attack on the *Jyllands-Posten* was viewed as an attack against the government of Denmark. That defendant not only had this video in the living room of his home at the same time during which he was providing material support to Headley's efforts to plan a violent attack in Denmark, but also discussed Denmark as a target for attack with Headley, discussed with Headley their disagreement with the promotion of the Danish Primie Minister to NATO Chief because of his defense of free expression, and stated that a gruesome attack in Denmark was long overdue and would attract the necessary media attention to create an atmosphere of fear in Denmark, proves at the very least by a preponderance that defendant's material support of the Denmark conspiracy was calculated to influence and retaliate against the conduct of the government of Denmark through intimidation or coercion.

The Probation Office, however, concluded that, although there is information to suggest that the Danish government was blamed for not taking action with respect to the *Jyllands-Posten's* publication of the Prophet Mohammad cartoons, "it could be argued that" the "terrorist motive" of the Denmark plot was to "intimidate or coerce a civilian population, rather than to influence of affect the conduct of government or to retaliate against government conduct." PSR at ¶ 49. Therefore, "to err on the side of being conservative," the Probation Office declined to apply the terrorism enhancement.

For all of the reasons stated above, the government respectfully disagrees. As discussed above, the Court's analysis must "focus[] on the intended outcome" of

17

defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115. The defendant might claim that the attack was intended only to retaliate against the newspaper, but the statements of his conspirators – "all Danes are responsible" – the attack being planned in a way to ensure a violent clash with Danish forces, and defendant's own possessions and statements make clear that the intended outcome, or target, was "Denmark" itself and not just the newspaper. *See El-Mezain*, 664 F.3d at 571 (applying the terrorism enhancement where defendant knew that the terrorist group he supported had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal). That this same evidence could possibly support an alternate interpretation regarding the intent of defendant's crime does not negate the applicability of the enhancement. *See Mohammed*, 613 F.3d at 202 (affirming district's court's application of the terrorism enhancement, "[a]lthough Mohammed's objection [to the PSR's conclusion that the terrorism enhancement was applicable] may show that the record can support alternate interpretations"). Thus, the evidence, and reasonable inferences drawn therefrom, proves that defendant intended that the material support he provided to the Denmark plot be used towards the conspiracy's goal of retaliating against the government of Denmark and influencing and affecting Denmark through violence.

The Court should apply the terrorism enhancement to Count Eleven, and cite

the following evidence in support of its ruling[7]:

- Lashkar and Kashmiri, the planners of the Denmark attack, made clear their belief that "all Danes are responsible" for the cartoons.

- Kashmiri specifically designed the attack on the *Jyllands-Posten* in such a way to heighten the response from Danish law enforcement, namely, by beheading individuals in the *Jyllands-Posten* building and throwing their heads into the streets of Denmark. Such an attack plan evidences an intent to influence, and to retaliate against, the government of Denmark.

- Defendant was aware of Kashmiri's plans in Denmark and thought they were "good" and would result in "a huge event in the media."

- Knowing not only the gruesome violence planned in Denmark, but also the results of the deadly attacks in Mumbai, defendant conspired with Headley and others to provide material support to the Denmark plot.

- Defendant admitted that he was aware of the Prophet Mohammad cartoons published by a newspaper in Denmark and told law enforcement that he condemned the cartoons and knew that Headley wished death upon those responsible for the cartoons.

- Defendant and Headley had discussed that the head of the Danish government at the time of the cartoons' publication, Prime Minister Anders Fogh Rasmussen, should not have been selected as NATO chief because of his responsibility for the cartoons.

- Defendant expressed to Headley his belief that an attack in Denmark in retaliation for the cartoons was "long overdue."

- In discussions with Headley, defendant and Headley referred to "Denmark" as the target of the plot.

- Prior protests and terrorist attacks in retaliation for the Prophet Mohammad cartoons were directed at the government of Denmark, including the suicide bombing of the Danish Embassy in Pakistan, of which defendant was aware (*see* below).

---

[7]     *See supra* at n.2; *see Chandia*, 675 F.3d at 334 (if the sentencing court determines that the terrorism enhancement applies to a material support conviction, the court should "identify the evidence in the record that supports it determination.")

- Defendant possessed an al-Qaeda video glorifying the attack on the Danish Embassy in Pakistan in retaliation for the cartoons, and featured the Danish flag in flames, depictions of the Danish Prime Minister, and a call for revenge against the "people of Denmark."

