UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 830 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| TAHAWWUR HUSSAIN RANA | ) | |

## GOVERNMENT'S POSITION PAPER
## AS TO SENTENCING FACTORS

The United States of America, by and through its attorney, Gary S. Shapiro,

Acting United States Attorney for the Northern District of Illinois, respectfully submits

the following as its position paper as to sentencing factors:

## Introduction

The goal of the conspiracy to which Rana conspired to provide material support,

as charged in Count Eleven, was murder on a grand, horrific scale. Attackers would

storm the *Jyllands Posten* facility in the heart of King's Square in Copenhagen,

Denmark, take hostages and set up a stronghold fight to the death with Danish forces.

The plan was to behead innocent employees of the newspaper, and throw their heads

on to the street below so as to maximize the attention to and violence of this terrorist

attack. As required for a violation of 18 U.S.C. § 2339A, the jury found beyond a

reasonable doubt that the defendant joined the conspiracy charged in Count Eleven,

knowing or intending that the support provided was to be used in carrying out the

conspiracy to commit murder in Denmark. Indeed, the government introduced a

recording in which defendant discussed "Denmark" as a "target." And, when Rana

1

heard the gruesome details of the murderous plan, his stark response was telling – "good," he said, "this would be a huge event in the media."

This was not the first time that Rana applauded mass murder. After approximately 164 men, women and children were mercilessly slaughtered by the foreign terrorist organization Lashkar e Tayyiba, Rana simply stated that the victims "deserved it." Rana praised the attacks, stating in a recorded conversation that they struck "fear in the hearts of Indians." Instead of showing any compassion for the innocent victims, the defendant believed that the Lashkar leader who planned the attack and the nine Lashkar operatives who carried out the attacks, deserved medals. Lashkar, of course, was the very terrorist organization to which Rana provided material support for years. The defendant admitted that he knew Headley worked for Lashkar for five to six years before 2009, and worked to make Headley available as personnel for Lashkar, and to conceal Headley's activity, for years. For this reason, the jury properly found the defendant guilty of Count Twelve, which charged that defendant provided material support to Lashkar in violation of 18 U.S.C. § 2339B.

The goal of sentencing is to achieve a sentence that is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a). In doing so, the Court must account for a variety of factors specific to the particular defendant and the particular case. Specifically, § 3553(a) requires the Court consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offenses, to promote respect for the law, and provide just punishment for the offenses; (4) the need to afford adequate deterrence; (5) the need

to protect the public from further crimes of the defendant; (6) the properly calculated Sentencing Guideline range, and (7) the need to avoid unwarranted sentencing disparities. *Id.*

As mentioned above, the jury found Rana guilty of two separate terrorism offenses: (1) conspiring to provide material support to a plot to commit murder overseas from October 2008 to October 2009, as charged in Count Eleven (18 U.S.C. § 2339A), and (2) providing material support to the foreign terrorist organization Lashkar e Tayyiba from late 2005 to October 2009, as charged in Count Twelve (18 U.S.C. § 2339B). Far from a lapse in judgment in choosing his friends, the evidence supporting Count Eleven established that Rana was well aware of the despicable, violent aims of those he supported, and played an essential role in providing material support to the conspiracy to commit murder in Denmark. Further, the evidence supporting Count Twelve established that Rana knew he was providing material support to a banned terrorist organization. Because of the nature of defendant's offenses and the need for the sentence to reflect the seriousness of defendant's criminal conduct, promote respect for the law, provide just punishment, and to deter others from such criminal conduct, among other factors, the government respectfully submits that the Court order the sentences on Counts Eleven and Twelve to run consecutively, and impose a total sentence of 30 years' imprisonment.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

**I.     The Nature and Circumstances of Rana's Crimes (18 U.S.C. § 3553(a)(1))**

The defendant was found guilty of two separate crimes of international terrorism. As charged in Count Eleven, from October 2008 to October 2009, defendant conspired with well-known, murderous terrorists to provide material support to a plan to commit murder in Denmark, in violation of 18 U.S.C. § 2339A. Further, as charged in Count Twelve, from late 2005 to October 2009, defendant provided material support to Lashkar e Tayyiba, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Violations of § 2339A and § 2339B are distinct offenses, requiring proof of different elements beyond a reasonable doubt.

