**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 CR 830-8 |
| | ) | Judge Harry D. Leinenweber |
| ILYAS KASHMIRI, *et al.,* | ) | |
| (TAHAWWUR HUSSAIN RANA), | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT RANA'S OBJECTIONS
TO THE PRESENTENCE INVESTIGATION REPORT; AND,
<u>POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS</u>[1]**

Patrick W. Blegen
Daniel A. Rufo
Jodi L. Garvey
BLEGEN & GARVEY
53 West Jackson Blvd., Suite 1437
Chicago, Illinois 60604
(312) 957-0100

Charles D. Swift
SWIFT & McDONALD, P.S.
1809 - Seventh Avenue, Suite 1108
Seattle, WA 92101
(206) 441-3377

*Attorneys for Defendant Tahawwur Rana*

---

[1]The defense previously filed this document under seal as Docket No. 351. The government subsequently indicated that it has no objection to an unsealed filing. No substantive changes have been made.

## TABLE OF CONTENTS

I.     **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     **Objections to the Presentence Investigation Report** . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     **Role in the Offense, p. 11, 12** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     **Terrorism Enhancement, p. 12** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           1.     **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           2.     **The PSR's Application of the Terrorism Enhancement to Count Twelve is Improper** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           3.     **The Government's Arguments for the Application of the Terrorism Enhancement are Incorrect** . . . . . . . . . . . . . . . . . . 12

                a.     **Rana's conviction relates solely to the *Jyllands-Posten* plot** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                b.     **The Government is incorrect that the terrorism enhancement applies to the *Jyllands-Posten* plot** . . . . . . . . 17

                c.     **The Government's attempts to bootstrap the terrorism enhancement into this case should fail** . . . . . . . . . . . . . . . . . 20

      C.     **Multiple Count Adjustment, p. 12-13** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      D.     **Total Offense Level, p. 13** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.     **Position Paper and Commentary on Sentencing Factors** . . . . . . . . . . . . . . . . . . . . . 29

      A.     **Legal Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.     **The Court Should Not Impose Consecutive Sentences for Counts Eleven and Twelve** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      C.     **Application of §3553 Factors to Rana's Case** . . . . . . . . . . . . . . . . . . . . . . . 32

           1.     **History and Characteristics of Tahawwur Rana** . . . . . . . . . . . . . . 32

                a.     **Rana's Health** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

i

           **b.**     **The Conditions of Rana's Pretrial Confinement** . . . . . . . . . 39

     **2.**     **The Need to Avoid Unwarranted Sentencing Disparities** . . . . . . . . 40

     **3.**     **The Sentencing Range** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**IV.**    **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Defendant, **TAHAWWUR RANA**, by and through his attorneys, **PATRICK W. BLEGEN**, **CHARLES D. SWIFT**, and **DANIEL A. RUFO**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), respectfully submits the following Objections to the Presentence Investigation Report; and, Position Paper and Commentary on Sentencing Factors.

## I.    INTRODUCTION

Defendant Rana stands convicted of two counts (Counts Eleven and Twelve) of providing material support, essentially aiding and abetting, to a plot to attack a private newspaper in Denmark, the *Jyllands-Posten*, and to *Lashkar e Tayyiba* ("Lashkar" or "LeT"), a designated terrorist organization.  The plot against the *Jyllands-Posten* was not executed, and no one was killed or injured.  Rana was also accused of providing material support to terrorism in India, including the attack on Mumbai in 2008.  Rana was acquitted of that charge.  Rana's provision of material support to Lashkar was also found by the jury not to have resulted in death to anyone.

Under the Sentencing Guidelines, the base offense levels for Rana's convictions are very high and reflective of the serious nature of the *Jyllands-Posten* plot.  For example, the base offense level for Count Eleven is 33, and the base offense level for Count Twelve is 28.  Such offense levels provide for significant sentencing ranges under the advisory guidelines, even for a first time offender like Rana.  Nevertheless, the government, and to a lesser extent the probation department, have taken the position that the "terrorism enhancement" found in the sentencing guidelines is applicable.  The terrorism enhancement would add a twelve level increase to

1

Rana's offense level and would place him in criminal history category VI – the category reserved for the worst repeat offenders. Application of such increases leads to a recommended guideline range of life (according to the government) or thirty years to life (according to probation), which, even at the low end, essentially means that Rana would die in prison.[2]

As is argued herein, such a draconian punishment for Rana would be inconsistent not only with his offense, but also with the life Rana has lived separate and apart from his interactions with co-defendant David Headley. Rana is quite simply not a "terrorist," not a "jihadist" and has not imposed on his family or friends the particular brand of hatred that Headley spread, or attempted to spread, to all of those around him. But even leaving personal factors aside, such a sentence should not be imposed on Rana because his offense does not qualify for the terrorism enhancement. Rana's convictions on Counts Eleven and Twelve both relate to the *Jyllands-Posten* plot, a plot which was designed to retaliate against a privately owned newspaper for publishing cartoons that were deemed offensive. The *Jyllands-Posten* plot was plainly not, as the terrorism enhancement requires, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Once the terrorism enhancement is properly excluded, the resulting offense level for Rana, including his limited role, provides a much more appropriate starting point for determining a reasonable sentence.

---

[2]All parties agree that the maximum possible sentence for Rana, if the sentences on Counts Eleven and Twelve are ordered to run consecutively, is thirty years. Rana will be 52 years old at the time of sentencing; and, as noted herein, has recently suffered a heart attack and is in overall poor health.

II.     **OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

A.     **Role in the Offense, p. 11, 12**

The Presentence Investigation Report "PSR" grants no reduction in offense level under U.S.S.G. §3B1.2 (Mitigating Role) for either Count Eleven or Twelve.  PSR, p. 11, 12.  In declining to recommend such a reduction, the PSR concludes that "while managers, organizers and leaders of this conspiracy are certainly more culpable than Rana, their offense levels will likely be increased to account for said aggravation, and their aggravating roles do not detract from the defendant's culpability."[3]  PSR, p. 11.  The PSR further argues that Rana's activities provided a cover for Headley in Denmark, that Rana lied to the Pakistani consulate, and that Rana made travel arrangements for Headley.  Therefore, the PSR argues, "Rana's conduct was significant in the entire planning stage of the plot."  *Id*.

What the PSR overlooks, however, is that §3B1.2 requires a comparison among culpable parties.  When viewed in that context, Rana's conduct is substantially less serious than the actions taken by literally everyone else in the conspiracy.  It is not just the "managers, organizers and leaders" of the conspiracy that are more culpable than Rana.  Every other participant is substantially more culpable than Rana.  According to Application Note 3(a) to section §3B1.2, the proper determination of whether a minor or minimal role reduction is appropriate involves a comparison of Rana to the average participant to determine if he is "substantially less culpable."  Rana is clearly substantially less culpable than the average participant.

_____

[3]Aside from Headley, no one else has been arrested.  As such, it will likely remain uncertain whether others will receive role in the offense enhancements.  Headley, who is clearly at a significantly higher level of culpability, and who recruited Rana, did not receive an enhancement for his role in the offense in his plea agreement.

Rana was convicted of two counts, Counts Eleven and Twelve, in which he was charged with six other individuals: Ilyas Kashmiri, Abdur Rehman Hashim Syed, and Sajid Mir (Count Eleven), and Sajid Mir, Abu Qahafa, Mazhar Iqbal, and Major Iqbal (Count Twelve). Headley had previously been charged in both Counts Eleven and Twelve, but had pleaded guilty by the time of the return of the second superseding indictment. It is abundantly clear from the evidence that Rana is not only substantially less culpable than Headley, but also that Rana played a substantially smaller and less culpable role than each of the other individuals charged. In fact, Rana was kept in the dark regarding much of the *Jyllands-Posten* plot – the only plot for which he was convicted.[4]

The determination of whether to apply a mitigating role reduction "involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. §3B1.2, Application Note 3(C). A minimal participant is an individual "plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. §3B1.2, Application Note 4. A minor participant is an individual "who is less culpable than most other participants, but whose role could not be described as minimal." *Id*. at Application Note 5. The evidence presented in this case makes it readily apparent that Rana is deserving of a minimal role, as his lack of culpability and broader awareness was repeatedly shown. Alternatively, a three or two level reduction for a minor role would be appropriate.

---

[4]As discussed herein, the bills of particulars and the jury's verdict, including the special verdict make clear that Rana was convicted of the *Jyllands-Posten* plot only.

4

The government's evidence of Rana's involvement in Counts Eleven and Twelve was based primarily around the testimony of Headley. Even taking Headley's credibility at face value, however, and despite issues regarding his truthfulness surfacing repeatedly during trial, Headley's testimony demonstrates that Rana played as limited a role as one could possibly play.