### d. Defendant's Arguments Ignore the Totality of the Evidence

In his Position Paper, the defendant essentially asks this Court to ignore the totality of the evidence, and instead focus on one snippet of Headley's testimony, wherein he expressed that the defendants wanted to avenge the publication of the cartoons. The government does not dispute that defendant and his co-defendants wanted vengeance against the newspaper, but that is not mutually exclusive with the intent to retaliate against and influence the Danish government. As discussed above, the evidence demonstrates that the intent behind the planned attack was broader.

First, the original leader of the attack, Sajid Mir, declared that "all Danes are responsible" when it was suggested that the attack be more limited to newspaper employees. Importantly, the defendant assisted the plot *after* learning that was the leader's goal, the same leader who defendant praised and named "Khalid bin Waleed" because of his prowess in planning the Mumbai terrorist attacks.

Second, the attack plan itself was designed to ensure and heighten the response of the nearby government forces (that Headley videotaped and discussed with the defendant[8]). The plan was specifically designed as a stronghold so that government

---

[8] In a recorded telephone conversation introduced at trial, Headley related to Pasha the fact that soldiers who paraded near the newspaper building used real ammunition, and confirmed that he shared this information with Rana. Tr. 512-516.

20

forces would engage the attackers inside the facility. And the plan was specifically designed to rile up the responding forces by throwing the heads of innocent employees from the windows of the building. If the intent was just to kill the newspaper employees, there would be no need to plan the attack in such a way to make certain that the attackers would engage the Danish military; they could simply kill the employees and attempt to escape. Instead, the attack was specifically designed to influence the government and strike fear in the hearts of Danes, which the defendant knew, as reflected by his agreement with the plan and his recognition that the attack would be a huge media event.

Third, the defendant talked about "Denmark," not just the newspaper, as the "target" of the attack, and possessed a video that called for revenge against the "the people of Denmark." Defendant attempts to characterize this video as "nonsensical." The video, however, depicted the Danish flag in flames and featured not only the cartoonist, but the Prime Minister of Denmark defending the publication of the cartoons. The Prime Minister was the same Danish official who Rana admitted discussing with Headley because they believed he "did a bad thing."

In support of his argument that the terrorism enhancement should not apply, defendant has submitted a letter from Marc Sageman in which Sageman concludes that the plot against the *Jyllands-Posten* was not calculated to influence, affect, or retaliate against government conduct. The Court should give little, if any, weight to Sageman's opinion for a number of reasons. Sageman's conclusion is based entirely on one cited example (the Salman Rushdie affair) that Sageman claims fits his conclusion.

21

Sageman provides no analysis or discussion beyond this example to support his conclusion. Sageman not only fails to provide any empirical analysis to support his conclusion, but also ignores the specific facts of this case. Indeed, the facts contradict Sageman's opinion that the Denmark plot was designed only to retaliate against those who published the cartoons. As set forth at length above, these facts include Sajid's statement that "all Danes are responsible," Kashmiri's plan for attack designed to heighten the response from Danish authorities, defendant's stated desire to have the Denmark attack be a huge media event, defendant and Headley's reference to "Denmark," as the target of attack, and defendant and Headley's disagreement with the Danish Prime Minister's selection as NATO chief on account of his perceived support of the cartoons.

Finally, the defendant argues that the enhancement does not apply for a "simple reason" – the planned mass murder would be carried out at a privately-owned newspaper, not a government facility. Def. Sent. Br. 17, 27. For the terrorism enhancement to apply, however, there is no requirement that the crime take place at a particular location, and certainly not a government facility. There are numerous examples of terrorist attacks taking place at privately-owned buildings – the World Trade Center and the Taj Mahal Hotel were privately-owned buildings, yet no one can seriously question whether those heinous crimes were intended to influence the government and would deserve application of the terrorism enhancement. The location of the attack is not determinative, the intent behind the attack is. As argued above, the totality of evidence demonstrates beyond a preponderance of the evidence that the

22

intent of this terrorist plot was not just vengeance against the newspaper, but, as captured in the recording of defendant's conversation with his co-defendant, "Denmark."[9]

### 3. The Terrorism Enhancement Applies to Count Twelve

The Probation Officer correctly concluded that the terrorism enhancement applies to Count Twelve. PSR ¶ 58. As set forth below and in the Government's Version of Offense Conduct, the government agrees that the enhancement is applicable to Count Twelve and agrees that defendant's knowing support of Lashkar, an organization that he knew to be a banned terror group, is sufficient to warrant the application of the enhancement.