As the Court has heard much of the evidence during the trial, the government will not reiterate the details of Rana's criminal conduct.[1] In sum, the evidence demonstrated that (1) the defendant knew that he was assisting a terrorist organization and murderers, (2) knew their violent goals, and (3) readily agreed to play an essential role in achieving their aims. The nature and circumstances of defendant's crimes are a significant aggravating factor in determining the appropriate sentence.

The defendant knew with whom he was conspiring and to whom he was providing material support. In his post-arrest statement, the defendant admitted that he knew his life-long friend, David Headley, had been trained by and was working with

---

[1]     A more thorough review of the nature and circumstances of Rana's criminal activity as to Counts Eleven and Count Twelve is detailed in the Government's Version provided to Probation and attached to the PSR, as well as in the Government's Objections to the PSR, filed separately.

4

Lashkar for five to six years before defendant's arrest in 2009. The defendant knew that Lashkar was a banned terrorist organization, and knew that they were responsible for numerous terrorist attacks in India. The defendant knew the identity of the Lashkar leaders with whom Headley worked, and offered high praise for their efforts. Besides Lashkar, the defendant knew that Headley claimed to be working with ISI, and even communicated with Headley's ISI handler. And, the defendant knew that Headley was meeting and working with Ilyas Kashmiri, who has been described as a "top al-Qaeda leader," to plan the terrorist attack in Denmark. GX 9/18/09 DH/TR.

Further, the defendant knew the goals of the terrorist plot to which he provided support. As to Count Eleven, the defendant knew that "Denmark" was a "target," as was demonstrated by a recorded conversation admitted a trial. The defendant knew that the object of the conspiracy was to commit mass murder, and commented "good," when he learned that the plan was a stronghold attack, during which attackers would behead innocent employees and throw their heads on the street, which was specifically designed to encourage a fight to the death with responding Danish forces. As to Count Twelve, the defendant admitted in his post-arrest statement that he knew Lashkar was a banned organization. Further, he admitted he knew that Lashkar had guns and weapons, and had conducted attacks in India, which the defendant characterized as a "freedom fight."

Significantly, defendant agreed to assist the plot in Denmark *after* knowing the horrific results of what Lashkar and his friend already had done in Mumbai. It was

5

less than two months after approximately 164 men, women and children were slaughtered by Lashkar terrorists when the defendant agreed that Headley could, once again, use his immigration business as cover to perform the advance surveillance for yet another attack.

Knowing who his co-conspirators were and what they had done, the defendant played an essential role in providing support to their objectives, and to conceal the support that was provided. As to Count Eleven, among other steps, defendant obtained business cards for Headley and posed as Headley in correspondence with the newspaper to maintain the cover story. Headley stayed in communication with the defendant while performing the surveillance in Denmark, asking the defendant to make his travel plans and to check directories for the addresses of Rose (the editor) and Westergaard (the cartoonist). Tr. 481-83. The defendant also lied to the Consul General from Pakistan in an attempt to conceal Headley's true identity from him while obtaining a visa for travel to Pakistan.[2]

As to Count Twelve, the defendant knew, as he admitted, that Headley was trained by and was working with Lashkar for five to six years before 2009. As the jury found, the defendant provided material support to Lashkar by making personnel – Headley – available to work at its direction. The defendant knew that Headley had

---

[2]     Defendant argues that this act of deceit was not conspiratorial, but this was not the only time that defendant engaged in deceit to assist obtaining a visa for Headley to travel. In a recorded conversation introduced at trial, Headley asked defendant, "can't we give them a letter similar to the, uh, Indian embassy." GX TR 9/18/09C; Tr. 600. Headley explained that this was a reference to a June 2006 letter, falsely identifying Headley as a consultant for defendant's business, which then was used to obtain Headley an Indian business visa. GX DCH 2; Tr. 600-601.

been tasked to conduct surveillance, and had changed his name to hide his Pakistani heritage. The defendant assisted Headley in repeatedly providing false information to the Government of India, claiming that Headley was a consultant for his business and thus needed a business visa for repeated travel to India. And while the jury did not find beyond a reasonable doubt that the defendant knew the specific details of the Mumbai attacks such as to convict him on Count Nine (which charged that defendant conspired to provide material support specifically to a conspiracy to bomb and murder), there is no question that the defendant knew he was providing material support to Lashkar, as charged in Count Twelve. After all, the defendant admitted in his post-arrest statement that he knew Headley worked for Lashkar as far back as 2003 or 2004.