The details of Headley's testimony regarding the *Jyllands-Posten* plot are provided in the Defendant's Motion for a Judgment of Acquittal on pages 11 through 17 (Docket No. 307). What Headley's testimony makes clear is that, at most, Headley kept Rana informed in a limited manner regarding his activities related to the *Jyllands-Posten*, and that he used Rana in a limited way to effectuate his cover. There was no evidence elicited that Rana was aware of the full breadth of the *Jyllands-Posten* conspiracy, or that he participated in any planning of the *Jyllands-Posten* attack. For example, Rana was not shown any of the results of Headley's surveillance, he did not have input into how the plan would be executed, and he had nothing to do with and no knowledge of the timing of the attack.

Rana's role, as detailed by Headley, was limited to the provision of business cards bearing Headley's name, booking travel for Headley on one occasion, on one occasion sending an email to the *Jyllands-Posten* newspaper using Headley's name, and on one occasion creating an email account purportedly to be used by Headley. Tr. 362-5, 483-4, 626-6, 629. Headley went so far as to testify on re-direct that the only assistance that Rana ever provided was the business card, which even Headley did not "envision" that he would need or use to enter the offices of the *Jyllands-Posten*. Tr. 1150.[5]

---

[5]Headley explained that, at the time he obtained the business card it was not clear to him how he would be using the card, or if it would be necessary. Tr. 362-3. Because Headley did not himself know how or if he would use the business card, Rana could not have known.

In addition to Rana's limited involvement, substantial evidence at trial also demonstrated that Rana had much different motivations than Headley. Rana, for example, was interested in actually setting up an immigration office in Denmark. Headley testified that Rana worked with a lawyer named Ray Sanders and that Rana's business was dependent on Mr. Sanders. Tr. 923. During a conversation with Headley prior to Headley's planned trip to Denmark in October of 2009, when the planned attack was apparently nearing the operational state, Rana asked Headley to bring along Mr. Sanders to help open an immigration office in Scandinavia. Tr. 927. Mr. Sanders is a white Christian in his 70s who is not suspected of any involvement in the *Jyllands-Posten* plot. Tr. 927. Yet, Rana suggested that Mr. Sanders accompany Headley on what Rana supposedly knew to be a terrorist mission to Denmark. Tr. 928. Headley found this proposal by Rana so absurd that he told Pasha and both laughed at the idea. Tr. 928. The defense has previously argued that this evidence is indicative of Rana's innocence, but it also demonstrates that Rana lacked significant details of the plot. No one who had an understanding of the "scope and structure" of the plot as well as the "activities of others" would suggest having Ray Sanders tag along with Headley to Denmark.

Other details further demonstrate Rana's "lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others." U.S.S.G. §3B1.2, Application Note 4. For instance, Headley testified that he used the code names Mickey Mouse Project, Northern Project, MMP and NP, to discuss the planned attack with Sajid, Pasha, and various other people in Pakistan. Tr. 938. Rana was unaware of any of these names for the plot, and Headley never used these code names with Rana even when communicating via means that could be intercepted; *e.g.*, email. Tr. 938-9. Furthermore, Headley testified that he purchased

6

souvenir hats from Denmark and handed them out to individuals involved in the attacks, such as Pasha, Headley's brother Hamza, and Sajid. Tr. 940. Headley did not give a hat to Rana. *Id*. These details demonstrate that although he was convicted, Rana was not intimately involved in the *Jyllands-Posten* plot.

Moreover, the plan contemplated an armed attack on the *Jyllands-Posten* office that necessarily would have required significant and detailed planning and preparation. For example, the plot required people to carry out surveillance, plan the attack, finance the attack, arm the attackers, and actually carry out the attack. Rana had nothing whatsoever to do with these details and virtually no knowledge of them. Moreover, in comparison to those other necessary roles, as well was the activities carried out by the co-defendants to the attack, Rana's provision of business cards, booking travel on one occasion, and responding to a single email is as minimal a role as one could imagine. Rana's limited involvement, and complete unawareness of even the code name for the project demonstrate a significant lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others. Furthermore, Rana is easily the least culpable of all the members of the plot, including even uncharged co-conspirators such as Headley's two wives, Shazia and Faiza, his uncle Saulat, and his brother Hamza.[6]

---

[6]Testimony elicited at trial showed that Shazia was aware not only of the Denmark plot, but she had prior knowledge of Headley's involvement in the Mumbai attack and even sent him congratulatory emails in code as the attack occurred. Tr. 976-7. Headley's second wife Faiza traveled to Mumbai with Headley, was aware of the plan in Denmark, and allowed Headley to attempt to enlist one of her brothers to help obtain guns for use in the Denmark plot. Tr. 925, 958. Headley's uncle, Saulat, actually traveled to the tribal areas of Pakistan to retrieve messages from Ilyas Kashmiri for Headley. Tr. 933, 1160. Hamza was involved in other criminal activity with Headley, including a planned kidnapping. Tr. 935. Hamza also facilitated communication between Pasha and Headley and was given one of the souvenir hats by Headley. Tr. 936, 940.

While the PSR further indicates that Rana "lied to the Pakistani consulate to get Headley a visa," this statement is unsupported by the evidence presented at trial. Specifically, Headley testified that Rana's dealings with the Pakistani consulate had no conspiratorial purpose, but rather was an attempt by Headley to avoid repeatedly paying Pakistani visa fees. Tr. 1004-5.[7]

Given his comparative lack of knowledge, and limited involvement, Rana is clearly among the least culpable and as such, is deserving of a four-level decrease as a minimal participant.[8] Alternatively, Rana should receive a 3 or 2 level reduction under §3B1.2. As explained in greater detail below, Count Eleven and Count Twelve both involve conduct solely related to the *Jyllands-Posten* plot. Therefore, a finding that Rana was a minimal participant with regard to Count Eleven should also necessitate a finding that he was a minimal participant with regard to Count Twelve.

**B.    Terrorism Enhancement, p. 12**

**1.    Introduction**

In its version of the offense, the government seeks the terrorism enhancement for both counts of conviction – Counts Eleven and Twelve. Probation has determined that the terrorism enhancement applies only to Count Twelve. It is the defense position that the terrorism

---

[7]There was also ample trial testimony demonstrating that Headley never had any difficulties traveling to Pakistan or elsewhere in the past without Rana's assistance.

[8]Further demonstrating that Rana was a minimal participant is that the material support that Rana was convicted of providing was not essential to the plot. Headley could have easily effectuated cover as a businessman looking to advertise in the *Jyllands-Posten* without the help of Rana, for example, by using his own Flix Video business. Furthermore, Headley could have used Rana's business as a cover without Rana's knowledge, as the jury concluded he did in Mumbai, and as Headley did in the past when explaining his prolonged absence (actually caused by prison) to Pakistani heroin dealers. Tr. 1050-52.

enhancement does not apply at all. The reason is simple. Rana's offenses of conviction both relate to a plot to attack the *Jyllands-Posten*, a private newspaper in Denmark. This plot was designed to retaliate against the newspaper for publishing cartoons that were deemed offensive. The plot was not, as the terrorism enhancement requires, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §2332b(g)(5)(A). U.S.S.G. §3A1.4 provides for a 12 level increase in the offense level, and automatic placement in criminal history category VI if a defendant's "offense is a felony that involved or was intended to promote a federal crime of terrorism." According to Application Note 1, a "federal crime of terrorism" is given the same definition as used in 18 U.S.C. §2332b(g)(5).

18 U.S.C. §2332b(g)(5) provides a two pronged definition for a "federal crime of terrorism." To qualify as a federal crime of terrorism an offense must be a violation of any one of a list of enumerated statutes found in 18 U.S.C. §2332b(g)(5)(B).[9] A federal crime of terrorism must also be an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §2332b(g)(5)(A). It is this provision that is at issue here. In determining whether the terrorism enhancement applies, the burden is on the government to show by a preponderance of the evidence that Rana had the "specific intent" to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010) *citing* 18 U.S.C.

---

[9]Both 18 U.S.C. §2339A and 2339B, the offenses of Rana's conviction, are among the enumerated statutes found in §2332b(g)(5)(B).

9

2332b(g)(5)(A); *cf. United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001)*, United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002), *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000) ("During sentencing, the Government must prove the facts underlying the base offense or an enhancement by a preponderance of the evidence.").