---

[9] If the Court concludes that the terrorism enhancement is not applicable to Count Eleven, the government respectfully requests that the Court impose an upward departure to the guideline range pursuant to Guideline § 3A1.4, Application Note 4. Application Note 4 provides that there may be cases in which an offense involved or intended to promote one of the offenses specifically enumerated by 18 U.S.C. § 2332b(g)(5)(B), "but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence of affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." In such instances, Application Note 4 counsels that "an upward departure would be warranted" and the amount of upward departure should not exceed the top of the guideline range that would have resulted if the terrorism enhancement had been applied. Here, there is no dispute that defendant's material support crimes are specifically enumerated by § 2332b(g)(5)(B); the only dispute is whether defendant's crime was calculated to influence or retaliate against government conduct or was limited only to attempting to influence or retaliate against civilian conduct. Thus, should the Court find that defendant's crime of conspiring to provide material support to the conspiracy to commit terrorist acts in Denmark was focused solely on influencing or affecting a civilian population, an upward departure consistent with Guideline § 3A1.4, Application Note 4 should be applied.

### a.   Background Regarding Lashkar

Lashkar is a militant jihadist group based in Pakistan.[10]   Tr. 71. Headley testified in detail about the Lashkar weapons and military training courses he attended, which included training in weapons such as AK-47 guns, pistols, grenades and explosives.   Tr. 73-78.   Headley told the defendant all about his training, a fact that Rana admitted in his post-arrest statement.   Tr. 1382; GX TRANA Transcript 4. Lashkar uses its weapons and trained operatives primarily to engage in violent acts intended to influence India, and more specifically, to challenge India's sovereignty over the Indian state of Jammu and Kashmir.

Lashkar's jihadist mission and ideology, however, extends far beyond Kashmir. *See*, *e.g.*, Council on Foreign Relations, Lashkar-e-Taiba, January 14, 2010 (*see* GV Exhibit Articles).   Lashkar has declared that it wages jihad in order to restore Islamic rule over India and bring about the union of all Muslim regions surrounding Pakistan.

---

[10]   Lashkar has consistently identified itself as a militant jihadist organization for more than ten years.  For instance, in 2000, Hafiz Saeed, the leader of Lashkar, was interviewed by a reporter for The New York Times.  *See* "Lahore Journal; A Jihad Leader Finds the U.S. Perplexingly Fickle," The New York Times, Oct. 10, 2000 (*see* GV Exhibit Articles).  Saeed told the reporter that Lashkar was duty-bound to "to destroy the forces of evil and disbelief" and "bring death to oppressors."  The interview was conducted in a Lashkar office in Lahore, where a poster hung declaring "destroy the nonbelievers" and showed American and Indian flags in flames.  In addition, Headley testified that he attended a speech that Saeed gave in 2000 during which Saeed discussed jihad and the merits of engaging in jihad.  Tr. at 69. Saeed continued to advance the same jihadist message twelve years later.  In April 2012, Saeed gave a speech in which he stated that the United States banned Lashkar because "we do jihad."  *See* "'We do jihad,' Says Lashkar-e-Taiba Emir Hafiz Saeed," The Long War Journal, April 12, 2012, GV Exhibit Articles. According to the article, Saeed further stated, "Osama bin Laden was a great person who awakened the Muslim world . . . Martyrdoms are not losses, but are a matter of pride for Muslims." *Id.*

*Id.* Lashkar views the United States, Israel, and India as enemies of Islam. *Id.* The United States designated Lashkar as a Foreign Terrorist Organization on December 24, 2001. *See* Stipulation 6.[11]

Reflecting Lashkar's international jihadist mission was its involvement in both the deadly attacks in Mumbai and the planning of a deadly attack in Denmark. As detailed during the trial and in the post-trial briefing, Lashkar planned and carried out the November 2008 attacks in Mumbai, India, which resulted in the murder of more than 160 people. The attacks targeted Indians, foreign visitors to India (including Americans), and Jewish people. In the aftermath of the attacks in India, Lashkar began planning its next terrorist attack, this time in Denmark. Lashkar ultimately decided not to pursue the attack in Denmark, but not before defendant provided material support to Lashkar's efforts to send Headley to Denmark to do surveillance for the attack.