Throughout the course of his crimes, the defendant engaged in extensive terrorist tradecraft. For example, the defendant had numerous coded communications with Headley, as well as his co-defendant Abdur Rehman Hashim Syed (Pasha), and set up at least two coded email accounts. In March 2009, after learning the role that Headley had played in Mumbai, the defendant used fake information to establish a coded email account for Headley to use when he returned to India to conduct yet more surveillance. GX Yahoo 1; Tr. 415-17. Headley used this account, mov.monie@yahoo.com, to store the list of Chabad Houses to be surveilled. Tr. 415; GX 3/06/09 TR. On October 3, 2009, the defendant and Headley agreed to set up another coded account (liaqatwing11@gmail.com), and discussed in a recorded conversation the complicated mathematical formula used to change the account name periodically.

7

Tr. 626; GX TR 10/03/09.

Despite the overwhelming evidence and the fact that jury found him guilty of two separate terrorism offenses, the defendant argues that he is not a "terrorist" because he played only a supporting role, characterizing his efforts as nothing more than sending emails and making business cards. The intent underlying the defendant's actions, however, is the important consideration, one which the defendant fails to acknowledge or even address. As to Count Eleven, the defendant knowingly took those steps in order to assist a conspiracy to commit murder, in violation of 18 U.S.C. § 2339A. The defendant knew that innocent Danish citizens and members of the responding Danish military likely would die in gruesome fashion during the attack, and nonetheless he took steps to help make that a reality. Significantly, as to Count Eleven, the defendant took those step *after* learning that Headley's surveillance work was a key to Lashkar's "success" in carrying out the Mumbai attacks and killing approximately 164 victims. Yet, the defendant did not pause for an instant when Headley sought defendant's assistance for a *second* terrorist attack, this time in Denmark.

Further, as to Count Twelve, the defendant argues that he was not a "terrorist" even though he knew that by assisting Headley, he was assisting a banned terrorist organization. To violate 18 U.S.C. § 2339B, a defendant must provide material support, which may include personnel, with the knowledge that the organization is a designated terror organization or that the organization has engaged in terrorist activity. 18 U.S.C. § 2339B(a)(1); *Holder v. Humanitarian Law Project,* 130 S.Ct. 2705,

8

2717 (2010). As to "personnel," a defendant knowingly provides material support when he makes an individual available to work under that terrorist organization's direction or control. 18 U.S.C. § 2339B(h); *Humanitarian Law Project*, 130 S.Ct. at 2721. There is no question that the defendant knew when he assisted Headley that he was working for Lashkar (the defendant admitted it) and knew Lashkar was a banned organization (he admitted it).

Defendant's argument that the acquittal on Count Nine somehow wipes away the serious crime charged in Count Twelve is not factually or legally correct. As the Supreme Court has noted, "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities." *Humanitarian Law Project,* 130 S.Ct. at 2717. The Court further explained, "[t]he material-support statute [§2339B] is, on its face, a preventive measure – it criminalizes not terrorist attacks themselves, *but aid that makes the attacks more likely to occur*." *Id.* at 2727 (emphasis added). Thus, while the jury may have found that the defendant did not have sufficient advance knowledge of the Mumbai attacks (so as to convict him of Count Nine), his knowing support of Lashkar remains a separate, and incredibly serious, crime. In short, the nature and circumstances underlying both of defendant's crimes are a significant aggravating factor in determining the appropriate sentence.

9

## II.  Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))

The defendant repeatedly revealed his character in what he believed were private conversations.  His words and actions, many of which he tried to conceal,[3] demonstrated that he was committed to the deadly cause of the terrorists with whom he conspired and supported.  What the defendant knew about and said about these co-conspirators is telling in considering his character.

Defendant repeatedly praised Sajid Mir, the Lashkar leader who planned and coordinated the Mumbai attacks.  There is little dispute that Sajid is a despicably violent terrorist with no regard for human life.  The government, in fact, introduced at trial a recording of Sajid's communication with one of the Mumbai attackers, wherein Sajid instructed him to line up hostages and shoot them in the backs of their heads.  GX TR 11/27/08.  Defendant nonetheless admitted to law enforcement that he conferred upon Sajid the name "Khalid bin Walid," a famous Muslim general, because of Sajid's "very successful" Lashkar operations.  Further, in a recorded conversation with Headley about the Mumbai attacks, the defendant stated that Sajid should receive a "medal for top class" on account of doing a "good job."  The simple fact is that defendant knew Sajid was responsible for mass murder, and he not only supported him, he offered him high praise.