As explained herein, when the bills of particulars and verdicts, including the special verdict, are taken into account, Rana's offense of conviction relates solely to the *Jyllands-Posten* plot. As such, the proper focus regarding the terrorism enhancement is whether the *Jyllands-Posten* plot was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

### 2.     The PSR's Application of the Terrorism Enhancement to Count Twelve is Improper

The PSR found the enhancement applicable only to Count Twelve, Rana's conviction for providing material support to Lashkar, on the basis that "verdict of guilty [on Count Twelve] alone is sufficient to assert that the offense involved, or intended, to promote a federal crime of terrorism." PSR, p. 12. This finding is incorrect for two primary reasons.

First, it is improper to apply the terrorism enhancement simply on the basis of a jury verdict for providing material support.[10] While the Seventh Circuit has not yet addressed the issue, in *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008), the Fourth Circuit explicitly rejected the idea "that the [terrorism] enhancement automatically applies to a material support conviction." *See also*, *United States v. Chandia*, 395 F. App'x 53, 56 (4th Cir. 2010) ("Most

---

[10]In its version of the offense, the government appears to agree with this reading of the statute, as it does not argue that the terrorism enhancement is applicable solely because Rana was convicted of material support to a designated terrorist organization.

importantly, we rejected the contention that the § 3A1.4(a) terrorism enhancement 'automatically applies to a material support conviction.'") (internal citations omitted). The Fourth Circuit was undoubtedly correct in this conclusion. If the Sentencing Commission intended the terrorism enhancement to apply solely on the basis of a material support conviction, the guidelines would simply have incorporated the 12 level enhancement into the base offense level for that offense.

Second, the jury's verdict of guilty on Count Twelve does not establish that Rana's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." To support its finding in this regard, the PSR explains that the jury instructions with regard to Count Twelve indicate that the government was required to prove "that Rana knowingly provided material support or resources to Lashkar; that Rana knew Lashkar was a designated terrorist organization, or knew that Lashkar engaged in or was engaging in terrorist or terrorism activity…" This jury instruction tracked the statutory language of 18 U.S.C. §2339B. The PSR concludes that because Rana knew Lashkar was a designated terrorist organization, or knew that they engaged in terrorist activity, then the terrorism enhancement applies. PSR, p. 12. While it is true that the jury must have made one of these findings,[11] the definitions of "designated terrorist organization" and "engage in terrorist activity" are not the same as the definition of "federal crime of terrorism" – the standard that must be met to apply the terrorism enhancement.

The definition of "designated terrorist organization" is found in 18 U.S.C. §2339B(g)(6),

---

[11]Because Rana's post-arrest statement indicates that he was aware that Lashkar had been designated as a foreign terrorist organization, the jury likely found that the government met its burden in this regard, rather than that Rana knew that Lashkar engaged in terrorist activity.

and refers to a group that has been designated by the Secretary of State as a foreign organization that "engages in terrorist activity," among other things. *See also*, 8 U.S.C. §1189. The definition of "engage in terrorist activity" is found in section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)). While the statutory definition is lengthy, it is clear that the term "engage in terrorist activity" carries a different and much broader meanings than "federal crime of terrorism" as used in U.S.S.G. §3A1.4 and defined in 18 U.S.C. §2332b(g)(5). The PSR's blending of the terms is incorrect. The terrorism enhancement rests on a different definition, and this definition has not been met.

The proper focus is whether Rana's material support conviction on Count Twelve meets the requirements of the terrorism enhancement; *i.e.*, whether Rana's offense involved, or was intended to promote, a *federal crime of terrorism* as defined in 18 U.S.C. 2332b(g)(5). That definition requires the government to establish that the offense of conviction was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Here, Count Twelve does not meet that requirement. Rana was not convicted of providing material support to Lashkar *in general*; for example, by providing them money to do what they pleased. Rather, Rana's conviction on Count Twelve was based on specific instances of material support provided to support a specific plot only – the *Jyllands-Posten* plot. That plot, however horrific its details as explained by Headley, was not calculated to influence or retaliate against *government conduct*.

### 3. The Government's Arguments for the Application of the Terrorism Enhancement are Incorrect

Contrary to the PSR, the government's version of the offense has asserted that the terrorism enhancement is applicable to both of Rana's convictions, Counts Eleven and Twelve.

The government also asserts that the terrorism enhancement is applicable based on the *Jyllands-Posten* plot *and* conduct in India. As the government is likely to repeat those arguments in its sentencing pleadings, the defense will address them here. The defense incorporates its version of the offense, in which all of the government's arguments are addressed, herein.

A straightforward analysis of the evidence presented at trial demonstrates that the terrorism enhancement does not apply. Rana's offense of conviction involved providing material support to a plot to attack the *Jyllands-Posten*. The *Jyllands-Posten*, a private newspaper, had published cartoons depicting the Prophet Mohammad, and the plot was calculated to retaliate against the newspaper for publishing the cartoons. Nothing in the evidence, or anywhere else, leads to the conclusion that the *Jyllands-Posten* plot was directed at government.

### a. Rana's conviction relates solely to the *Jyllands-Posten* plot.

The government's version suggests that the terrorism enhancement should apply because of conduct related to both Denmark and India. Government's Version, p. 32-39. Rana, however, was not convicted for any conduct in India; his conviction related only to conduct in connection with the *Jyllands-Posten* plot.

Rana was charged with three counts of providing material support. Count Nine alleged that he conspired to provided material support to attacks in India, including the Mumbai attack in 2008. Count Eleven alleged that Rana conspired to provide material support to an attack against the *Jyllands-Posten* newspaper. Count Twelve charged that Rana provided material support to Lashkar, a designated terrorist organization.

Prior to trial, the Court ordered a bill of particulars requiring the government to provide the specific material support that Rana was alleged to have conspired to provide in Counts Nine

and Eleven and substantively provided in Count Twelve. (Docket No. 99)[12]  The superseding indictment had generally alleged the following types of alleged material support for Count Nine: "personnel," "tangible property," "money," and "false documentation and identification"; for Count Eleven: "money," "personnel," and "tangible property"; for Count Twelve: "personnel", "currency", "tangible property", and "false documentation and identification."  (Docket No. 32)

In its first bill of particulars, the government identified, with regard to Count Nine the "personnel" to include both Headley and Rana; "tangible property" to include memory cards, maps and books, and red bracelets provided by Headley to co-conspirators; and "money" to include the wiring of funds to Headley by Rana and the payment of expenses in India for Headley by Rana.  (Docket No. 109)

With regard to Count Eleven, the government identified "personnel" to include both Headley and Rana; "tangible property" to include memory cards provided by Headley to co-conspirators; and "money" to include the payment of travel expenses for Headley by Rana.  *Id*.

Notably, with regard to Count Twelve, the government provided no additional identifications of material support.  Instead, the government incorporated its identifications of "personnel", "currency", "tangible property", and "false documentation and identification" from Counts Nine and Eleven into Count Twelve.  *Id*.  By simply incorporating the allegations of Counts Nine and Eleven, the government's bill of particulars demonstrates unequivocally that Count Twelve charges the same material support as Counts Nine and Eleven, rather than

---

[12]"When a bill of particulars has been furnished, the government is strictly limited to the particulars which it has specified, i.e., the bill limits the scope of the government's proof at the trial."  *United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965), *see also United States v. Vasquez-Ruiz*, 00 CR 1044, 2002 WL 171969 (N.D. Ill. Feb. 4, 2002) (Kennelly, J.).

additional conduct. The only difference is that Count Twelve is charged substantively rather than as a conspiracy.

Following the return of a Second Superseding Indictment, the government provided a second bill of particulars explaining that the new indictment alleged that Rana also provided "expert advice and assistance" in Counts Nine, Eleven and Twelve. (Docket No. 223) For Count Nine, the government defined "expert and advice and assistance" as Rana providing his immigration expertise in various ways to help Headley travel to Mumbai and open and maintain an immigration business. *Id*. For Count Eleven, the "expert advice and assistance" was defined as Rana providing his immigration expertise to help establish a cover for Headley in Denmark. *Id*. These identifications were incorporated into Count Twelve, as the government had done in its first bill of particulars. No additional conduct was alleged, and the charges and bill of particulars otherwise remained the same.

The bills of particulars make the following clear. Count Nine charged conspiracy to provide material support to the activity in India, including the Mumbai attack. Count Eleven charged conspiracy to provide material support to the *Jyllands-Posten* plot. Count Twelve charged material support to Lashkar in relation to Mumbai and the *Jyllands-Posten*, but no other conduct.[13]

The jury ultimately found Rana not guilty of Count Nine, and guilty of Counts Eleven and Twelve. (Docket No. 282). As such, Rana was acquitted of the India / Mumbai material

---

[13]With regard to Count Nine, the only conduct in India in which Lashkar was alleged to be involved was the Mumbai attack in 2008. Headley is alleged to have returned to India after the Mumbai attack to conduct additional surveillance, but that surveillance was on behalf of a different group. In fact, Lashkar was apparently upset that Headley had returned to India.