### b. Defendant Supported Lashkar for Many Years

In finding defendant guilty of Count Twelve, the jury found that, beginning no later than late 2005 and continuing until October 3, 2009, defendant knowingly provided material support or resources to Lashkar, an organization that defendant either knew to be designated terrorist organization or knew to be engaging in or had

---

[11]     The United Nations declared that Lashkar was a terrorist group affiliated with al Qaida in 2005. United Nations Resolution 1526. According to the United Nations Security Council Committee, Lashkar was listed on the United Nations Al-Qaida Sanctions List on May 2, 2005 because the group engaged in terrorist activity and supported Al-Qaida and Usama bin Laden. GV Exhibit Articles.

engaged in terrorist activity. R. 284 at 34 (Jury Instructions); *see also* R. 213 at 32 (Second Superseding Indictment). The jury's conclusion that defendant knew Lashkar to be a terrorist organization or an organization engaging in terrorist activity was supported by overwhelming evidence, including defendant's own admissions.

During his post-arrest interview, defendant admitted that he knew Lashkar was an organization that was banned by the United States. GX TRANA Transcript 3. Defendant further admitted that he knew that Headley was affiliated with Lashkar for five or six years and had trained with Lashkar. GX TRANA Transcript 3. Defendant was familiar with a number of the leaders of Lashkar, including Sajid Mir and Hafiz Saeed. GX TRANA Transcript 7; GX TR 09/07/2009F at 18. Defendant was aware that Lashkar sought to influence and affect the government of India, and to retaliate against the conduct of that government – he told law enforcement that he knew that Lashkar had guns and weapons and that Lashkar was involved in a "freedom fight" against the Indian government in Kashmir. GX TRANA Transcript 4.

Defendant's post-arrest admissions about his knowledge and understanding of Lashkar were consistent with the items found in defendant's home. During the execution of the search warrant at defendant's home in October 2009, authorities recovered from defendant's home four audio recordings of religious speeches made by Lashkar members. That defendant was aware of Lashkar's ambitions beyond influencing and retaliating against the Indian government over Kashmir was further proven by other items found in his home. Specifically, authorities found the Denmark Embassy video discussed above and three jihadist books in his home, titled "The Rules

26

and Regulations of Jihad and Its Encyclopedia Islamic Jihad," "After Faith the Most Important and Precise Duty Defense Jihad Assault Against the Enemy and Recover of Occupied Muslim Territories," and "The Judeo-Christian Mischief and the International Jihad Movement." The cover of "The Judeo-Christian Mischief and the International Jihad Movement" book shows a Christian Cross and Jewish Star of David in flames. *See* GV Exhibit Book.

### c. Defendant's Material Support of Lashkar Was Calculated to Influence the Governments of India and Denmark Through Violence and to Retaliate Against the Conduct of Those Governments.

At this stage of the proceedings, there is no question that defendant knowingly supported Lashkar, a banned terrorist organization, for at least approximately four years prior to his arrest in October 2009. This alone is sufficient to warrant the application of the terrorism enhancement. *See, e.g., El-Mezain,* 664 F.3d at 571 ("To the extent that the defendants knowingly assisted Hamas, their actions benefitted Hamas's terrorist goals and were calculated to promote a terrorist crime that influenced government.") (citations omitted).

The evidence of defendant's terrorist intent, however, is much more extensive. The evidence proved that defendant intended his support of Lashkar to be used towards Lashkar's jihadist goals, and more specifically, its goal to influence and affect the governments of India and Denmark through violence, and retaliate against the governments of India and Denmark. In fact, defendant admitted to law enforcement that he was aware of Lashkar's goal to influence and retaliate against the conduct of

27

the government of India with respect to the Kashmir area. Specifically, defendant admitted to law enforcement that he had conferred upon Sajid the name "Khalid bin Walid," a famous Muslim general in Islamic history, because of Sajid's "very successful" Lashkar operations. GX TRANA Transcript 7. Defendant stated that he conferred this title on Sajid because defendant understood that Sajid was responsible for training Pakistani people for the "liberation of Kashmir" and "also that they can [be] freedom fighters." *Id.*[12]

In addition to his statements to law enforcement, defendant's statements to Headley reflect his support of Lashkar's goal to influence and retaliate against the government of India through violent means. For example, upon learning the details of Lashkar's gruesome attacks in Mumbai, defendant told Headley, "they [the Indians] deserved it." TR 349-350. Later, on September 7, 2009, when defendant mistakenly believed no one was listening, defendant told Headley that the Mumbai attacks successfully caused:

---

[12] Notably, the United States Treasury Department recently added Sajid Mir to its list of "Specially Designated Nationals" based upon his leadership position with Lashkar. *See* August 30, 2012 US Treasury Anti-Terrorism Designations (*see* GV Exhibit Articles); *see* August 13, 2012 Treasury Department Press Release (GV Exhibit Articles). The Treasury Department found that Mir was Lashkar's "project manager" for the Mumbai attacks, provided guidance to the attackers and directed the execution of hostages taken during the attack, and direction the surveillance conducted by Headley. *See* GV Exhibit Articles (Treasury Press Release). As a result of Treasury's Designation, Sajid Mir's assets are blocked and United States persons are generally prohibited from dealing with Sajid. Additionally, in April 2012, the State Department posted a $10 million reward on its Reward for Justice website for information leading to the arrest of Hafiz Saeed, the head of Lashkar. *See* Reward for Justice (GV Exhibit Articles). Saeed was previously named as a Specially Designated National by the Treasury Department. *See id.*

> . . . a fear in the hearts of Indians. Anything could happen, anywhere. Whatever has happened here [Mumbai], can happen with anyone at anytime. Every person has become fearful of Pakistan.

GX TR 09/07/2009F at 19. Defendant was happy about the fear Lashkar struck in the hearts of the Indian people and defendant expressed his belief that the nine attackers who were killed during the attacks should be given a medal. GX TR 09/07/2009F at 10-11. Defendant further stated that Sajid should receive a "medal for top class" on account of doing a "good job" with the Mumbai attacks, and Headley confirmed that he already had passed along this message to Sajid from the defendant. *Id.* at 12.

As already detailed above in the discussion regarding Count Eleven, defendant also agreed with Lashkar's desire to retaliate against Denmark for its actions and inactions with respect to the publication of the Prophet Mohammad cartoons. *See supra* pages 10-23. Knowing that Lashkar believed "all Danes" were responsible for the cartoons, defendant supported Headley's work on behalf of Lashkar to plan the terrorist attack in Denmark. Stated another way, in conspiring to support Lashkar's efforts to plan an attack in Denmark, defendant intended that his support be used by Lashkar to retaliate against the conduct of Denmark and to influence or affect the conduct of the Danish government by violence.

Thus, based on all of the evidence detailed above, the Court should find that defendant's material support of Lashkar was calculated to influence or affect the governments of India and Denmark through intimidation and coercion, and to retaliate against the conduct of those governments. The government respectfully submits that the Court identify the evidence on which the Court relies in making this determination,

including:

- Defendant admitted to law enforcement that he knew Lashkar was banned by the United States and knew that Headley had been involved with Lashkar for years and had trained with Lashkar.

- Defendant knew that Lashkar had guns and weapons and that Lashkar was involved in a "freedom fight" against the Indian government in Kashmir.

- Defendant admitted to law enforcement that he had conferred upon Sajid the name "Khalid bin Walid," a famous Muslim general in Islamic history, because of Sajid's "very successful" Lashkar operations. Defendant understood that Sajid was responsible for training Pakistani people for the "liberation of Kashmir" and "also that they can [be] freedom fighters."

- Defendant knew Lashkar had carried out mass murder in Mumbai for the purpose of influencing India by violence and agreed with Lashkar's actions, stating that they caused "a fear in the hearts of Indians. Anything could happen, anywhere. Whatever has happened here [Mumbai], can happen with anyone at anytime. Every person has become fearful of Pakistan."

- Lashkar made clear its belief that "all Danes are responsible" for the cartoons. Knowing that the deadly attacks in Mumbai were perpetrated by Lashkar, defendant continued to support Lashkar in its plot to carry out an attack in Denmark.

- After learning of Lashkar's assignment to Headley to perform surveillance for an attack in Denmark, defendant expressed to Headley his belief that the an attack in Denmark in retaliation for the cartoons was "long overdue."

- In discussions with Headley, defendant and Headley referred to "Denmark" as the target of the plot to avenge the Prophet Mohammad cartoons.

- Prior protests and terrorist attacks in retaliation for the Prophet Mohammad cartoons were directed at the government of Denmark, including the suicide bombing of the Danish Embassy in Pakistan.

- Defendant had in his home jihadist books and a jihadi video calling for

30

revenge against the "people of Denmark."