As mentioned above, defendant also knew that Headley was working with Ilyas

---

[3]      For example, when defendant establish the coded email account movmonie@yahoo.com, he provided a fake name and a false date of birth.  Further, defendant repeatedly lied to the Consul General to conceal Headley's true identity when obtaining a visa for his travel.

Kashmiri, a top al Qaeda leader.  In recorded conversations introduced at trial, the defendant and Headley talked about Kashmiri several times in the context of planning the Denmark attacks.  *See e.g.,* Tr. 538-40; GX TR 9/7/09D.  Kashmiri was a notorious terrorist. An article that Headley had provided to the defendant, in fact, described Kashmiri's role in numerous high-profile murders, kidnappings, and terrorist attacks in Pakistan and India.  GX 09/18/09 DH/TR.  The defendant nonetheless lamented the reported death of Kashmiri, stating  "pray that he didn't."  Tr. 578.  And, when the defendant learned that the reports of Kashmiri's death were wrong, his response was telling: "Wow! Great! Great!"

Moreover, defendant knew all about his life-long friend, Headley, including his training by and work for Lashkar.  In his Position Paper, defendant derides Headley for his past conduct, but the fact remains that defendant was well aware of who Headley was when he chose repeatedly to assist him in terrorist activity.  As mentioned above, the defendant did not blindly help a friend in need.  There was overwhelming evidence, including recorded conversations and defendant's own post-arrest admissions, demonstrating that defendant knew Headley was a trained terrorist plotting mass murder in Denmark and that he was working for Lashkar, and yet he still agreed to assist him.

In his Position Paper, defendant describes himself as "kind" and "compassionate."  The evidence admitted during trial belies this claim.  Knowing his friend's integral role in the Mumbai attacks, defendant has never expressed compassion for the men, women and children who were murdered.  Just the opposite.

11

Defendant believed that the innocent victims "deserved it." Tr. 349-50. Furthermore, in a recorded conversation, defendant expressed his belief that nine of the Mumbai attackers deserved one of Pakistan's highest medals. GX 09/07/2009F. In yet another recorded conversation, Rana was heard laughing when he discussed with Headley five separate targets for terrorist attacks, including "Denmark." In short, he directed praise towards the murderers and laughter at the potential victims.

Defendant repeatedly attempts to draw a contrast between Headley and himself, relying upon letters from various family members, including his wife. His wife, however, was intercepted in a recorded conversation prior to his arrest in which she expressed that Rana was just like Headley.[4] She stated, "Dawood [Headley] is absolutely crazy. . . . *Both [Rana and Headley] are alike [and] have ended up together.* They talk nonsense all day, idiots. That's not how Islam spreads! . . . Such as, '*kill him,* he is not practicing like us – *kill him,* do that to him, do this to him, he is like this – look, how that woman is – is this how Islam spreads? . . . Hatred spreads like this, not Islam." *Id.* (emphasis supplied).

Defendant also relies upon a letter submitted to the Court by defendant's consultant, Marc Sageman. Sageman claims that the defendant is not a violent person, and bases this argument on his belief that defendant was not part of "an extremist subculture preaching violence" and did not display the characteristics of a jihadist.

---

[4] This recorded call between defendant's wife and another family member includes discussion of a number of personal issues. For this reason, the government is not attaching a transcript to this filing. If the Court wishes, the government will make the entire transcript available for its review.

The Court should ascribe very little weight, if any, to Sageman's unsupported conclusion. As an initial matter, Sageman's conclusion is problematic in that it is based upon the model he developed to identify the common characteristics of individuals who engage in jihadi terrorism in the West. *See* R. 236 at 3-7 (government's motion to exclude Sageman's testimony at trial). As the Court may recall, when the government moved to exclude Sageman's testimony during the trial, the defense agreed not to elicit any testimony from Sageman about this very topic. *See* R. 276. Thus, Sageman's sentencing letter represents an attempt to get in through the backdoor opinion testimony that would not have been admissible at trial. Second, Sageman's "jihadi" model simply does not fit this case; the government has never claimed that defendant was an operational terrorist. The characteristics of an individual who wants to martyr himself in battle versus the characteristics of someone who is willing to provide assistance at a safe distance so that someone else can be violent are quite different. There is simply no reason to apply Sageman's model to a situation where there is no scientific basis to believe the model fits.