15

support conspiracy (Count Nine) and convicted of the *Jyllands-Posten* material support

conspiracy (Count Eleven).

With respect to Count Twelve, the jury returned a special verdict. Once the jury found

Rana guilty of Count Twelve (Providing Material Support to Lashkar), it was required to

determine whether death resulted to anyone from the conduct charged in Count Twelve.

> Specifically, the jury was instructed:
> "In order to find that at least one individual died as a result of the conduct charged
> in Count Twelve, the government must prove that the defendant's conduct
> contributed to an individual's death in the attacks committed by *Lashkar e Tayyiba*
> in Mumbai, India, in November 2008, even if that conduct by itself would not have
> caused the death. The government is not required to prove that the defendant
> intended for any specific individual to die.
>
> You will see on the verdict form a question concerning this issue. You should
> consider that question only if you have found that the government has proved the
> defendant guilty as charged in Count Twelve.
>
> If you find that the government has proven beyond a reasonable doubt that an
> individual died as a result of the conduct charged in Count Twelve, then you should
> answer that question "Yes."
>
> If you find that the government has not proven beyond a reasonable doubt that an
> individual died as a result of the conduct charged in Count Twelve, then you should
> answer that question 'No.'"

(Docket No. 284).

By answering "no," the jury indicated that the government failed to prove that any

material support provided to Lashkar by Rana led to death. Because the Mumbai attack

undeniably resulted in the death of 164 persons, the jury's special verdict indicates that Rana

was not connected to the Mumbai attack. Combined with Rana's acquittal on the Mumbai

material support conspiracy (Count Nine), the special verdict on Count Twelve indicates a

wholesale rejection by the jury that Rana provided material support to Lashkar in relation to

16

Mumbai. Moreover, because the bills of particulars make clear that Count Twelve charged only the material support previously alleged in Counts Nine and Eleven, the acquittal of Rana on Count Nine leaves only the incorporated allegations from Count Twelve - the *Jyllands-Posten* plot.

In light of the jury's verdict, including the special verdict for Count Twelve, and the bills of particulars, the only permissible conclusion is that Rana was convicted of conspiracy to provide material support to the *Jyllands-Posten* plot (Count Eleven) and was convicted of substantively providing material support to Lashkar (Count Twelve), but only in relation to the *Jyllands-Posten* plot.

> **b.    The Government is incorrect that the terrorism enhancement applies to the *Jyllands-Posten* plot.**

Despite conceding that the *Jyllands-Posten* is a private newspaper, the government argues in its version of the offense that the "Denmark plot" was "intended to influence, affect, and retaliate against the conduct of government by coercion and intimidation." Government's Version, p. 36. Specifically, the government points out the fact that the plot was referred to as the "Denmark plot" on a recorded conversation, as opposed to referencing the newspaper. Government's Version, p. 40. Likewise, the government relies on the fact that other groups attacked the Danish Embassy in Pakistan, purportedly in response to the publication of the cartoons. Government's Version, p. 42. None of these arguments support the application of the terrorism enhancement here, however, because there is no indication that the *Jyllands-Posten* plot, the only plot in Denmark in this case, was calculated to influence the conduct of the Danish government, or to retaliate for its conduct. Rather, the offense was clearly designed to exact revenge from the privately held newspaper *Jyllands-Posten* for its publication of cartoons

17

depicting the Islamic Prophet Muhammad. No government motivation or intent has been shown.

It should be sufficient to deny the terrorism enhancement based simply on the lack of evidence that the *Jyllands-Posten* plot was calculated to do anything other than what is obvious; that is, to retaliate against the newspaper for publishing cartoons. *See e.g.*, *United States v. Leahy*, 169 F.3d 433, 442-3 (7th Cir. 1999) (Indicating that where there is no evidence that a defendant "sought to influence or affect the conduct of the government," the crime is not a federal crime of terrorism.). But here there is affirmative evidence, presented by the government itself, establishing the purpose behind the *Jyllands-Posten* plot. According to Headley, the purpose of the plot was discussed during the very first meeting on the topic between Headley, Sajid Mir, and Major Iqbal in Pakistan. When asked by the government how the *Jyllands-Posten* plot began, and later the purpose of the plot, Headley testified as follows:

> Q:    All right. Now, you mentioned Denmark a couple times already, so what was said by Sajid to Major Iqbal about Denmark in this conversation?
>
> A:    That they were planning to -- they wanted to make a preliminary plan to attack the newspaper that had made the cartoons.
>
> Q:    Who is "they"?
>
> A:    The newspaper.
>
> Q:    Okay. You said that Sajid said that "they" were planning something. Who is the "they" that --
>
> A:    Lashkar wanted to plan something.
>
> Q:    Okay. And what newspaper was being discussed?
>
> A:    The Jyllands-Posten newspaper.
>
> Q:    Okay. Is that J-Y-L-L-A-N-D-S?
>
> A:    Yes.

18

Q:      P-O-S-T-E-N?

A:      Yes.

Q:      And what country is that newspaper located?

A:      In Denmark.

Q:      And you mentioned cartoons. What were you referring to?

A:      They had made some cartoons of the Prophet.

Q:      Okay. And what was your reaction to those cartoons?

A:      It was not favorable.

Q:      When you say that you didn't have a favorable reaction to the cartoons, Mr. Headley, can you be a little bit more detailed in terms of what your reaction was and what Sajid's reaction was?

A:      We were all angry about it.

Q:      And when Sajid expressed that, what was Major Iqbal's response?

A:      He said he was surprised that such an attack had not already taken place by any -- by anyone.

Q:      When Sajid referred to this attack or this plan, did he say for what purpose it was? What was his -- what was his words in terms of why -- why this was being planned?

A:      I don't understand the question.

Q:      Did he say that he had been instructed to avenge the cartoons?

A:      Yes.

MR. BLEGEN: Judge, I'm going to object to the leading.

THE COURT: Well, he --

MR. BLEGEN: It's a little late --

THE COURT: He didn't understand the question, so he can follow up. Overruled.

19

THE WITNESS: **Yes. The whole discussion of the newspaper was only to avenge the fact that they had made cartoons.**

Tr. 307-309. (emphasis added)

This testimony, the only evidence whatsoever regarding the purpose of the plot, indicates that the proposed attack on the *Jyllands-Posten* was calculated "only" to retaliate against the newspaper because it had published the cartoons. There is simply no evidence of a different or larger purpose. Rather than acknowledging the expressed purpose of the plot in this case, the government's version of the offense focuses on the motivations and writings of different jihadi groups, unrelated attacks, and nonsensical tirades on a DVD. Government's Version, p. 35, 38, 42. None of this was evidence at the trial; and more importantly, none of it is connected to the specific plot at issue here. As set forth above, the government presented *direct* evidence of the purpose of the *Jyllands-Posten* plot. It cannot now change the purpose in order to obtain a 12 level enhancement.

   c.   **The Government's attempts to bootstrap the terrorism enhancement into this case should fail.**

Despite the plain language of the terrorism enhancement, and the direct evidence of the purpose of the *Jyllands-Posten* plot, the government's version attempts to support the enhancement by imputing the purpose behind other unrelated attacks onto the *Jyllands-Posten* plot, by imputing the thoughts and beliefs of people entirely disconnected from the *Jyllands-Posten* plot onto Rana, and by relying on Lashkar's action in India. Government's Version, p. 32-36, 42.

The government's version also provides several articles regarding the overall philosophy of Lashkar. The government includes a report from the Council on Foreign Relations ("CFR"),

20

which it argues demonstrates that Lashkar's jihadist mission and ideology extends far beyond the disputed regions of Jammu and Kashmir in India. Government's Version, p 33; GV Exhibit Articles, p. 8-12.[14]

The crux of these arguments appears to be that, in providing material support to Lashkar, Rana intentionally provided material support to an *organization* that intended to influence, affect and retaliate against the conduct of government, including Denmark, by coercion and intimidation. Government's Version, p. 37. This argument fails for several reasons. First and foremost, the terrorism enhancement is based on the purpose behind an *offense*, not the general and nebulous purpose of a particular group. *See*, 18 U.S.C. 2332b(g)(5)(A) ("The term 'Federal crime of terrorism' means *an offense* that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct…") (emphasis added).

Moreover, the government misconstrues the evidence regarding Lashkar's purpose when initiating the *Jyllands-Posten* plot. The government believes that in planning the *Jyllands-Posten* plot Lashkar wanted the attack to affect the entire country of Denmark. Government's Version, p. 40. To support this position, the government suggests that a statement by Sajid Mir to Headley that "all Danes are responsible for this [the cartoons]" indicates that the plot targeted the Danish government. [15] Government's Version, p. 40 *citing* Tr. 325.