### d. The Acquittal on Count Nine Does Not Limit the Jury's Finding on Count Twelve

As to Count Twelve, the defendant again argues that the Court should ignore the totality of the evidence. The indictment charged that starting in 2005, defendant began providing material support to Lashkar e Tayyiba, knowing that it was a terrorist organization or had engaged in terrorism. Among other evidence, the government introduced defendant's own admissions that he knew Lashkar was designated as a terrorist organization and had engaged in attacks in Kashmir against the Indian government. Further, defendant admitted that he knew Headley was working for Lashkar for five to six years prior to 2009. The government presented extensive evidence regarding the ways in which Rana assisted Headley's work for Lashkar over those years. The jury heard this evidence, and found him guilty of Count Twelve.

Defendant, however, argues that the acquittal on Count Nine somehow means that this Court should just ignore the evidence of Rana's material support of Lashkar from 2005 to 2008, before the conspiracy to commit murder in Denmark began. This is factually and legally incorrect. The charge in Count Nine was not limited to whether defendant provided material support to Lashkar, as charged in Count Twelve. Count Nine was much more specific, alleging that defendant conspired to provide material support to one of two conspiracies – the conspiracy to bomb places of public use and to commit murder in India. As to Count Nine, the jury was specifically instructed that they must find beyond a reasonable doubt that defendant became a member of the

31

conspiracy *knowing or intending* that the material support provided was to be used in preparation for or the carrying out of either the conspiracy to bomb or the conspiracy to murder, each of which was separately defined. Further, the jury was instructed that they must be unanimous as to which conspiracy he joined. Based on these instructions, defendant specifically argued the evidence did not prove beyond a reasonable doubt that defendant *knew* the details of Lashkar's plans to bomb and commit murder in India during the November 2008 attacks. For example, defendant repeatedly argued that his travel to Mumbai right before the attack showed that he did not know the details of the attack plans.

In contrast, as to Count Twelve, the jury was instructed that defendant was guilty if defendant provided material support to Lashkar and knew that it was a terrorist organization. The government presented overwhelming evidence of these points. The government was not required to prove that defendant knew the specific details of what operations Lashkar was planning, as was required for Count Nine. Thus, the defendant's argument that the Court must now ignore the substantial evidence of defendant's material support of Lashkar going back at least to 2005, when he admitted that he knew Headley was working for Lashkar, is without factual or legal merit.

The fact that the indictment and the bill of particulars alleged that Rana provided material support in the same methods as to Counts Nine and Twelve does not mean that the charges became inter-changeable. They were distinct charges. The jury properly was instructed to consider each count separately, and they clearly did so.

32

Whereas the jury may have found that the evidence did not prove beyond a reasonable doubt that Rana knew the details of the bombing plot when he made "personnel" available to Lashkar or provided "expert advice" so as to convict him on Count Nine, the jury properly found that this same support was provided by Rana to Lashkar when he knew it was a terrorist organization so as to convict him on Count Twelve.

Thus, neither the jury's verdict, nor the indictment and bill of particulars, provide a basis to ignore the evidence of defendant's support of Lashkar going back to 2005 in determining the applicability of the terrorism enhancement to Count Twelve. *Awan*, 607 F.3d at 317 (terrorism enhancement was applicable because the evidence proved that defendant knew the objective of the terrorist group he supported was to influence the Indian government through violence and knew that the money he provided to the group would be used toward that end). Defendant provided material support to Lashkar from at least 2005 through October 2009, a time period during which Lashkar was a designated foreign terrorist organization. The indictment alleged as much, and the jury properly found defendant guilty of Count Twelve based on the evidence presented.

### C. The Evidence Does Not Support a Role Adjustment

Probation correctly concluded that the evidence did not support a role adjustment pursuant to Guideline § 3B1.2 as to Counts Eleven and Twelve. PSR, ¶¶ 50-53, 59. A defendant bears the burden to demonstrate by a preponderance of the evidence that he is entitled to a minimal or minor participant adjustment. *United States v. Garcia,* 580 F.3d 528, 538 (7th Cir. 2009). The Sentencing Guidelines define

a "minimal" participant as one who is "plainly among the least culpable of those involved in the conduct of a group." Guideline § 3B1.2, cmt., n. 4. The Sentencing Commission has expressly stated its intent "that the downward adjustment for a minimal participant will be used infrequently." *Id.* A "minor" participant, on the other hand, is one "who is less culpable than most other participants, but whose role could not be described as minimal." Guideline § 3B1.2, cmt. n. 5.