In addition, Sageman's opinion that defendant is not a violent person fails to take into account specific evidence in this case, including the jihadi books, video, and lectures found in defendant's home, defendant's praise of well-known terrorists, defendant's support of a banned terrorist organization, defendant's support of a deadly plot to murder and maim Danish people, and defendant's statement that the attacks in Mumbai successfully struck "a fear in the hearts of Indians."

Finally, the Court should give little, if any, weight to Sageman's opinion that

defendant is not a violent person because that opinion is entirely untested. Sageman's letter clearly would not stand scrutiny under Rule 702 and Rule 704(b) of the Federal Rules of Evidence and *Daubert* if presented at trial *See* R. 236. The government has no ability to cross-examine Sageman to test the validity of his theory. *Lewis v. CITGO Petroleum*, 561 F.3d 698, 705 (7th Cir. 2009) ( Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."). Although presented for purposes of sentencing, the Court should take into account the letter's lack of reliability under the Rules.

Although the defendant correctly states that he has no criminal record, the Court should not consider this a mitigating factor in determining his punishment. As noted in the Government's Objections to the Presentence Report, the terrorism enhancement under Guideline § 3A1.4 mandates that the defendant's criminal history be increased to the maximum, Category VI. This provision of the Sentencing Guidelines embodies the judgment that terrorism offenses are particularly dangerous and deserve severe punishment. Furthermore, when assessing the need to protect the public in crafting an appropriate sentence, courts have recognized that terrorists present a special risk of danger. *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.").

14

Defendant's history and characteristics are not a mitigating factor in determining the appropriate sentence.

### III. The Need to Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment for the Offenses (18 U.S.C. § 3553(a)(2)(A))

The defendant committed extremely serious crimes when he knowingly conspired to provide material support to a conspiracy to commit murder overseas, as charged in Count Eleven, and knowingly provided material support to a foreign terrorist organization, as charged in Count Twelve. Considering the seriousness of these distinct crimes, promoting respect for the law and providing just punishment are important factors in this case. As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Humanitarian Law Project,* 130 S.Ct. at 2724.

Sophisticated terrorist plots, such as the conspiracy to commit murder in Denmark, require multiple participants performing different roles. The fact that defendant played a supporting role does not make his crime any less serious. As found by the Probation Department and as argued in the Government's Objections to the Presentence Report, defendant played an essential role in advancing the plot to commit a terrorist attack in Denmark. Considering the aim of the underlying conspiracy was mass murder, there can be no question that defendant's violation of § 2339A, as charged in Count Eleven, was a serious offense requiring a substantial term of imprisonment.

Further, in enacting § 2339B as a distinct criminal offense, Congress made

specific findings regarding the serious threat posed by international terrorism. Congress determined, and the Supreme Court has recognized, that terrorist organizations, such as Lashkar, "are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct." *Humanitarian Law Project,* 130 S.Ct. at 2724 (quoting AEDPA §§ 301(a)(1)-(7), 110 Stat. 1247) (emphasis in the Court's opinion). The Supreme Court further explained that enforcing § 2339B "furthers this international effort [to combat terrorism] by prohibiting aid for foreign terrorist groups that harm the United States' partners abroad." *Id.* at 2726.

The government respectfully submits that the Court consider the seriousness of defendant's support to Lashkar, which has committed numerous acts of terrorism against the Government of India and its citizens, and others, for years.[5] Defendant reveled in the fact that Lashkar had, in the defendant's own words, struck "fear in the hearts of Indians. . . . Every person has become fearful of Pakistan." GX TR 09/07/2009F at 19. A substantial term of imprisonment, therefore, is necessary to reflect the seriousness of defendant's violation of § 2339B and to promote respect for the law.

Considering the distinct nature of defendant's crimes and the evidence that supports his guilt as to each offense, the government submits that the Court should order the sentences to run consecutively. A district court has the discretion to impose consecutive terms of imprisonment, taking into consideration the § 3553(a) factors. 18

---

[5]   The government provided an extensive background discussion of Lashkar in its Objections to the PSR, and will not restate that here.