_____

[14]The report makes no mention of Denmark. Rather, the report argues that Lashkar is interested in the restoration of Islamic rule over parts of India, that it considers the United States, Israel and India to be existential enemies of Islam, and that it seeks to bring about a union of all Muslim majority regions in the countries surrounding Pakistan. GV Exhibit Articles, 9.

[15]The "all Danes" statement is, at best, equivocal. But even if it were more clear, it cannot overcome the direct evidence establishing the purpose of the plot; *i.e.*, that it was planned

21

The full context of Headley's testimony regarding the "all Danes" statement, however, makes clear that there is no indication that the attack was intended to affect the government of Denmark. Specifically, Headley's testimony was as follows:

Q:      In this same conversation, did you once again talk about Denmark?

A:      Yes.

Q:      Let's turn to that topic. In December of 2008, did you talk with Sajid about your job of performing surveillance in December?

A:      Yes.

Q:      Okay. Did he provide you anything?

A:      Yes, he gave me close to 3,000 Euros.

Q:      In this discussion, did you make any recommendation as to what should happen in Denmark?

A:      Yes, I suggested that we only focus on the cartoonist and the editor.

Q:      What was Sajid's response?

A:      Well, I said that since the whole newspaper really wasn't responsible, it was just these two people, we should focus on these two people. And he said all Danes are responsible for this.

Q:      Did he say anything else in that conversation about Denmark?

A:      Not that I can recall right now.

Tr. 325.

This discussion reveals, again, that the attack targeted the *Jyllands-Posten* office from the very beginning. There was never a larger plot to attack "Denmark" in general. If there were, Sajid would have wondered why Headley was even suggesting that only the cartoonist and editor

---

"only to avenge the fact that [the newspaper] had made cartoons." Tr. 309.

22

be targeted when the plan was to affect an entire country or government. Instead, when Headley raised the idea of keeping the attack limited to just the cartoonist and the editor, and avoiding killing or hurting newspaper office staff, Sajid Mir responded by saying that "all Danes are responsible." *Id.* In context, this statement does not imply that the *Jyllands-Posten* plot was calculated to retaliate against the government of Denmark or affect its conduct. Sajid Mir's statement is merely a justification for his lack of concern regarding the staff of the newspaper office. Sajid Mir did not mind if staff members who made no decisions regarding the cartoons were injured or killed. Nevertheless, his callousness does not convert the plot to an attack against government – even the newspaper staff were private citizens and not government officials. If the government's view is correct, the plot could simply have been to attack Danish citizens on the street. Why bother sneaking into a newspaper office if an attack on Danish people on the street would meet your goal? That was never the plan, because the plot was designed to retaliate against the newspaper.

The government also argues that the *Jyllands-Posten* plot targeted government because Kashmiri told Headley that he wanted the attackers to behead hostages and throw the heads onto the street in order to heighten the response by Danish authorities. Government's Version, p. 41 *citing* Tr. 435. Purportedly, when Headley informed Rana of this plan, he responded by saying "good" and that it would be a huge event in the media. Government's Version, p. 41 *citing* Tr. 438. The government argues that Rana's "enthusiastic agreement" with Kashmiri "leaves no doubt that defendant intended to influence the conduct of the Danish government in attacking the Jyllands-Posten in retaliation for the Prophet Mohammad cartoons." Government's Version 41-2.

23

Several problems exist with the government's reliance on this testimony. First, Headley made clear that Kashmiri was offering the beheading idea merely as a suggestion for how to carry out the attack, not as a requirement. The planners were concerned that the police response in Denmark would be more competent than the response in Mumbai, and therefore the attack on the newspaper would not last as long. Tr. 434. Kashmiri proposed beheadings in order to cause the Danish authorities to rush into the building, giving the attackers a tactical advantage. Tr. 434-5. Kashmiri was clearly *not* discussing how to influence the conduct of the Danish government, but rather how to maximize the chances that the plan would be successful.

Second, the government overstates Rana's "enthusiastic agreement." Headley testified that he informed Rana of his discussion with Kashmiri. He then testified that Rana reacted by saying "good," that he agreed with the plan, and that it would be a big event in the media. Tr. 438. On cross-examination, however, Headley clarified that Rana "just said okay. I am not saying he was jumping with joy." Tr. 926.

Third, the government provides no explanation for why Rana's supposed desire for this to be an event in the media is indicative of a desire to influence the *government* of Denmark or to retaliate against the conduct of the Danish *government*. A more natural conclusion to be drawn from this alleged statement, and the details of the planned attack, is that the attack was designed to punish individuals who were deemed to have insulted Islam. The media coverage and gruesome details would, therefore, highlight the strength of conviction the attackers felt about the insult to Islam, not, as the government suggests, convince Denmark to take some action such as placing restriction on the publication of offensive cartoons. This suggestion has no basis in

24

the evidence whatsoever as it was never discussed by Headley or any of the other plotters.[16]

The government claims that it proved at trial that the *Jyllands-Posten* plot was against the country of Denmark in retaliation for the cartoons. Government's Version, p. 42. But the simple fact remains that there was no government conduct here for which the conspirators would be retaliating. And, if the conspirators wanted to attack the Danish government, or its symbols, such as a government building, they could have planned to do so.

Seeking to apply the terrorism enhancement based on the thoughts of other people, the government's version further contends that "[a]lthough the printing of the cartoons was carried out by a newspaper, not a government, the cartoons and the subsequent statements in support of free speech made by Danish officials…was considered by jihadist groups such as Lashkar to be an act of government, as demonstrated by the fact that the Denmark Embassy in Islamabad was attacked in retaliation for the cartoons." Government's Version, p. 42. The government has provided no evidence whatsoever that Lashkar itself viewed the publication of the cartoons to be an act of government. It may, however, be the case that other jihadist groups did believe the publication to be an act of government. Certainly other groups were angry and as a result carried out horrific acts such as the attack on the Danish Embassy in Islamabad, Pakistan. Simply because some groups planned attacks that were calculated to retaliate against symbols of Danish government, however, does not mean that the particular attack at issue here was calculated to retaliate against or affect government conduct. The government's efforts to equate Rana's offenses with attacks in which he had no involvement should be rejected.

---

[16]Of course, all of the above requires one to accept Headley's uncorroborated testimony regarding what he told Rana and Rana's responses. There are innumerable reasons to reject Headley's testimony, particularly where it is uncorroborated.

The government's version also appears to assert that the terrorism enhancement is warranted if it can show that *any* terrorist attack meets the requirements.[17] To that end, the government cites to a DVD found in Rana's home entitled "Bombing of Denmark Embassy." Apparently, possession of this video suggests that Rana was motivated to carry out an attack on the government of Denmark. Government's Version, p. 42. The government has not explained, however, why possession of this video illustrates that an attack against a private newspaper was intended to affect or retaliate against government conduct. Furthermore, the government omits that, while Headley gave Rana the video, he has told the government, and as is reflected in an FBI-302, that he does not know whether Rana watched the video and that they never discussed it. As the Court concluded in excluding the DVD from evidence, the government cannot equate possession of a video with Rana's agreement to its contents. (Docket No. 287) That is all the more so when there is no evidence that he even viewed it. At most, the video demonstrates that a different group, uninvolved with the *Jyllands-Posten* plot at issue, attacked the Danish embassy in Pakistan.[18] It says nothing of the purpose behind the *Jyllands-Posten* plot.

In conclusion, all of the government's justifications for the application of the terrorism

---

[17]There can be no other explanation for the government's citation to unrelated attacks in Pakistan and Libya. Government's Version, fns. 14, 17. The government misses a simple distinction. One offense by a jihadist group can be calculated to retaliate against a government or affect the conduct of a government. Another offense, such as the *Jyllands-Posten* plot, can be calculated to punish an individual or private group.

[18]The defense has reviewed both the video and its accompanying transcript. To the extent the video's message can even be understood, it is far from evident that the purpose of the video is to incite or glorify attacks or retaliation against the Danish government itself. The video appears to be a propaganda film designed to gain recruits by inciting outrage about the publication of the cartoons. It also appears to be an attempt at justifying the already completed attack on the Danish Embassy in Pakistan.

26

enhancement cannot overcome the simple fact that there was no government action involved in the publication of the cartoons. As such, there can be no retaliation for government conduct. And, there is no evidence that Rana's offense – providing material support to the *Jyllands-Posten* plot – was intended to influence or effect government conduct. In fact, the only evidence, which was elicited by the government itself, is to the contrary. The attack did not target any government building or employee, despite Copenhagen's status as the capital of Denmark. There were any number of potential targets that could have been chosen to retaliate against the government or that could have attempted to influence the conduct of the government. Nevertheless, the planned attack targeted a private newspaper. The government's argument, including its reliance on unrelated terrorist groups and attacks, serves no purpose other than to strip the language of the terrorism enhancement of all meaning.