The Seventh Circuit has made clear that a "defendant who was an essential part of a conspiracy does not merit a role reduction simply because other members of the conspiracy were more involved." *Garcia,* 580 F.3d at 538. Further, the Seventh Circuit has directed that the court must evaluate the defendant's role against the average participant, "not the leaders." *United States v. Deck,* 2012 WL 2680815, at *1 (7th Cir. July 6, 2012); *United States v. Leiskunas,* 656 F.3d 732, 739 (7th Cir. 2011); *United States v. Sorich,* 523 F.3d 702, 717 (7th Cir. 2008).

In denying a role reduction, Probation reasoned that defendant played a "significant role in the offense in that he directly assisted Headley," and noted various steps taken by the defendant to effectuate his part in the conspiracy. PSR, ¶52. Thus, Probation correctly concluded that defendant played an essential part in the conspiracy, and deserved no role reduction. In rejecting defendant's argument, Probation correctly noted that defendant could not be compared to the leaders of the conspiracy. PSR, ¶51.

In his Position Paper, defendant puts forth several arguments to support his request for a role reduction, each of which is factually and legally unsupported. First,

as to Count Eleven, defendant argues that he was substantially less culpable based on a claim that he was kept in the dark and lacked knowledge about the scope of the plot. The evidence admitted at trial contradicts this claim. Headley testified that he continually informed defendant about his activities and his discussions with Sajid, Kashmiri and Pasha. For example, when defendant originally was informed about Headley's assignment to conduct surveillance to prepare for an attack, defendant commented that this was "long overdue." When Headley later told the defendant about the specific plan to behead hostages during the stronghold attack, Rana commented "good," and how this would be a "huge event in the media." Headley testified, and was corroborated by a recorded telephone conversation, that he informed the defendant about the fact that nearby soldiers carried real ammunition. Tr. 512-516. Headley and the defendant, in fact, were even recorded talking about the status of discussions with Kashmiri and Kashmiri's UK associates. Tr. 538-40; GX TR 9/7/2009D.

In addition to being aware of Headley's discussion with other co-conspirators, Rana was fully aware of Headley's activities. The emails and testimony demonstrated that Headley stayed in contact with Rana while he was in Denmark, and requested his assistance in advancing the cover story and other tasks. Headley and the defendant were, in fact, recorded discussing "Denmark" as a "target." Tr. 543-44; GX TR 9/7/2009D. The above examples, as well as all of the evidence admitted at trial, demonstrated that defendant was intimately aware of the plot in Denmark, and thus does not qualify for a role reduction. As the Seventh Circuit has held, "[t]he fact that [the defendant] possessed such extensive knowledge of the conspiracy significantly

35

deflates the strength of his minimal-role reduction claim." *United States v. Doe,* 613 F.3d 681, 691 (7th Cir. 2010).

Instead of addressing the evidence establishing the scope of his knowledge, defendant points to the fact that Headley used a code – "Mickey Mouse" – when he communicated by email with Sajid and Pasha, both of whom were located in Pakistan, but did not use the same code when speaking in-person with Rana. The reason is simple. When the defendant and Headley spoke in person, they did not need to use code – they openly discussed the target, "Denmark." Further, there were multiple other instances of Rana using code when communicating with co-conspirators. Rana established two separate coded email accounts for communication with Headley – mov.monie@yahoo.com, and liaqatwing11@gmail.com. As to the latter, Headley and Rana were recorded discussing how they would change that address periodically according to a mathematical formula. Tr. 626; GX TR 10/03/09. Further, Rana spoke in code by telephone with Pasha on September 4, 2009. GX TR 9/04/09A, Tr. 1333. And, when Headley was in Copenhagen, he used code with Rana to discuss his activities, describing his surveillance activity as a "vacation" in one instance, describing Lashkar as the "company," and Lashkar's potential success in carrying out the attacks as getting "rich." Tr. 388, 393 and 394.

Rana also argues that he must have lacked knowledge of the plot because he did not get a souvenir hat after Headley's first trip to Copenhagen in January 2009. Following this trip, Headley returned to Pakistan (where he distributed the hats), and did not return to the United States until June 2009, five months later. This argument

is ridiculous. Far more important than a souvenir hat, the evidence demonstrated that Rana agreed to let Headley use his business as a cover story to explain his visit to Copenhagen, that Headley used the business cards that Rana had made for him to gain entry into the building, and that Headley communicated, in code, with Rana while in Copenhagen and Aarhus performing surveillance. Headley asked Rana to reach out to First World employees to make sure that the cover story was not blown, and Rana assisted in preserving the cover by posing as Headley and emailing a representative of the newspaper.