U.S.C. § 3584; *United States v. Collins,* 640 F.3d 265, 270 (7th Cir. 2011). Indeed, the "Guidelines, in cases involving multiple counts of conviction, direct the court 'to impose maximum and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima.'" *United States v. Russell,* 662 F.3d 831, 853 (7th Cir. 2011) (quoting *United States v. Veysey,* 334 F.3d 600, 602 (7th Cir. 2003) (citing U.S.S.G. § 5G1.2(d)). As described in detail above, the defendant engaged in two separate acts of terrorism: (1) he conspired to support a conspiracy to commit a terrorist attack in Denmark, and (2) he provided material support to a terrorist organization that has terrorized India for years. Each offense is incredibly serious in its own right, and imposition of consecutive sentences is necessary to reflect that seriousness, promote respect for the law and provide just punishment for the offenses.

The evidence at trial demonstrated that starting in 2005 (when he admitted that he knew Headley was working for Lashkar), the defendant began providing material support to Lashkar in violation of § 2339B. Three years later, in October 2008, the evidence demonstrated that the defendant joined a conspiracy to commit a specific terrorist attack in Denmark in violation §2339A. While the government presented evidence demonstrating that certain members of Lashkar (Sajid and Headley) were involved in the Denmark plot, and that evidence unquestionably supports defendant's guilt as to Count Twelve, this was not the only evidence. Three years before the Denmark murder plot was even discussed, the defendant knew that Headley was working for Lashkar and defendant supported and concealed his efforts with Lashkar.

17

Further, defendant continued to assist after Lashkar backed out from the Denmark plot in early 2009, including when defendant assisted Headley during his second surveillance trip to Copenhagen in August 2009. In addition to the distinct nature of the conduct, as the Probation Department concluded, there also were separate (in addition to overlapping) victims for each offense. Consecutive sentences, therefore, will reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for defendant's crimes.

As argued above, defendant's effort to characterize the two offenses as one in the same is neither supported legally nor factually. The fact that the jury did not find beyond a reasonable doubt that defendant had sufficient advance knowledge of the underlying conspiracies charged in Counts One and Two such that defendant was guilty of Count Nine, does not erase the evidence that defendant knew, going back for years, that he was providing support to Lashkar in violation of Count Twelve. As it was instructed to do, the jury considered Counts Nine and Twelve separately, and reached a well-supported conclusion based on the evidence presented. R. 284, at 43 ("Each count and the evidence relating to it should be considered separately"). There is no basis to suggest that the jury failed to follow the instructions and combined its consideration of Counts Eleven and Twelve. *Id.* ("Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count."). Further, as to Count Eleven, the jury properly was instructed that the material support "need not have been provided to a particular or specified terrorist group." R. 284, at 29.

18

Moreover, defendant's reliance on *Rutledge v. United States,* 517 U.S. 292 (1995), a decision that he concedes has no direct application, is misplaced. Defendant's violations of § 2339A and § 2339B were distinct offenses, for which Congress intended separate punishments. Imposing concurrent sentences, as defendant requests, would undermine the seriousness of each of these offenses and fail to provide just punishment.

## IV.    The Need to Afford Adequate Deterrence (18 U.S.C. § 3553(a)(2)(B))

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence. The sentence imposed in this case needs to deter individuals from believing that they can sit at a safe distance, lend support to the violent aims of terrorists and terrorist organizations, and be free from detection or punishment. The harm that material support to international terrorism causes is of grave concern. *Humanitarian Law Project,* 130 S.Ct. at 2724 (upholding the constitutionality of §2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order.").

The defendant has failed to accept responsibility for his crimes. Perhaps more disturbing, however, is the defendant's attempt to minimize his actions, blaming them on the influence of a friend, and arguing that he merely performed menial tasks. A substantial sentence is necessary to deter individuals, like the defendant, from believing that simply because they do not pick up a gun or attend a training camp, they do not facilitate terrorism. As the Supreme Court has recognized:

'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Id.* at 2725.

## V. The Need to Protect the Public from Future Crimes by Defendant (18 U.S.C. § 3553(a)(2)(B))

Rana had seven co-defendants, only one of which (Headley), was arrested by American authorities. The evidence at trial demonstrated that the defendant had direct communications with at least two co-defendants, both of whom are at large. In particular, as the defense acknowledged at trial, Rana met in-person with Pasha (Abdur Rehman Hashim Syed) in Dubai immediately before the Mumbai attacks began, and received a warning not to return to Mumbai. Further, the government introduced emails and a recorded conversation between the defendant and Pasha. During the conversation, the defendant spoke in code, asking Pasha about whether he revealed any information to Pakistani authorities when taken into custody. The government introduced another email exchange, wherein defendant instructed Pasha to delete after reading.