Fifteen pages of its version of the offense were devoted to the terrorism enhancement. Nevertheless, the government has been unable to succinctly state why the terrorism enhancement should apply. It cannot, because the enhancement clearly does not apply. What the government has done instead is attempt to satisfy the enhancement with inflammatory descriptions of books, DVDs, other attacks, and the gruesome details of the planned attack. There is no question that the plans discussed by Headley are horrifying. But that does not mean that the *Jyllands-Posten* plot meets the strictures of the terrorism enhancement. The government has simply not met its burden of showing by a preponderance of the evidence that Rana's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." As such, the terrorism enhancement is inapplicable.

### C.    Multiple Count Adjustment, p. 12-13

Both the government and the defense agree that Counts Eleven and Twelve should be grouped under the Guidelines.  Defendant's Version, p. 32, Government's Version, p. 47.  The PSR found grouping inapplicable, concluding that Counts Eleven and Twelve do not involve the same victim and the same act or transaction and therefore cannot be grouped under U.S.S.G. §3D1.2.  PSR, p. 12.

§3D1.2 provides that '[a]ll counts involving substantially the same harm shall be grouped together into a single Group."  Counts are considered to involve substantially the same harm when, among other things, they "involve the same victim and the same act or transaction." U.S.S.G. §3D1.2(a).  According to the PSR, "[t]he victims of Count 11 appear to be specific to the *Jyllands-Posten* facilities and two of its employees, while the victims of Count 12 appears to be all possible victims of Lashkar's terrorist activity."  As explained above, the indictments, bills of particulars, and the jury verdict make clear that the convicted conduct for Count Twelve, is the same conduct as Count Eleven.  There are no separate victims, acts, or transactions in Count Twelve or in Count Eleven which would make grouping inappropriate.

Furthermore, the PSR's statement that "the victims of Count 12 appears to be all possible victims of Lashkar's terrorist activity" is unsupported by any evidence put forth at trial.  There was no indication at trial that Rana gave money or other fungible support to further all of Lashkar's possible terrorist activity.  Again, the evidence showed that any involvement by Rana with Lashkar was specifically in relation to the *Jyllands-Posten* plot.  Consequently, the counts should be grouped into a single Group and no increase in offense level assessed.

### D. Total Offense Level, p. 13

Taking into account the objections set forth herein, the proper total offense level for Rana is a 29, rather than the 41 calculated by the PSR, or the 45 proposed by the government in its version of the offense.[19] This calculation consists of the base offense level of 33 for Count Eleven, and a four-level "minimal participant" reduction pursuant to §3B1.2 for his role in the offense. In the absence of application of the terrorism enhancement, Rana's criminal history category is I. A total offense level of 29 combined with a criminal history category of I, results in an advisory Sentencing Guidelines range of 87-108 months imprisonment.

## III. POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS

### A. Legal Standards

The Court is no doubt familiar with the wide sentencing discretion provided under 18 U.S.C. §3553(a) in the eight years since the Supreme Court decided *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), and as was reiterated in cases such as *United States v. Rita*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S 38 (2007).[20] As such, counsel will not

---

[19]Under the PSR's calculations, the higher total offense level is that of Count Twelve. Under the defense calculations, the higher total offense level is that of Count Eleven.

[20]The *Gall* court explained the post-Booker sentencing procedure as follows:

> "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the

restate the law supporting that discretion here.

**B.    The Court Should Not Impose Consecutive Sentences for Counts Eleven and Twelve**

As explained herein, Rana's conviction on both Counts Eleven and Twelve arise out of the same conduct – providing material support to the *Jyllands-Posten* plot.  Each count of Rana's conviction carries a maximum sentence of fifteen years imprisonment.  However, because Rana has been convicted of two offenses that involve the same conduct, this Court should decline to impose consecutive sentences.

In *Rutledge v. United States*, 517 U.S. 292 (1995), the Supreme Court analyzed a case in which a petitioner who had been convicted of participating in a drug conspiracy and of conducting a continuing criminal enterprise ("CCE") "in concert" with others, was sentenced to concurrent life sentences on each count.  The defendant argued that, although the sentences were concurrent, he was nonetheless impermissibly punished twice for the same offense, as a drug conspiracy was a lesser included offense of the CCE charge.  *Id.* at 296.[21]

---

facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."

*Gall*, 552 U.S. at 49-50 (internal citations omitted)

[21]The defense is not contending here that Count Twelve is a lesser included offense of Count Eleven, or vice versa.  Rather, the Supreme Court's language and reasoning in *Rutledge* provide a basis for the Court to decline to impose consecutive sentences because the conduct for both counts is essentially the same.

In its opinion, the Supreme Court initially noted that "Courts may not 'prescrib[e] greater punishment than the legislature intended.'" *Id*. at 298 *citing Missouri v. Hunter*, 459 U.S. 359, 366, (1983); *Brown v. Ohio*, 432 U.S. 161, 165, (1977). To that end, there is a presumption that "'where two statutory provisions proscribe the 'same offense,'' a legislature does not intend to impose two punishments for that offense." *Id. quoting Whalen v. United States*, 445 U.S. 684, 691-692 (1980); *Ball v. United States*, 470 U.S. 856, 861 (1985). The Supreme Court agreed with the defendant that the drug conspiracy was a lesser included offense of the CCE charge and ordered that one of the defendant's counts of conviction and one of the sentences be vacated as impermissibly duplicative. In its analysis the Court noted that the case involved "*two* conspiracy-like offenses directed at largely identical conduct" as opposed to the traditional "difference between conspiracy-like crimes and the substantive offenses on which they are predicated." *Id*. at 300, fn. 12 (emphasis in original) (internal citations omitted).

While not directly on point, the Supreme Court's analysis in *Rutledge* nonetheless counsels against the imposition of consecutive sentences here. Rana stands convicted of Count Eleven, conspiracy to provide material support to the conspiracy to attack the *Jyllands-Posten*, and Count Twelve, providing material support to a designated terrorist organization; that is, LeT. The government presented evidence that Lashkar was involved in the *Jyllands-Posten* conspiracy in Count Eleven for a limited time before dropping out. Another group, HUJI, then took over the *Jyllands-Posten* plot. Count Twelve charges that Rana provided material support to LeT. The bills of particulars, and the jury verdicts make clear, however, that Rana's conviction on Count Twelve relates only to the *Jyllands-Posten* plot.

Consequently, any provision of material support to the *Jyllands-Posten* plot, or

conspiracy to do so, would necessarily include the provision of material support to LeT. And, similar to both a CCE offense and a drug conspiracy, both offenses here are "conspiracy-like offenses directed at largely identical conduct." *Rutledge* at 1247, fn. 12. It has long been settled that "where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Whalen v. United States*, 445 U.S. 684, 692 (1980). In this case, Rana could not have provided material support to Lashkar regarding the *Jyllands-Posten* plot (Count Twelve) without also conspiring to provide material support to the *Jyllands-Posten* plot (Count Eleven). The provision of material support to Lashkar is subsumed within the provision of material support to the *Jyllands-Posten* plot. The Court, therefore, should decline to sentence Rana to consecutive terms of imprisonment, on the grounds that such a sentence would be duplicative or double counting.

### C.    Application of §3553 Factors to Rana's Case

In addition to the legal and factual arguments raised above, there are numerous aspects of this case and this defendant that warrant against a lengthy sentence of imprisonment. The defense submits that a sentence within the properly calculated guideline range; that is, without reference to the terrorism enhancement and including Rana's mitigating role, will adequately take into account all of the 18 U.S.C. §3553 factors and provide a sentence that is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.

### 1.    History and Characteristics of Tahawwur Rana.

The PSR and the letters written on behalf of Rana demonstrate that he is a loving husband and father, an upstanding member of his community, and a generous, kind, and

32

compassionate man.  The letters written by Rana's immediate family illustrate that Rana is a dedicated family man, who came from Pakistan and ultimately to the United States in order to make a better life for his family.  Emigrating first to Canada, Rana eventually settled in the United States, a country he loves to this day.  Here in the United States, Rana has raised a son and two daughters, all of whom have turned out to be smart, compassionate, and driven, as a result of his upbringing.