Second, as to Count Eleven, defendant argues that he did not participate in the planning of the attacks, roles that were first played by Sajid and later by Kashmiri. Sajid and Kashmiri were unquestionably leaders in the conspiracy, and, as such, it is improper to compare defendant's role to theirs. *Deck,* 2012 WL 2680815, at *2 (a "leader . . . does not provide the proper comparison"). Further, the fact that Headley was more involved in the conspiracy, actually having conducted the surveillance, does not support a role reduction for Rana because his assistance nonetheless was essential to the conspiracy. *United States v. Gallardo,* 497 F.3d 727, 741 (7th Cir. 2007) (essential member of scheme not entitled to adjustment even though others were more involved).

Third, as to Count Eleven, defendant resurrects the argument that he actually wanted to open an office in Denmark and was legitimately seeking information about advertising in the *Jyllands Posten.* As established at trial, this argument is implausible for several reasons. As defendant admitted following his arrest, he knew

37

that Headley had been working with a terrorist organization for years and had advocated lethal violence against the employees of the newspaper ("death to them"). The idea that they would patronize this newspaper was ridiculous. Further, had they truly been interested in information about advertising, there was no need to incur the expense of a cross-Atlantic flight and hotels when they could have obtained the same information with a simple phone call or from the newspaper's website. Similarly, there was no need to visit two separate locations (a fact that Headley communicated to defendant in emails) for the same newspaper to obtain the same information. There was no evidence that defendant was in touch with any attorney (as he falsely claimed to the newspaper while posing as Headley) or any clients. The government, in fact, presented evidence that there was not one call to Denmark from defendant's home or cellular phones between August 2008 and August 2009. Tr. 1313, GX U.S. Cell1, GX U.S. Cell 2, and GX AT&T 3. During that same time period, there was not one call or fax to Denmark from any of the four phone lines at defendant's business. Tr. 1313-14, GX AT&T 1, GX AT&T 9, and GX AT&T 10. Moreover, defendant stipulated that neither his name, Headley's name, or defendant's businesses were ever registered in Denmark. Stipulation No. 8. The suggestion that Sanders accompany Headley on another reconnaissance trip – whether an absurd way to provide cover or not – does nothing to contradict the overwhelming evidence of defendant's knowledge.

Lastly, as addressed above, the defendant's argument that he was convicted only for what was planned for Denmark is factually and legally incorrect. The defendant was convicted of two separate charges. As to Count Twelve, the evidence admitted at

trial, and discussed in the Government's Response to Defendant's Motion for Acquittal, demonstrates that Rana provided material support for years, going back to at least 2005. Rana repeatedly provided assistance to Headley while he conducted his surveillance work, knowing for "five to six years" that he was working for Lashkar. Considering the numerous steps taken and the extended time period during which he provided support, a role reduction is not warranted. *See Sorich,* 523 F.3d at 717 (role reduction not appropriate for a defendant who participates for years in a scheme).

### D. The Multiple Count Adjustment

The government does not object to Probation's conclusion that Counts Eleven and Twelve should not be grouped pursuant to Guideline § 3D1.2. The government recognizes that, in its version, it recommended that the counts be grouped, but recognizes that Probation is correct in concluding that the counts of conviction do not encompass the same victims.

### E. The Correct Guideline Range

After increasing Count Eleven's offense level to 45 based on the terrorism enhancement, and Count Twelve's offense level to 40 based on the terrorism enhancement, applying the grouping rules, and rejecting any role adjustment, the government submits that the correct adjusted offense level is 46, and the correct criminal history category is VI. As such, the defendant faces a guideline range of life before consideration of the statutory maximum penalties. Once the maximum penalties are considered, the applicable guideline range is reduced to 360 months' imprisonment. USSG § 5G1.1. Although Probation reached the same result by

39

different methods, the government submits that the correct guideline range is 360 months' imprisonment.

## CONCLUSION

For the foregoing reasons, the government request that the Court sustain the government's objections to the PSR, and reject the defendant objections to the PSR.

Respectfully submitted,
GARY S. SHAPIRO
Acting United States Attorney

By: /s/ Daniel J. Collins
DANIEL J. COLLINS
SARAH E. STREICKER
Assistant United States Attorney
219 South Dearborn Street,5th Floor
Chicago, Illinois 60604
(312) 886-3482

40