Further, emails, telephone records, and other evidence established that Rana was in direct contact with Major Iqbal, whom Headley identified as an ISI officer that supported the planning of the Mumbai attacks by Lashkar. Rana, in fact, passed a coded message to Headley from Major Iqbal. The government submits that in light of the defendant's conduct, the fact that Rana's co-conspirators are still at large is an

important consideration. After all, Lashkar e Tayyiba remains an active, and deadly, terrorist organization.

The government, of course, recognizes that had the defendant never known Headley, he would not have been in the direct position that he was to provide Headley assistance. This does not change the fact that defendant made his own decision to participate in these separate criminal acts, and, once he did, did so whole-heartedly. Far from doing a favor for a friend on a single instance, the defendant repeatedly took steps to provide material support, over the course of years, to a terrorist organization and a terrorist plot. Further, as described above, the defendant had direct communication with other co-defendants beyond Headley.

The defendant has argued that because he intends to no longer talk to Headley, he should receive a lighter sentence. In making this point, the defendant again relies upon a letter written by his consultant. In this letter, Sageman claims that defendant will not re-offend because Headley will no longer be in a position to assert influence over the defendant. *See* Sageman Letter. Sageman not only is unqualified to render such an opinion, but also fails to provide any scientific or objective basis for his opinion. Indeed, nothing in the defense's previous expert disclosures relating to Sageman establish that he is qualified to present an expert opinion assessing the risk of recidivism. Without any empirical or statistical analysis to support his claim that defendant will not be a recidivist, there is no reason to credit his conclusion.

Furthermore, Sageman's basis for stating that defendant will not re-offend – i.e., because he was motivated only by a desire to help Headley and Headley will no longer

21

be in a position to assert influence over him – conflicts with the facts. As described above, the evidence proved that defendant was fully aware of the other co-conspirators and in direct contact with at least two of them, Major Iqbal and Pasha. Moreover, as discussed above, defendant repeatedly praised terrorists and murderers, and there is no evidence to suggest that the defendant has changed his views.

## VI. The Properly Calculated Sentencing Guideline Range (18 U.S.C. § 3553(a)(4))

As described in the Government's Objections to the Presentence Report, the properly calculated Sentencing Guidelines in this case recommend a sentence of 360 months. *See* Government's Objections to the Presentence Report (filed simultaneously with the instant filing). The same range of 360 months would apply even if defendant was convicted of just Count Eleven or Count Twelve. The range recommended for each count, and when combined, is significant, and reflects the Commission's judgment that terrorism offenses are particularly dangerous and deserve severe punishment. While the government recognizes that the goal of sentencing is not simply to achieve the greatest possible sentence, the sentence must account for a variety of factors specific to the particular defendant and the particular case. These factors, as described throughout, support the government's recommendation.

## VII. The Need to Avoid Sentencing Disparities (18 U.S.C. § 3553(a)(6))

In determining the appropriate sentence, § 3553(a)(6) requires the court consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). This is

a unique case, in part, because defendant was convicted of two distinct terrorism offenses. Count Eleven was a year-long conspiracy relating to a specific terrorist attack in the country of Denmark, the members of which were affiliated with three separate terrorist organizations – Lashkar, HUJI and Al Qaeda. Count Twelve, on the other hand, involved providing material support over a four-year period to an organization that has committed numerous acts of terrorism against the government and citizens of India, among others. The government submits that imposing a substantial sentence in this case will not cause a disparity amongst similarly-situated defendants across the country.

As the Seventh Circuit has explained, "the kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). For this reason, the Court should give no weight to defendant's allegations concerning Headley's family members. Further, defendant's comparison to Shaker Masri is misplaced. Unlike Rana, Masri was convicted of one count, charging a violation of 18 U.S.C. § 2339B, based on statements that he made over a three-month period to a cooperating source working with the government, not two separate offenses, one of which related to a specific plot to commit murder overseas and the other of which involved providing material support to a foreign terrorist organization for four years. Thus, Masri faced a maximum term of imprisonment of 180 months. Rana faces a maximum term of imprisonment of 360 months. Further, Masri accepted responsibility for his criminal conduct and pleaded guilty. Rana has

23

never accepted responsibility, and continues to minimize his actions. Lastly, defendant fails to mention that Masri pleaded guilty pursuant to Rule 11(c)(1)(C), such that the government and the defendant, through plea negotiations based on considerations particularly unique to that case, recommended an appropriate sentence to the district court and avoided a public trial. That situation stands in stark contrast to Rana, who put the government to its burden and was found guilty by a jury.