Rana, through both his personality and example, has instilled in his children an appreciation for hard work and dedication.  While building a life for his family in the United States, Rana created multiple businesses in the hopes of providing for them.  Rana's youngest brother, Fakhar Abbas Rana, describes Rana as a "compulsive entrepreneur."  It is this entrepreneurial spirit that brought Rana to the United States in the first place, believing that hard work and sacrifice would bring success.  Though Rana's businesses have not always attained great success, his tireless effort is admirable, and the effect of Rana's effort on his children is clear, all of whom achieved exceptional academic success, enrolled in college, or are currently in the application process.

Rana has also taken great pains to instill the importance of charity in his children.  Throughout the numerous letters written on Rana's behalf, a common theme is that Rana is almost excessively willing to provide help to anyone who is in need.  For example, Rana's eldest daughter describes a businessman that did not make money, but rather, provided opportunity and employment to people who needed clothing and food for their children, at great expense to himself.  She discusses Rana's dreams of starting a non-profit organization to feed the poor and provide a safe haven for children after school and his encouragement of his daughters to do the

33

same.  Rana's two daughters, along with his help, ultimately set up Tea House NFP, a non-profit

charitable organization.  Likewise, Rana's youngest daughter, writes about how Rana's support,

guidance, and example encouraged her to follow his lead and give back to those in need.  To that

end, she now spends her summers performing charity work such as helping children learn to read,

lecturing at-risk teens, and researching diabetes in poor Chicago neighborhoods.

It is not just Rana's immediate family that he has reached and inspired through his

charitable works.  For instance, one of Rana's youngest cousins, Abdur Rehman, from Pakistan,

writes that Rana's financial help and encouragement has enabled a number of young boys and

girls to attend school.  Abida Mushtaq, one of Rana's aunts, and Rana Iqtidar Abbas, another

cousin of Rana's, write that Rana regularly provided free medical care to those in need.  While

this already lengthy pleading could go much longer detailing each and every charitable act found

in the letters written on Rana's behalf, it should suffice to say that he is a selfless and caring

individual, who would go so far as to borrow money just to provide it to someone in need.

The fact that Rana stands convicted of the offenses at issue here is out of touch with the

man that Rana has been for his entire life, and the man he will continue to be during his

impisonment and upon his release.  There is a relatively simple explanation for this dichotomy.

But for his friendship with David Headley, Rana would never have been so much as suspected of

involvement in any sort of violent activity, let alone face sentencing following a conviction for

providing material support.  This Court likely remembers the testimony of Headley.  Through

cross-examination he was exposed as a liar, a thief, and a master manipulator.  It became readily

apparent during his testimony that he lied to, manipulated, and hid information from his family,

including his two wives, multiple branches of the United States government, terrorist

organizations, the Pakistani ISI, and Rana.

Rana did not become Headley's friend because the two met as adults and found that they had common interests. Rather, the two met as boys at the Hasan Abdal Cadet College in Pakistan, a strict, high level boarding school where boys from different backgrounds were thrown together. Headley was gregarious, funny, and often in trouble. Rana was studious and followed the rules. Nevertheless, the two formed a bond based on separation from their families and the sharing of a common dialect.

The two continued their friendship throughout their lives. But while Headley lived a life of crime and excess, Rana lived a full and productive life, becoming a doctor, joining the Pakistani military, starting several businesses, getting married and raising three children. Throughout that life, he made the unfortunate mistake of maintaining a relationship with Headley. Out of a sense of loyalty, Rana provided help to Headley when needed, helping him conquer a serious drug addiction, and going so far as putting his house up as collateral for Headley to obtain bond so that Headley could cooperate with the DEA and reduce a drug sentence. This continued friendship and loyalty to Headley ultimately led to Rana's downfall.

While Rana's association with Headley does not excuse his conviction, it does provide a glimpse of what Rana's life will be like upon his release from prison. No matter the length of Headley's sentence, he will no longer be a part of Rana's life.[22] Without Headley around, there is no chance whatsoever that Rana will become involved with any sort of terrorist organization or jihadist movement, commit any crimes such as the ones he stands convicted of, or recidivate in

---

[22]Even if Headley were to be released from prison some day, there is no reason to believe that Rana and Headley would ever be in touch again.

any other way.

Defense consulting expert Dr. Marc Sageman has provided a letter to the Court regarding Rana's sentencing. In his letter, Dr. Sageman opines that he does not believe that Rana was ever dangerous in the sense that he was personally violent, nor does he believe that Rana will be so in the future. More importantly, Dr. Sageman notes that Rana did not display the sort of signs or interests that are common in jihadi terrorists such as intensive interaction with jihadi websites and material. Nor does Rana display any indicator that he subscribed to violent jihadi beliefs, such as the belief that it was his personal duty to take action into his own hands, or the development of a "martial" self-identity as a soldier for Islam.

Dr. Sageman's letter concludes that Rana's actions seem to have been motivated by his desire to help and loyalty to Headley, rather than to directly assist terrorism. While Headley attempted over the years to convert Rana, the evidence elicited at trial made clear that Rana disagreed with Headley's view of Islam and resisted his attempts at conversion. Furthermore, as Dr. Sageman's letter explains, Rana never took steps to support terrorism directly; his involvement was always in relation to Headley.

Headley and Rana's friendship is over. The two individuals will never communicate or see each other again, either in prison or outside. Given that Rana has never been involved with anything criminal before, and that he was never directly involved with the terrorist organizations at issue here, or even supportive of terrorist beliefs, the risk that Rana will ever be involved in criminal behavior in the future is non-existent. Quite simply, had Headley and Rana never attended the same boyhood school, Rana would not be before this Court today. While this does not excuse his convictions, it does make clear that a lengthy term of incarceration is unnecessary.

36

A sentence sufficient to punish Rana for his convictions will suffice. His sentence need not take into account a risk of future criminal conduct.

Overall, Rana's conviction does not represent his true character. Rana is a kind, hardworking, dedicated, charitable, compassionate family man. He made the unfortunate mistake of becoming involved in the activities of his oldest – and most manipulative – friend, David Headley. For this conduct he faces punishment and being separated from his family for years – a hardship he has already suffered since 2009. However, given all that he has been to his family, and all the help and encouragement that he has provided to them and others throughout his life, a lengthy term of imprisonment is not warranted. The Court should take into account the totality of Rana's life, as well as the circumstances of his conviction, and sentence Rana to a reasonable sentence consistent with the guideline range calculated by the defense.

### a.    Rana's Health

As noted by the PSR, Rana suffered a heart attack while in custody in the MCC on June 30, 2012. Specifically, following debilitating chest pains and repeated requests for medical treatment over a seventeen-hour period, Rana was taken to Northwestern Memorial Hospital where he was diagnosed with acute coronary syndrome ("ACS") and a non-ST elevated myocardial infarction.[23] Rana was treated for approximately one week at Northwestern Memorial Hospital, before being discharged on July 5, 2012. Rana's treatment included a cardiac catheterization, angiogram, angioplasty, and the placement of a heart stent because of coronary blockage. Rana was also placed on a litany of daily medications that he continues to take to this

---

[23]The defense has obtained Rana's relevant medical records and can provide them to the Court if requested.

37

day.

Approximately three months after being discharged from Northwestern, Rana was admitted to Thorek Medical Center on September 28, 2012, following an incident in which he became dizzy and collapsed at the MCC. Thorek Hospital found that Rana's symptoms were likely related to a vasovagal event.[24] Following a CT scan and an overnight stay with no further episodes of dizziness, Rana was discharged and returned to the MCC.

As the PSR notes, MCC medical records show that Rana also suffers from chronic kidney disease (Stage II), coronary atherosclerosis, hyperlipidemia, esophageal reflux, hypothyroidism, hemorrhoids, allergic rhinitis, asthma, bursitis, acute peptic ulcer with hemorrhage, acute sinusitis, nasopharyngitis, hyperthyroidism, abrasion or friction burn, shoulder pain, joint disorder, psoriasis, and muscle spasms. Rana also, as of October 18, 2012, has been prescribed a large quantity of medications to treat blood disorders, high blood pressure, high cholesterol, asthma, sinus issues, GERD, and inflammation, among other drugs. The summation of these conditions and medications indicate that Rana is in very poor health. Given Rana's age of 51 (52 by the time of sentencing), it is likely that Rana's health will continue to deteriorate. He will likely at some point require dialysis due to his kidney disease, and is, of course, at risk for a second heart attack or vasovagal event.