## VIII. Defendant's Health and Conditions of Confinement

The defendant has asked the court for a lighter sentence based on his claims of various health concerns, and the fact that he suffered a heart attack in June 2012. This is not a compelling factor in this case, considering that "adequate medical care is available in federal prison." *United States v. Moreland,* __ F.3d __, 2012 WL 5992122, at *12 (7th Cir. Dec. 3, 2012) (rejecting claim for leniency by 59-year-old defendant who lost a kidney to cancer). Indeed, as defendant acknowledges, he received medical treatment following the heart attack, having been taken to Northwestern Memorial Hospital.

Further, the defendant has asked for a lighter sentence because he spent 13 months in the Special Housing Unit, where he was permitted recreation and a shower three days a week. He described these and other conditions as "onerous," but provides no affidavit or evidence to support his allegations. In *United States v. Ramirez-Gutierrez,* 503 F.3d 643, 645-46 (7th Cir. 2007), the Seventh Circuit described the "truly egregious conditions" that an inmate must have suffered in order for conditions

24

of confinement to be a mitigating factor at sentencing. *Id.* at 646.[6] Specifically, the Court gave as examples (1) an inmate who "was subjected to 23-hour-a-day lockdown and was not allowed outside" for five years and (2) an inmate who "was detained eight months in a Dominican prison, where he was held in an unlit four-by-eight foot cell with three or four other inmates, had no access to running water, paper, pens, newspaper, or radio, and was allowed only one phone call per week." *Id.* In contrast, the inmate in *Ramirez-Gutierrez* had been housed at the Kankakee County Detention Center, and complained "that he was unable to obtain care for his broken tooth, lived in poorly ventilated quarters, and was given inadequate opportunity to exercise during his 2½ month detention." *Id.* at 645. Those conditions were insufficient grounds for a mitigation in the sentence, and indeed, the Seventh Circuit rejected the defendant's argument that the district court had to explicitly discuss the issue. *Id.* at 646.[7] In the

---

[6] It is unclear whether the Seventh Circuit expressly held in *Ramirez-Gutierrez* that confinement conditions could be a permissible ground for mitigating a sentence; the opinion describes cases from other circuits but did not explicitly state that the Seventh Circuit was adopting those cases. Regardless, in light of the weight of authority, the government accepts for purposes of this case that a court may consider pretrial conditions of confinement, *cf. Koon v. United States*, 518 U.S. 81, 112 (1996) (pre-*Booker* consideration of conditions of confinement (susceptibility to inmate violence) after sentencing), but only if extraordinarily deplorable, in selecting the appropriate sentence.

[7] Cases in which reductions have been granted involved truly extraordinary facts. *United States v. Mateo*, 299 F. Supp.2d 201, 211-212 (S.D.N.Y. 2004) (9-level departure warranted because defendant's requests for medical attention were ignored as she endured 15 hours in labor, giving birth alone in her cell, and because she was twice forced to strip in front of a male guard or face discipline); *United States v. Rodriguez*, 214 F. Supp.2d 1239 (M.D. Ala. 2002) (3-level reduction for defendant who was raped by a prison guard while awaiting sentencing); *United States v. Francis*, 129 F. Supp.2d 612, 619-620 (S.D.N.Y. 2001) (1-level reduction for 13 months spent in County jail "virtually controlled" by armed gang members, where defendant endured multiple threats and assaults and suffered significant weight loss, insomnia and depression).

present case, the defendant's allegations concerning his conditions of confinement do not approach anything close to the examples of "truly egregious conditions" discussed above.  The government submits that the court give little, if any, weight to defendant's unverified allegations.

## Conclusion

Because of the nature of defendant's offenses and the need for the sentence to reflect the seriousness of defendant's criminal conduct, promote respect for the law, provide just punishment, and to deter others from such criminal conduct, among other factors, the government respectfully submits that the Court order the sentences on Counts Eleven and Twelve to run consecutively, and impose a total sentence of 30 years' imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By: /s/ Daniel J. Collins
DANIEL J. COLLINS
SARAH E. STREICKER
Assistant United States Attorney
219 South Dearborn Street,5th Floor
Chicago, Illinois 60604
(312) 886-3482