Rana's health can be taken into account under §3553. Even when the Guidelines were mandatory, U.S.S.G §5H1.4 provided that an "extraordinary physical impairment" may be a reason to depart downward from a sentencing range. The defense submits that the above

---

[24]Counsel's research has revealed that a vasovagal event is characterized by a sudden drop in heart rate and blood pressure, reducing blood flow to the brain, and can be triggered by issues such as myocardial infarction and heart disease.

recitation of Rana's health conditions, and the fact that he has had two incidents which led to hospitalization, including a heart attack, within the past six months, show that Rana is suffering from extraordinary physical impairments. While downward departures under Chapter Five of the Sentencing Guidelines have given way to an analysis of the sentencing factors under §3553, it is apparent that Rana's health conditions weigh heavily against a lengthy term of imprisonment. Both society and the Bureau of Prisons, are not well served by a lengthy sentence for an aging individual in poor health. The Court should take Rana's health into account and decline to sentence him to a lengthy term of imprisonment.

### b.     The Conditions of Rana's Pretrial Confinement

Rana has been confined at the MCC since his arrest on October 18, 2009. For approximately the first thirteen months of his incarceration Rana was confined in the MCC's Special Housing Unit ("SHU"). For much of that time, Rana was also on a "three-man hold" requiring that three guards be present any time Rana was moved from one location to another within the MCC. During his time in the SHU, Rana lived in solitary confinement in a small cell. Many of his days were spent entirely in the cell. Rana was not allowed outside recreation, and only permitted limited indoor recreation three days per week. He was also only permitted a shower three times per week   He received severely limited phone and visiting time, had limited access to legal materials, and was subject to other onerous daily restrictions not placed on other inmates at the MCC.[25]

---

[25]Demonstrating the harsh nature of the SHU, Judge Castillo recently went so far as to order the BOP to permit an inmate housed in the SHU to have outdoor recreation over the government's objection. *United States v. Vincente Zambada-Niebla,* 09 CR 383 (N.D. Ill.) (Docket #116).

It is counsel's understanding that Rana was not placed in the SHU because of any fear of violence or escape, but rather because of the high profile and inflammatory nature of the charges brought against him. However, following approximately thirteen months as a model inmate in spite of conditions, and repeated requests to be released from SHU custody, Rana was released from the SHU and placed in the MCC general population. While in the general population, he has had no behavioral problems and has continued to be a model inmate, suggesting that his time in the SHU was both unnecessary and overly harsh given his non-violent and cooperative nature.

The extended period that Rana spent in the SHU was drastically more onerous than the conditions faced by all but the smallest minority of federal pretrial detainees. Despite only accusations of criminal activity, and no evidence of violence or behavioral problems in custody, Rana was subjected to among the harshest conditions that can be placed on an inmate. Such conditions were extraordinarily punitive and should be taken into account in fashioning a sentence for Rana.[26]

### 2.    The Need to Avoid Unwarranted Sentencing Disparities

18 U.S.C. §3553(a)(7) provides that a sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." While there is a dearth of cases of this type in the Seventh Circuit, in a recent Northern District of Illinois case, *United States v. Masri*, 10 CR 655, the defendant Shaker

---

[26]While the Seventh Circuit has not stated whether unduly harsh pre-sentence confinement conditions can justify a reduced sentence, the Court, in *United States v. Campos*, 541 F.3d 735, 751 (2008), cited to an 11th Circuit case, *United States v. Pressley*, 345 F.3d 1205, (11th Cir. 2003) in which comparable pre-sentence detention was held sufficient to support a downward departure. Specifically, in *Pressley*, the defendant was kept in his cell for 23 hours per day and not allowed outside for five of the six years of his confinement. *Id*. at 1219.

Masri plead guilty to one count of providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1). Specifically, Masri told a government cooperating source that he had decided to leave the United States in order to wage jihad as an armed combatant. 10 CR 655, Docket No. 91, p. 3. Masri explained to the source that he could either travel to Somalia to aid the terrorist group al-Shabaab, or travel to Afghanistan to aid al-Qaeda. *Id*. The source then offered to provide funds for Masri's travel, on the condition that the source travel with Masri to Somalia to join al-Shabaab. *Id*.

The source and Masri then met on several different dates in order to form a plan for how they would travel to Africa and connect with the al-Shabaab militia. *Id*. at 4. The men ultimately determined that they should travel to Mexico and then further into Latin or South America before traveling to Africa. *Id*. Prior to his arrest on August 3, 2010, Masri used a debit card provided by the source to book two one way flights to Los Angeles, scheduled to depart on August 4, 2010. Masri was ultimately arrested after obtaining $18,000 from a liquor store with the source, and purchasing a new laptop computer for the trip. *Id*.

As explained in the government's sentencing memorandum in the Masri case, Masri "did not simply want to offer himself as a soldier to fight in the ranks of a terrorist militia engaged in a bloody civil war, he wanted to die killing others." 10 CR 665, Docket No. 103, p. 3. Masri had also encouraged the source to review jihadist materials and provided recordings of terrorist lectures, and himself advocated extremist violence. *Id*. at 3-4. In a recorded conversation, Masri told the source that he wanted to learn how an explosive vest is made, and that he intended to wear one. *Id*. at 4. In another conversation, Masri stated that he wished he could blow himself up in the presence of United States' soldiers he had seen on the street. *Id*. Masri later stated that it

would be better if he could kill a bus full of American soldiers. *Id.* After a plea agreement, but with no cooperation, Masri was sentenced to a term of imprisonment of 118 months.

In sum, Masri was convicted of attempting to travel to a foreign nation in order to wage violent jihad, including violence and murder. Masri talked about his desire to kill American soldiers, expressed a desire to wear a bomb to kill a busload of Americans, and sought out and viewed jihadist lectures and materials.[27] Masri's end goal was to personally kill "enemies" of Islam and end his life as a martyr. 10 CR 665, Docket No. 103, p. 3.

Rana, by contrast, provided a business card to Headley, sent an email purporting to be Headley, and arranged travel for Headley. He had no plans to personally wage jihad, never discussed harming Americans or American soldiers, and as the evidence showed, was kept almost largely about the nature of the *Jyllands-Posten* plot, unaware of even its code name.[28]

Furthermore, it cannot go unmentioned that there was substantial testimony at trial that Headley's own wife, Shazia Gilani, was aware of Headley's involvement in the Mumbai attack and the Denmark plot, that she congratulated him as the attacks in Mumbai were occurring, that she assisted him in arranging travel with regard to the Denmark plot, and that she was proud of her husband's actions. Tr. 975-9. To this day, Shazia Gilani has not been arrested or charged with any provision of material support. Nor have Headley's brother or uncle been charged.

---

[27]While there were such materials found in Rana's home there is no evidence that Rana viewed all of the materials, agreed with their contents, or encouraged others to review the materials.

[28]It should also be mentioned that Mohamed Geele, a Somalian terrorist who broke into the home of Kurt Westergaard (the main cartoonist behind the Prophet Mohammad depictions at issue here) and attempted to kill him with an axe and a knife in 2010, was sentenced to nine years imprisonment by a Danish Court. *See*, http://www.bbc.co.uk/news/world-europe-12366076.

In order to avoid an unwarranted sentencing disparity between Rana and other individuals who have been involved in such crimes, this court should sentence Rana to a term of imprisonment consistent with the guideline range calculated above by the defense. Such a sentence will punish Rana, provide a deterrent to both him and others, and provide a punishment consistent with the gravity of the offense.[29]

### 3.    The Sentencing Range

Should this Court determine that the terrorism enhancement does apply to Rana's offense, then Rana should be sentenced to a term of imprisonment significantly below the guideline range. At the very least, the terrorism enhancement more than doubles Rana's sentence. While there is no doubt that Rana's offense is serious, he already begins with an extremely high base offense level of 33. Increasing this offense level by an additional twelve levels serves no compelling purpose, penal or otherwise. Furthermore, the imposition of a Criminal History Category of VI is unduly harsh as it places Rana in the most serious criminal history category when this conviction represents his only crime. For all of the above reasons, there is no need to sentence Rana to a Guidelines sentence that includes the terrorism enhancement apply. Such a sentence would not reflect the nature and circumstances of the offense, Rana's history and characteristics, the need for the sentence imposed, or the need to avoid unwarranted sentence disparities. Simply put, a sentence of the length suggested by the terrorism enhancement would be far greater than necessary to comply with the purposes of 18 U.S.C. §3553.

---

[29]There are a number of other terrorism cases nationwide that also counsel against a lengthy sentence for Rana. However, as the government has not indicated what specific sentence it will seek, the defense wishes to reserve the right to supplement this position paper in that regard should the government seek a sentence approaching the maximum sentence of 30 years.

43

**IV.     Conclusion**

Rana respectfully requests that this Court impose a reasonable sentence, taking into

consideration all of the information and circumstances discussed herein.

Respectfully submitted,

s/Patrick W. Blegen
PATRICK W. BLEGEN, One of the
Attorneys for Defendant, Tahawwur Rana.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served on January 14, 2013, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

**s/ Patrick W. Blegen**
**PATRICK W. BLEGEN**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100