1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3
     UNITED STATES OF AMERICA,      )  Docket No. 09 CR 830
4                                   )
                    Plaintiff,      )  Chicago, Illinois
5                                   )  January 17, 2013
               v.                   )  10:34 o'clock a.m.
6                                   )
     TAHAWWUR HUSSAIN RANA,         )
7                                   )
                    Defendant.      )
8
                 TRANSCRIPT OF PROCEEDINGS - SENTENCING
9              BEFORE THE HONORABLE HARRY D. LEINENWEBER

10   APPEARANCES:

11   For the Government:          MR. GARY SHAPIRO
                                  Acting United States Attorney by
12                                MR. DANIEL J. COLLINS
                                  MS. SARAH E. STREICKER
13                                219 South Dearborn Street
                                  Chicago, Illinois 60604
14
     For the Defendant:           BLEGEN & GARVEY by
15                                MR. PATRICK W. BLEGEN
                                  MR. DANIEL A. RUFO
16                                53 West Jackson Blvd.
                                  Suite 1437
17                                Chicago, IL  60604

18                                SWIFT & McDONALD by
                                  MR. CHARLES D. SWIFT
19                                1809 7th Avenue
                                  Suite 1108
20                                Seattle, Washington  98101

21
     Court Reporter:             GAYLE A. MCGUIGAN, CSR, RMR, CRR
22                               Official Court Reporter
                                 219 South Dearborn Street
23                               Room 2318-A
                                 Chicago, Illinois 60604
24                               (312) 435-6047

25

1         (In open court:)

2         (Defendant enters courtroom.)

3              THE CLERK:  09 CR 830, United States versus Rana.

4              MR. COLLINS:  Good morning, your Honor.  Dan Collins

5    and Sarah Streicker on behalf of the United States.

6              MR. BLEGEN:  Good morning, Your Honor.  Patrick

7    Blegen, Charles Swift, and Daniel Rufo on behalf of Mr. Rana,

8    who is present.

9              PROBATION OFFICER:  Good morning, your Honor.  Kelly

10   Kwong on behalf of the probation office.

11             THE COURT:  We're here for sentencing.

12             MR. BLEGEN:  Yes.

13             THE COURT:  Ready for sentencing?

14             MR. BLEGEN:  Yes.

15             THE COURT:  Okay.  First, I have reviewed the

16   pre-sentence investigative report prepared by Miss Kwong dated

17   November 15th of last year.

18             I have received and reviewed the government's position

19   paper as to sentencing factors, the government's objection to

20   the pre-sentence report, and the government's version of the

21   offense.

22             In addition, I have read and reviewed defendant Rana's

23   pre-sentence investigation report, position paper, and

24   comment -- commentary on sentencing factors, the defendant's

25   version of the offense, and a series -- I did not count them,

1    but there's a substantial number of letters written on --

2    character reference letters written on behalf of Mr. Rana, many

3    of them from family and acquaintances and business people.

4         In addition, just -- I did review my amended

5    memorandum opinion and order on the post-trial motions.

6         Have I -- I also received just a moment ago a

7    supplemental report from the probation office dated

8    January 16th concerning a victim impact statement prepared by

9    Andreina, A-N-D-R-E-I-N-A, Varagona, V-A-R-A-G-O-N-A.  And

10   also, I'm not sure where I got these, but I got -- appears to

11   be a victim impact statement from a Nancy Walsh.

12        Anything else I should have?

13        MR. COLLINS:  No, your Honor.

14        THE COURT:  Has the defense seen all of these

15   documents?

16        MR. BLEGEN:  I -- we don't have a recollection of a

17   Nancy Walsh victim impact statement.

18        THE COURT:  I don't -- I don't know where it came

19   from.

20        MR. COLLINS:  It's attached to the PSR, your Honor.

21        MR. BLEGEN:  We'll check to see if it is then.  I just

22   don't recall --

23        THE COURT:  If you want to look at it, I've got it

24   here.

25        Mr. Blegen, have you read the pre-sentence report?

```
 1                    MR. BLEGEN:  Yes.

 2                    THE COURT:  Have you had -- have you read all of the

 3      documents I've referred to?

 4                    MR. BLEGEN:  Yes.

 5                    THE COURT:  Have you discussed them all with your

 6      client?

 7                    MR. BLEGEN:  Yes.

 8                    THE COURT:  Mr. Rana -- Dr. Rana, have you read this

 9      pre-sentence report?

10                    THE DEFENDANT:  Yes, your Honor.

11                    THE COURT:  Have you discussed it with Mr. Blegen?

12                    THE DEFENDANT:  Yes, sir.

13                    THE COURT:  Leaving out calculations for the

14      guidelines, is it accurate?

15                    MR. COLLINS:  Yes, your Honor.

16                    MR. BLEGEN:  Yes.

17                    THE COURT:  Okay.  Is that correct, Mr. Rana, that the

18      factual matters in this, leaving out the guideline

19      calculations, are accurate?  Is that correct, sir?

20                    MR. BLEGEN:  I'm not sure he understands, Judge.

21                    We didn't have any objections to the details of his

22      family history --

23                    THE COURT:  Right.

24                    MR. BLEGEN:  -- and those sorts of things.

25                    THE COURT:  Correct.  The family history and those
```

1    personal matters to you, rather than the legal matters, are

2    accurate.  Is that correct, sir?

3              THE DEFENDANT:  Yes.

4              THE COURT:  You said the government is satisfied.

5              MR. COLLINS:  Yes, your Honor.

6              THE COURT:  All right.  Now, in reviewing, there is

7    agreement as to the base offense for Counts 11 and 12.  Is that

8    correct?

9              MR. COLLINS:  Yes, your Honor.

10             MR. BLEGEN:  Yes.

11             THE COURT:  And there is disagreement as to whether or

12   not there should be a 12 -- on both counts, the government

13   contends that there should be, pursuant to 3A1.4, a victim

14   aggravation of an increase of 12 on both Counts 11 and 12.  And

15   the defense disagrees.  And the probation office had suggested

16   only on 12, not on 11.  Is that accurate?

17             MR. COLLINS:  Yes.

18             THE COURT:  So that issue remains to be resolved.

19             The role in the offense, the government and the

20   probation office indicate that there should be no adjustment up

21   or down on the role of the offense.  And the defense wishes

22   that either a minor or minimal role.  Is that correct?

23             MR. BLEGEN:  Correct, Judge.

24             THE COURT:  So two- or four-level reduction.

25             MR. BLEGEN:  I think there's also an intermediary

1    three-level reduction that is possible.  It's obviously up to

2    you.

3              THE COURT:  On the Count 12, the base that's agreed is

4    26.  Is that correct?  Both sides agree with that?

5              MR. COLLINS:  Yes, your Honor.

6              MR. BLEGEN:  Yes.

7              THE COURT:  And the -- there's a recommendation of a

8    two-level increase for intention.  I can't remember now whether

9    you objected to that or not.

10             MR. BLEGEN:  We have not.

11             THE COURT:  Okay.  So the 12-level, promote terrorism,

12   has been recommended.  And the defense disagrees with that, and

13   the government agrees with that.  Correct?

14             MR. COLLINS:  Yes, your Honor.

15             THE COURT:  And as far as grouping is concerned, the

16   probation office believes they should not be grouped, but both

17   of you agree that they should be grouped.  Is that accurate?

18             MR. COLLINS:  Your Honor, we had indicated in our

19   government's version that we believe they should be.  After we

20   saw probation's more detailed analysis of it, we agree with

21   probation and think they should not.  And as a result, there

22   should be an increase --

23             THE COURT:  That's the one additional issue that must

24   be resolved.

25             MR. COLLINS:  Yes.

1          THE COURT:  And then the final issue to be resolved,

2     and it really will depend on a prior resolution, and that is

3     whether or not the terrorism increase of 12, if that applies,

4     and that increases the criminal history to VI, as otherwise it

5     would be a criminal history I.  Is that it?

6          MR. COLLINS:  Yes.  Yes.

7          THE COURT:  So have I listed all of the areas of

8     dispute that need to be resolved?

9          MR. COLLINS:  Yes, your Honor.

10         MR. BLEGEN:  Yes.

11         THE COURT:  Any suggestions on how we proceed?  Just

12    go to -- right down the list?

13         MR. COLLINS:  Sounds --

14         THE COURT:  There's been substantial written on both

15    sides, which I've read, as to all of these issues, so I

16    certainly will give you a chance to go in, but I would ask that

17    perhaps you summarize your arguments.  So you don't need to go

18    through -- I think each devoted, for example, about 20 pages to

19    the issue of terrorism increase of 12.

20         MR. BLEGEN:  That's true, Judge.

21         One thing I would say is that the local rules got

22    changed recently.  It used to be you would have simultaneous

23    filing of position papers.  Now it's defense files first and

24    then the government.  So there is some new stuff in the

25    government's submissions that we haven't addressed.

1           THE COURT:  I'm not stopping you --

2           MR. BLEGEN:  Okay.

3           THE COURT:  -- from presentation.  I'm just suggesting

4    that there has been an exhaustive written -- I should ask this:

5    Is there going to be any oral testimony?

6           MR. COLLINS:  No, your Honor.

7           MR. BLEGEN:  No.

8           THE COURT:  Okay.  So then we should proceed to I

9    guess the -- probably the biggest area of disagreement,

10   obviously the most potent one, is the terrorism aggravation of

11   12 levels.

12          The government wishes on both.  The probation office

13   suggests just on Count 12.  And the defense, of course, has

14   argued that it not apply, so ...

15          On Count 11, since the probation office has not

16   recommended the increase, do you wish to make your argument?

17          MR. COLLINS:  Your Honor, as we laid out --

18          MR. BLEGEN:  Judge, would it be all right if Mr. Rana

19   sits down while --

20          THE COURT:  Sure.  Absolutely.

21          MR. COLLINS:  Your Honor, as we laid out in detail, as

22   you mentioned, and so I'll be brief, the government feels that

23   we need to consider these two counts separately.

24          And in looking at Count 11, we need to look at the

25   intentions that were behind the conduct.  And we know those

1    intentions from what the participants said and how they planned

2    this to take place.

3             This was calculated to retaliate against the

4    government, your Honor.  And there's little question based on

5    the evidence.

6             The defendant and Headley talked about the fact that

7    the Prime Minister of Denmark defending the free expression of

8    this newspaper was a bad thing, and they thought that his

9    promotion to a NATO commander was a bad thing in light of that.

10            One of the participants in the plan rejected the idea

11   that it be focused only on the newspaper, stating, "All Danes

12   are responsible."

13            And one of the architects of the plan planned it in

14   such a way so that it was not just a retaliation against the

15   newspaper, but it was planned in a way to involve a response

16   from Danish forces.  And not just any response, Judge.  It was

17   planned in a way to heighten that response so that the nearby

18   Danish military would respond and be involved in a fight to the

19   death.  Headley took surveillance video of those nearby

20   soldiers.  And it was discussed with the other participants,

21   including the defendant.  As you know from our briefs, that

22   there was extensive -- that there was a worldwide extensive

23   response to this.

24            And it is important for the context in terms of what

25   the defendant's intentions here were and what this crime

1    involved.

2              The reaction was not just to the newspaper.  It was to

3    the Danish government and their defense of their freedom of

4    expression.

5              Danish government facilities were in jeopardy

6    worldwide.  And the fact that they planned this attack at a

7    private building does not mean that the terrorism enhancement

8    does not apply.

9              We laid this out in some detail, Judge.

10             There are numerous instances in recent and long

11   history of private facilities being attacked for purposes of

12   terrorism.

13             This was no different, and the government believes

14   that the enhancement should apply.

15             THE COURT:  Mr. Blegen?

16             MR. BLEGEN:  I might be a little longer than

17   Mr. Collins was.

18             Judge, there is no evidence in this case supporting

19   the application of the terrorism enhancement to the plot to

20   attack the *Jyllands-Posten* newspaper.

21             One of the ways you can figure that out is because in

22   trying to get the enhancement, the government cited to about

23   seven or eight newspaper articles relating to other attacks and

24   other plans.  None of those articles, if you read them, were

25   related to the *Jyllands-Posten* offense, the plot that is at

1    issue here.

2          And the terrorism enhancement is offense specific.

3          They cannot obtain the terrorism enhancement by saying

4    that some other group of people wanted to attack a different

5    building, the country of Denmark, a specific person, and then

6    impute that offense to Mr. Rana.

7          Mr. Rana's offense on Count 11 is the *Jyllands-Posten*

8    plot.  There is no other plot in this case in Denmark other

9    than the *Jyllands-Posten* newspaper.

10         The government has talked, just now, and said that

11   there's evidence supporting that the purpose of the plot was to

12   retaliate against the government of Denmark.

13         Well, they had a witness on the stand who participated

14   in the very first meeting regarding the plotting of this

15   offense.

16         David Headley met with the guy Sajid and with

17   Major Iqbal in Pakistan and discussed the offense.  And the

18   government asked Headley what the purpose of the plot was.  And

19   he told them, under oath, their own witness -- this didn't come

20   out on cross-examination.  This is from them.  This is from

21   their witness.  And we refer to it in our pleadings.  And I can

22   tell you exactly what he said.

23         He said, "The whole purpose" -- let me find it

24   exactly.

25         "The whole discussion of the newspaper was only to

1    avenge the fact that they had made cartoons."

2           That's the evidence in this case about the purpose of

3    the *Jyllands-Posten* plot.

4           There was no discussion by Headley.  Headley never

5    said the purpose was to attack the government of Denmark.  He

6    never said that it was -- that its purpose was to do something

7    to the Prime Minister of Denmark.  That's what he said the

8    purpose of the plot was.

9           And the government, they -- in their pleadings, you

10   may have seen, that they said, Well, the defense is pointing to

11   one snippet of evidence but ignoring the totality of the

12   evidence.

13          That's -- that's a -- that's a trick.  Okay?

14          This is a critical piece of evidence, which they've

15   ignored.  And they're saying by pointing to it, we're ignoring

16   the rest of the evidence.  We didn't ignore the rest of the

17   evidence.  We discussed all of it in our pleadings.  And none

18   of it comes close to overcoming the explanation by their

19   witness as to the purpose of the plot.  And that's the whole

20   question here is what was the purpose.  To retaliate against a

21   newspaper for publishing cartoons?  Or to somehow influence or

22   retaliate against the government of Denmark.  They haven't come

23   close to the other one.

24          And I'll discuss a couple of the points that

25   Mr. Collins made here in a second.

1    They have asked you to rely on several facts.  And you

2    probably recall the bullet point presentation from their

3    pleading.  They've asked you to adopt those facts for Count 11

4    and suggest -- or to decide, I guess, that that is why the

5    terrorism enhancement is applicable.

6    All of those are either factually incorrect or do not

7    support the application of the terrorism enhancement.

8    It's on page 19 of the government's objections to the

9    pre-sentence report, which is Docket 2674.

10   THE COURT:  Page 19?

11   MR. BLEGEN:  Page 19.  It's their first bullet point

12   presentation.

13   THE COURT:  All right.

14   MR. BLEGEN:  And these are the facts that they say

15   support the terrorism enhancement.  And they've suggested to

16   you that while the Seventh Circuit hasn't said you have to do

17   this, that another circuit says courts should list the facts,

18   the evidence that they're relying on, to support the terrorism

19   enhancement.

20   In one case, in fact, that we've cited says if you

21   don't have evidence to support the terrorism enhancement, then

22   you cannot -- then you cannot apply it.

23   Number one.  Lashkar and Kashmiri, the planners of the

24   Denmark attack, made clear their belief that "All Danes are

25   responsible" for the cartoons.

1      And they have "All Danes are responsible" in quotes.

2      First off, Ilyas Kashmiri never said anything that

3    "All Danes are responsible."  He never said that.

4      Sajid Mir, not Lashkar in total, but a guy named Sajid

5    Mir, did say "All Danes are responsible."

6      We went back and looked at the transcripts and said,

7    Well, in what context did he say "All Danes are responsible"?

8      Here's what happened.  David Headley, after the plot

9    to attack a newspaper had already been made, to attack the

10   *Jyllands-Posten*, said to Sajid, The whole newspaper isn't

11   responsible for this, just the cartoonist and the editor.

12     So right there we already know that one of the

13   plotters, Headley, and the only one that Rana knows, is saying

14   that not even the whole newspaper is responsible.  So clearly

15   the whole government of Denmark is not responsible, but not

16   even the whole newspaper, just two people are responsible.  Why

17   don't we limit the attack to them?  And Sajid said, No, all

18   Danes are responsible.

19     But he said that because he just didn't care that the

20   other people in the newspaper building were going to get hurt

21   as part of the attack.

22     "All Danes" is not the government of Denmark.  "All

23   Danes" are the citizens of Denmark.

24     Sajid is just saying, I don't care that those other

25   newspaper employees get hurt.  But he didn't say, So just

1    simply shoot Danish people on the street.

2            The attack was still limited to the newspaper.  That's

3    the evidence of this "All Danes" statement that they're relying

4    on to say somehow the terrorism enhancement should apply.

5            Mr. Collins mentioned bullet point number two as well.

6            Bullet point number two has to do with Ilyas Kashmiri

7    talking about beheading people as part of the plot to attack

8    the newspaper and throwing the heads out the window.  And he

9    indicated that that was designed to create a heightened

10   response by the Danish authorities.

11           Again, we looked at the transcripts.  That's not what

12   Ilyas Kashmiri said.  He said the Danish responders are going

13   to be good, they're going to be competent and good at their

14   jobs.  We're trying to make -- we're going to try to make them

15   not good at their jobs by doing something shocking like

16   throwing the heads out the window.

17           You can look at it.  It's in the transcript.  It

18   starts on page 434 of Headley's direct testimony.

19           In fact, Headley says, "He said the Danish response

20   forces would not be as incompetent and timid as the Indians,

21   and, therefore, we should expect that the siege won't last very

22   long.  He said to make them hurry, they should -- the soldiers,

23   the attackers, should throw out heads of the hostages from the

24   window."

25           "And why would that be important," the government

1    asked.

2           And Headley said, "To rush the Danes into assaulting

3    the building."

4           They're not trying to heighten any attack, make it a

5    bigger -- to make the response bigger.  They're trying to make

6    the response worse.

7           The government also indicates in this part that it was

8    going to be a stronghold option, and that somehow means it's an

9    attack against government.

10          The stronghold option is just so the attackers

11   themselves don't survive and they can't rat out the people who

12   sent them there back in a foreign country.

13          The government has also suggested that the simple fact

14   of police involvement is enough to get the terrorism

15   enhancement, as they just said, Well, there were going to be

16   soldiers who would respond.

17          If that's the criteria, which it's not, every crime

18   gets the terrorism enhancement, because virtually every crime

19   gets some sort of response from authorities, either at the time

20   or later for the investigation.

21          It is not a way to get the terrorism enhancement

22   because it doesn't convert the attack to one on government.

23          Bullet point number three, which they would like to

24   adopt -- oh, I'm sorry.  Mr. Rufo also reminded me of something

25   about the heightened response of throwing the heads out the

1    window.

2    That was not part of the plot.  It was a suggestion

3    made by Ilyas Kashmiri to Headley, which Ilyas Kashmiri told

4    Headley he was free to reject.  So it's not essentially part of

5    the plot.  It's a suggestion that one guy made.

6    And here's what Headley said about it.

7    "He was giving his idea, but he left it up to my

8    discretion.  If there was anything that prevented it, it could

9    be changed."

10    Page 435 of the transcript.

11    So the government has now jumped forward and said, Oh,

12    this has become an essential part of the plot.  It's going to

13    happen.

14    It was only a suggestion.  And it did not change an

15    attack on a private building into an attack on government.

16    Bullet point number three.  They've indicated that

17    Mr. Rana was aware of the plans of Kashmiri and said, "Good,"

18    meaning the heads thrown out the window apparently, and that

19    "This would be a huge event in the media."

20    First of all, there's no indication that the jury

21    necessarily believed that Mr. Rana was told, We're going to go

22    throw the heads out the window, and he said "Good" in response

23    to it.

24    They didn't have to accept every word that Headley

25    said.  They obviously did not accept every word that he said.

1    And there's no independent corroborating evidence of that.

2              But even if they did con -- say that, Headley later

3    retracted that statement.  Rana didn't say "Good."  According

4    to Headley, Rana said, "Just said okay.  I am not saying he was

5    jumping for joy."

6              But even if he were jumping for joy, Judge, the point

7    is not how gruesome the attack was going to be, for the

8    terrorism enhancement.  The point is was it directed against

9    government, is it an attack on government.

10             That's why bullet point number four is irrelevant.

11   Knowing not only the gruesome violence planned in Denmark, but

12   also the results in Mumbai, defendant still conspired to do it.

13             The gruesome nature of it -- this is not the gruesome

14   attack enhancement.  This is the terrorism enhancement.

15             Terrorism offenses themself already start out at a

16   very high level.

17             They only jump to this extremely high level and put

18   the defendant in criminal history category VI if they were

19   designed to retaliate against government or to influence

20   government, and the gruesome details have no impact on it being

21   a government attack.

22             Bullet point number five.  Defendant admitted that he

23   was aware of the Prophet Mohammad cartoons published by a

24   newspaper in Denmark and told law enforcement that he condemned

25   the cartoons and knew that Headley wished death upon those

1    responsible for the cartoons.

2    What he actually said is not "those responsible."  I

3    guess they're trying to make "those responsible" to be the

4    government of Denmark.  But he said on the cartoonists, that's

5    what Headley said, and that's what Rana admitting to it having

6    heard.

7    That bullet point does -- also does not convert this

8    into attack on government.

9    Bullet point number six is the issue with regard to I

10   guess former Prime Minister Rasmussen of Denmark.  The

11   government, I believe, is suggesting that somehow the attack on

12   the newspaper was really intended to be an attack on

13   Mr. Rasmussen.

14   First of all, Mr. Rasmussen, as I read in one of the

15   articles attached to the government's pleadings, said that he

16   disagreed with the publishing of the cartoons and said that he

17   would not have done it.

18   So there seems to be no independent reason to attack

19   Rasmussen based on the government's belief about First

20   Amendment rights or whatever they call them in Denmark.

21   But what they've also done in bullet point six is sort

22   of tried to combine Headley and Rana into one person, even

23   though it's really only one person who is talking about

24   Rasmussen.

25   They're referring to an issue in a post-arrest

 1    statement from Rana, and suggesting that Rana himself believed

 2    that some sort of attack against Rasmussen or that Rasmussen

 3    was somehow awarded when he shouldn't have been happened.

 4            That's not what the -- simply not what the transcript

 5    says.

 6            In part of the transcript of the post-arrest

 7    statement, Agent Parsons, who is taking the statement, stops

 8    Mr. Rana when he's talking about something and says, Tell me

 9    again, I want to understand, what did Headley say to you about

10    this?  And he responds, Rana responds, by explaining what

11    Headley said.  Headley said that this guy Rasmussen got

12    promoted to some high role in NATO and he shouldn't have done

13    this because he got a bad thing.

14            The government's pleading then goes on to say they,

15    meaning Rana and Headley, believed that Rasmussen shouldn't

16    have been promoted.  But they don't have any evidence of that.

17    There's not one piece of evidence suggesting that Rana thought

18    Rasmussen shouldn't have been promoted.

19            What they did was take a statement of Headley, related

20    by Rana, and then just said, Oh, it's now Rana's statement,

21    too, and he agrees with it.

22            That's -- they've taken the transcript, they've taken

23    what Headley said, and converted it to Rana and -- but more

24    importantly, there is no attack planned on Mr. Rasmussen.

25            The attack, the only plot, was on the newspaper

1    building.

2        And, Judge, this was part of -- it's on Docket Number

3    352-2, if somebody wants to take a look at it, on page 63.

4    It's a government exhibit of Rana's statement.  And if

5    everybody wants to check and see if I'm wrong about what

6    happened.  It starts with Agent Parsons saying, "Let me

7    understand what he, David, told you."  Rana says, "Yes."  And

8    then Rana goes on, I won't read the whole page, to explain what

9    Headley told him about Rasmussen and NATO.

10        That's the evidence they're relying on to try to say

11    that Rana believed Rasmussen shouldn't have been promoted.

12        It's not there, and that's not what the transcript

13    says.

14        Bullet point seven.  Defendant expressed to Headley

15    his belief that an attack in Denmark in retaliation for the

16    cartoons was long overdue.

17        I cannot still at this moment understand why, even if

18    this were said by Rana, that saying something is "long overdue"

19    converts a plot from one against a private entity to one

20    against a government.

21        The length of time that the insult has been out there

22    really has nothing to do with whether the terrorism enhancement

23    applies or not.

24        And the "long overdue" comment comes, of course, only

25    in relation to the newspaper.

1          Number eight, bullet point eight.  The government says

2     that defendant and Headley referred to Denmark as the target of

3     the plot.

4          I believe what they're talking about here, Judge, is,

5     if you can recall, at one point Headley sort of saying out some

6     words during a recorded conversation.  He said, Somnath,

7     Denmark, Shiv Sena, and Bollywood.  And then said something in

8     Urdu or another language.  That's I believe what they're

9     talking about when they say because he used the word "Denmark"

10    when he was doing that, somehow the plot to attack the

11    *Jyllands-Posten* was really a plot to attack Denmark.

12         That is absurd.  "Denmark" was shorthand for what he

13    was talking about, at best.

14         Headley himself said that the sing-song thing he said

15    was a joke.  And more importantly, there were other names for

16    the plot as well.  It was called the Northern Project.  It was

17    called the Mickey Mouse Plot.  None of those names of the plot

18    convert it from what it was, a plan against a newspaper, to

19    something else.

20         Is the government going to suggest that there was a

21    plot to attack all of the north because they called it the

22    Northern Project?  Or Disney because they called it the Mickey

23    Mouse Plot?

24         Those were just names for the plot.  The plot itself

25    was still against the *Jyllands-Posten*.

1          And then lastly -- almost lastly, bullet point nine,

2     they've indicated that prior protests and terrorist attacks

3     from other groups on other people and other buildings should

4     somehow convert this one into an attack on government.

5          They can't do that, Judge.  There's no case that

6     suggests that they can take another offense and use that to

7     find that this offense qualifies for the terrorism enhancement.

8     And they've presented no evidence that anybody in this case was

9     somehow mimicking these other people or was doing what other

10    people wanted to do, that, frankly, the other attacks is

11    irrelevant.

12         Mr. Collins said when he was up here that there are

13    attacks on private buildings -- and we've listed them in our,

14    in our pleadings, and some of those are -- should get the

15    terrorism enhancement.  They listed two.  They listed the

16    attack on the World Trade Center and said clearly that should

17    get the terrorism enhancement.

18         The attack on the World Trade Center was part of a

19    coordinated attack to attack multiple places, including the

20    Pentagon.  So nobody would suggest that that was not an attack

21    on government.

22         It doesn't make, in here, there was a plot against the

23    *Jyllands-Posten*, not the *Jyllands-Posten* and Danish parliament.

24         They've also suggested the Mumbai attack on the Taj --

25    the Taj Hotel.

1      That attack was part -- also part of a bigger attack

2  that also targeted other locations, and there was discussions

3  that the reasons they wanted to attack the Taj Hotel and wanted

4  to attack it at a time when there would be computer technical

5  people from India there because they wanted to hurt the Indian

6  economy directly.  That's one of the reasons why that plot

7  would qualify.

8      But that doesn't convert this plot, the

9  *Jyllands-Posten* plot, into one against government.

10     And then the last thing they refer to is a DVD found

11  in Rana's home talking about the attack on the Danish embassy

12  and somehow suggesting that because he had this DVD, that means

13  the purpose behind the *Jyllands-Posten* plot was somehow

14  different than what it -- what it really was.

15     First of all, as I think the Court has previously

16  concluded, possession of something does not equate with,

17  necessarily, with agreement to its contents.  That's why you

18  precluded it from trial in the first place, one of the reasons.

19     But this DVD also says nothing about the purpose of

20  this specific plot.

21     The terrorism offense is -- excuse me, the terrorism

22  enhancement is offense specific.

23     We're talking about the *Jyllands-Posten* plot, not an

24  attack on the Danish embassy.

25     And also -- although this didn't come out at trial,

1   it's in statements that Headley has made to the government --

2   Headley gave this DVD to Rana.  He never watched it with him.

3   He's not sure that Rana ever watched it.  And he never

4   discussed it with Rana.

5           So how does it suddenly become some underpinning or

6   some basis to convert the purpose of the *Jyllands-Posten* plot

7   to retaliating against a newspaper building or a newspaper

8   company to retaliating against the entire country of Denmark.

9   It can't.

10          That's the bullet points.  Those are the ten points

11  that they've asked you to rely on.  And, frankly, half of them

12  are not even factually accurate, and the rest are essentially

13  irrelevant.

14          There is no evidence in this case to support the

15  application of the terrorism enhancement to the *Jyllands-Posten*

16  plot.  Headley told us the purpose of it.

17          They have the burden of proof.  If they want to prove

18  it, they can call him back, see if they can get him to say

19  something different.  Call another witness, see if they can get

20  that person to say something different.  But when they asked

21  the question at trial, they got an answer that they didn't

22  want.  Now they're trying to muck up that answer by throwing in

23  allegations of other attacks.

24          The *Jyllands-Posten* is a private newspaper building.

25  Nobody denies that.  It's not a government building.

1   Copenhagen is the capital of Denmark, so there are going to be

2   a lot of government buildings there.  There could have been a

3   plot to do that, but there wasn't.  It was the newspaper.

4           THE COURT:  Okay.

5           MR. BLEGEN:  Thank you, Judge.

6           THE COURT:  Anything further?

7           MR. COLLINS:  Judge, if I may briefly respond, very

8   briefly.

9           THE COURT:  Very briefly, yes.

10          MR. COLLINS:  Very briefly, Judge, you know, the

11  suggestion was made a moment ago that Sajid is just -- just

12  some member of Lashkar.

13          Sajid was one of the Lashkar leaders.  He was the main

14  architect of what they had done just months before.

15          So to try to disassociate Sajid from Lashkar is

16  really, really ridiculous.

17          The idea that one snippet of Headley's testimony is

18  the only testimony ignores Headley's other testimony about what

19  this plan would entail, and Headley's other testimony and the

20  videos that we saw of the nearby forces that were going to

21  respond to this attack.  Calling this a suggestion as opposed

22  to a plan is really something else, considering that Kashmiri

23  instructed Headley to go visit two people in the United Kingdom

24  and let them know that this was going to be a fight to the

25  death and instruct them to make martyrdom videos because they

1     knew that there would be a fight to the death.

2              When it's a stronghold, Judge, that's what it is.

3     It's a fight to the death.

4              Well, who is going to kill these attackers?  It's

5     going to be the Danish military forces, of which Headley did

6     surveillance, and of which Headley found out that they have

7     real ammunition, and then communicated that to the defendant.

8              He wants to disassociate himself from everything --

9     all the other participants in the plot said and act like, Well,

10    they don't speak for me.

11             Well, Judge, he knew Sajid wanted all -- that thought

12    that all Danes were responsible.

13             He knew that Kashmiri wanted Danish military killed.

14             He knew that Headley was mad about Rasmussen.

15             And he took all the actions to support this plot after

16    knowing those things.  He knew what these participants were

17    calculating in -- in -- in the Danish attack.

18             And it was not just against the newspaper.  The plan

19    was much broader.  And there's significant evidence in the

20    record of that.

21             And he can nitpick about, you know, the way things

22    were described within that, but that evidence is all there,

23    Judge.

24             And I know -- I know I don't want to reiterate what's

25    been put in our brief.  We addressed this point extensively,

1    and you've asked me to be brief, so I'll be so.  But you can't

2    just ignore all the other participants and what they said and

3    what they wanted this to be.  He knew what they wanted.  He

4    agreed to help them.  He actively did.

5              THE COURT:  Well, as far as Count 11 is concerned, I'm

6    going to find that the -- that the terrorism enhancement does

7    not apply.  It seems clear to me that this attack, planned

8    attack, was against a private newspaper, to be carried out on

9    private property.  And as counsel pointed out, that if you're

10   going to have any kind of attack, commit any kind of a crime,

11   you're probably going to have -- the government is going to get

12   involved because, somewhere along the line, they're going to

13   respond by arresting the people or attempting to arrest or, if

14   need be, by shooting them to prevent further -- to prevent

15   further crimes.  So it seems to me clear that we had here, at

16   least certainly as far as Mr. Rana was concerned, we had a plot

17   to invade a private newspaper on private property and

18   presumably kill or maim and possibly throw their heads out the

19   window -- not sure exactly how clear that was as part of the

20   plan -- but assuming that it was, it was certainly a dastardly

21   plot.  But it seems clear that under the terms of the Terrorism

22   Act, a federal crime of terrorism means an offense is

23   calculated to influence or affect the conduct of government by

24   intimidation or coercion or retaliate against the government

25   conduct.

1        There's no part of this that -- it seems to me what

2    they were attempting to do is intimidate the press and other

3    people from publishing cartoons or otherwise defaming the --

4    Islam and the Prophet.

5        So the Court finds that with regard to Count 11, the

6    terrorism enhancement does not apply.

7        The next area would be the role in the offense.

8        The government contends that there should be -- and

9    the probation office contends that there should be no

10   enhancement or lowering of the offense level based on role in

11   the offense.

12       Does the government wish to argue that further?

13       The defense contends that it should be a minor or

14   minimal role.

15       MR. COLLINS:  Judge, as we stated in our brief,

16   probation properly concluded that it was an essential role.

17   And the fact that others were more involved does not take away

18   from the fact that what he did was an essential part of the

19   crime that was charged, the material support charge that was

20   crime -- charged.

21       THE COURT:  Mr. Blegen?

22       MR. BLEGEN:  Judge, here's the -- what I think that is

23   being missed.

24       A role in the offense enhancement or reduction is

25   comparative to the other offenders.  They don't have to be

1    charged, all of them, but other offenders.

2         I don't think anybody who sat through this trial could

3    possibly conclude that Rana was not substantially less culpable

4    than Headley.  And Headley has been identified as [sic] the

5    government as an average participant in the offense.  And that

6    may be true, because there are some gigantic level participants

7    like Ilyas Kashmiri and Sajid Mir, who they talked about.  But

8    Headley is average, and Rana is substantially less culpable

9    than Headley.

10        Headley was the guy driving the *Jyllands-Posten* plot

11   forward.

12        If you'll recall, Lashkar was only involved for a

13   short period of time and then said, We don't want to do it.

14        He then actively looked for somebody else to help him

15   do it.  So he's substantially more culpable than Rana.

16        They've -- the government has indicated that he should

17   get denied a reduction because his -- Rana's assistance was

18   essential.  And so I looked it up in the dictionary this

19   morning.  And "essential" means absolutely necessary.

20        There is no way in the world that Rana's assistance to

21   Headley was absolutely necessary for the plot to go forward.

22        With regard to the *Jyllands-Posten*, Rana gave Headley

23   a business card.  Headley had his own businesses, could have

24   used his own business card, or gotten one from somewhere else,

25   if he even needed one.

1          The testimony of Headley was that when he got the

2    business card, he didn't even know what he was going to do with

3    it.  He didn't know he was going to use it to get into a

4    building.  He just wanted to have it as some explanation for

5    his travel.

6          Clearly, while that's one of the things Rana was

7    convicted of, it wasn't something that was absolutely necessary

8    to the offense.

9          Rana also sent an e-mail to the *Jyllands-Posten* when

10   they made some inquiry about an ad and used Headley's name.

11         Also not absolutely necessary.  Headley could have

12   done it himself.  The only reason he didn't do it is because he

13   happened to be traveling and didn't have internet access, or he

14   could have had somebody else do it, like his wife.

15         The other issue with regard to the material support

16   for the *Jyllands-Posten* plot by Rana was the -- not the paying

17   for airplane tickets, because I think we all came to understand

18   that Rana was really paying back Headley money whenever he did

19   something financially for Headley, but the arranging for the

20   airline tickets.  And you may recall the testimony of Rana

21   arranging for Headley's airline ticket in Denmark was only

22   because Headley's wife could not figure out how to do it.  So

23   then Headley communicated with Rana and asked him to get the

24   ticket.

25         So his -- Rana's assistance was in no way essential or

1   absolutely necessary.

2          Obviously, we have to live with the fact that he was

3   convicted of doing it, but it is a minor role.

4          It's -- and it -- sometimes I get the impression that

5   the government is acting as if the offense itself is being

6   denigrated or being called less serious if you give somebody a

7   minor role.

8          That's not it.

9          The offense is separate and apart from a role

10  adjustment.

11         A role adjustment is based on the relative level of

12  responsibility of the offenders, the relative involvement.

13         There were enumerable details of the *Jyllands-Posten*

14  plot that, even giving the government the benefit of every

15  doubt, Rana didn't know.

16         Rana didn't know the details of the attack, when it

17  was going to do it, who was going to do it.  He wasn't off in

18  Europe trying to find attackers like Headley was.  He didn't

19  know any of that stuff.  He is an aider and abettor of this,

20  and at a small level.

21         So we think at a very -- at a minimum, a two-level

22  downward adjustment is appropriate.

23         And, frankly, under the circumstances of this case, a

24  three- or four-level downward adjustment would also be within

25  your discretion.

 1            MR. COLLINS:  Judge, I think there's two propositions

 2     that are completely incorrect.

 3            The idea that the minor role applies in every single

 4     case is wrong.  And the Seventh Circuit and other courts have

 5     said that.  You don't stack up the number of people that were

 6     involved and pick the guy at the bottom and say, Well, he

 7     definitely gets a minor role.

 8            If that was the case, then in every case where there's

 9     multiple defendants, minor role would apply.  And we know

10     that's not the law.

11            And secondly, your Honor, the proposition that you

12     could have done this differently somehow changes what he did do

13     is incorrect.

14            The fact that this could have been done 100 different

15     ways doesn't change the fact of how he did it.

16            He concealed Headley's role.  He took specific steps.

17     And he didn't just write some e-mail to the newspaper.  He

18     advanced the cover story, Judge, which was his role.

19            THE COURT:  Well, I'm not going to make an adjustment

20     for the role in the offense.

21            It seems to me that, first of all, that the offense

22     didn't happen.  If the offense had happened, then quite

23     possibly, since presumably Mr. Rana would not have participated

24     in any of the carrying out of it, he might very well have been

25     lesser than some others.  But as pointed out in the

1    pre-sentence report, the fact that someone else might have an

2    aggravating role doesn't necessarily mean that there has to be

3    a mitigating role.

4            So the Court finds that there should be no adjustment

5    for role in the offense.

6            The -- I believe that completes 12.

7            We move on then to Count -- excuse me, Count 11.

8            Count 12, again, to promote terrorism.

9            The government, make your argument how that would

10   distinguish that from Count 11.

11           MR. COLLINS:  Judge, we provided extensive arguments

12   in our brief about why we know these are two separate offenses,

13   both in the scope of the time, the nature of the conduct, who

14   was involved.  We know these are two different -- very

15   different offenses.

16           Rana admitted that he knew Headley was with Lashkar

17   four to five years before 2009.  And we, through our evidence,

18   showed that he assisted him throughout that time period.

19           And while the jury might have found that we didn't

20   prove beyond a reasonable doubt he knew specifically what

21   were -- they were going to do in Mumbai, the fact is that they

22   convicted him of supporting that organization for four years.

23   2005 to 2009.

24           THE COURT:  How do you say that?  I mean, since

25   Lashkar was at the beginning of this plot against the newspaper

1    involved, might the jury not have concluded that that was

2    Rana's --

3          MR. COLLINS:  I would submit, Judge, then the jury

4    ignored a tremendous amount of evidence then of what Rana did

5    to support Headley in the early years.

6          THE COURT:  They specifically found that Rana did not

7    cause any deaths, which eliminates the Mumbai massacre from the

8    case, it seems to me.

9          MR. COLLINS:  Well, Judge, the issue there is the

10   government did not show to the jury's belief that he knew what

11   was going to take place.  And we provided extensive discussion

12   about the jury instructions in our briefs about that.

13         But, Judge, we know from the evidence that he took

14   different steps in 2005, in 2006.  When Headley was over in

15   Mumbai, there was no question that he knew he was over there

16   and he was assisting him.

17         The argument from the defense at trial was he didn't

18   know these attacks were going to take place at this time.

19         The argument from the defense was that because he

20   traveled to Mumbai, how could he have known?

21         That's what, the government submits, caused the jury's

22   finding on that.

23         But, Judge, there's no question that, and we can't

24   ignore the evidence, that he knew he was helping Headley, who

25   worked for Lashkar.  He admitted in his post-arrest statement

1    that he knew that Headley was working with them for years.   The

2    evidence showed that he was assisting him for those years.   And

3    the evidence shows through the post-arrest that Rana knew

4    Lashkar was a banned organization.

5          And while Rana wants to call this a freedom fight, the

6    reality is that he knew that they were engaging in military

7    attacks.

8          He was praising one of the commanders of Lashkar,

9    Sajid, for his -- his great command and his great ability in

10   carrying out these attacks.

11         Judge, all we were required to prove to the jury was

12   that he knew he was providing support to a banned organization

13   or that they engaged in terrorism.   And both of those points

14   were fully demonstrated by the post-arrest statements alone.

15         But on top of that, Judge, we submitted a ton of other

16   evidence showing his involvement lasted for years.

17         And for that reason, Judge, and considering the fact

18   that he knew that they were engaged in this, what he believed

19   was a freedom fight, against the government of India and

20   others, the terrorism enhancement absolutely applies, because

21   he provided support to an organization that was calculated to

22   influence and retaliate against that government.

23         THE COURT:  Mr. Blegen?

24         MR. BLEGEN:  Judge, the reason the jury rejected

25   Count 9 is because they decided that Rana didn't know he was

1    giving support to a terrorist organization when he was giving

2    support -- not support, when he was -- when he and Headley had

3    an office in Mumbai.  That's what they decided.  And you, I

4    think, have hit on the point that the government misses and

5    didn't mention in any of their briefs, which is the special

6    verdict finding that Rana's material support did not result in

7    death on Count 12, negates the possibility that the jury

8    concluded that Rana gave material support to Lashkar in

9    anything other than in relation to the *Jyllands-Posten* plot.

10          In fact, Mr. Swift reminded me this morning that there

11   was some discussion of this when we were talking about jury

12   instructions back in chambers that he could be acquitted of

13   Mumbai and convicted of the *Jyllands-Posten* on Count 12.  And

14   that's exactly what happened, and we know that's what happened.

15   We know it's happened because of the special verdict.

16          Here's -- I'm going to try to say it as succinctly as

17   possible.

18          Count 9 charged terrorism in India, essentially, and

19   that supposedly Rana's material support to that was related to

20   Lashkar and the Mumbai plot.

21          There was some also evidence about Headley going back

22   to Mumbai -- and India, excuse me, India, after the Mumbai

23   attack.  But that was for a different group, so that has

24   nothing to do with Count 12.  That was for HUJI, not for

25   Lashkar.  So Count 9 charged material support to Lashkar

1    related to India.

2         The government gave a Bill of Particulars and said

3    this is what he did, for Count 9. Let's call that A. That's

4    Group A of the material support that he provided.

5         Count 11 is material support in relation to the

6    *Jyllands-Posten* plot. And the government said here's the list

7    of material -- of material support he provided. We'll call

8    that B. That's B.

9         Count 12 is providing material support to Lashkar.

10   And in their Bill of Particulars, the government simply said

11   incorporate what he did in Count 9, the material support from

12   Count 9, and from Count 11, into Count 12. Nothing additional.

13   Those two things. A and B.

14        The jury rejected A. So the only thing left is B,

15   which is the material support to Lashkar.

16        And in addition to the Bill of Particulars, the

17   special verdict on Count 12 demonstrates that they rejected the

18   material support to Lashkar in India.

19        They had to have, because the Count 12 jury

20   instruction told them that they didn't have to find very much

21   to conclude that death resulted. They didn't have to say that

22   Rana knew that death was going to result, that he had some

23   specific intention to kill any person or group of people, just

24   that he provided material support and death resulted.

25        And you may recall, we complained up and down about

1    that jury instruction, because we thought it was too good for

2    the government, meaning it meant if anybody died and he gave

3    material support, he was going to be on the hook for it.

4         But, you know, the law wasn't really great on our

5    side, and you gave the instruction that the government wanted.

6         Now that verdict has come out against them, and it

7    demonstrates that he was not convicted of material support

8    related to India, only to the *Jyllands-Posten*.  And that's what

9    makes the terrorism enhancement, again, inapplicable to

10   Count 12.

11        And I'll -- once again, this is going to be a lot

12   shorter, but they did a bunch of bullet points that they want

13   you to adopt for Count 12.  It's on page 30.

14        The first four of those bullet points all relate to

15   Lashkar's efforts in India.  All of that was rejected by the

16   jury.  They found him -- you know, Lashkar isn't, you know, in

17   Kashmir arm-wrestling with people.  There are people shooting

18   at each other and getting killed.  The jury rejected death

19   resulting.  Lashkar apparently committed the Mumbai attack.

20   People got killed.  The jury rejected that Rana's material

21   support caused death.

22        One thing I did want to point out is Mr. Collins keeps

23   saying that Rana agreed with and celebrated these things and

24   all that stuff.

25        None of that has any impact on the terrorism

1    enhancement, but also they keep cutting up a quote from -- from

2    Rana and making it appear to be something different than what

3    it is.

4         In the fourth bullet point, they say defendant knew

5    Lashkar had carried out mass murder in Mumbai for the purpose

6    of influencing India by violence and agreed with Lashkar's

7    action, stating that they caused, meaning Lashkar caused, "a

8    fear in the hearts of Indians.  Anything could happen,

9    anywhere.  Whatever has happened here can happen with anyone at

10   any time.  Every person has become fearful of Pakistan."

11        What they cut out is that at the beginning of the

12   quote -- and this is Headley and Rana in the car -- Rana says,

13   "They say a fear in the heart of Indians," that it has caused

14   "a fear in the heart of Indians."  He's not saying I'm saying

15   it or I'm happy about it.  He doesn't say either way.  But he

16   says "they say."

17        And I, frankly, was surprised to see this in their

18   pleading because we had the same fight about it in the version

19   of the offense.  And when we got their version, we said you

20   can't just cut out the "they say."  That's like, you know,

21   Blegen said, "They say the White Sox are the best team in the

22   world."  And then can Collins go around saying, "Hey, Blegen

23   says the White Sox are the best team in the world."

24        No.  It's "they say."  That's what -- that's what Rana

25   said.

1        They're trying to take that statement and turn it into

2    somehow Rana celebrating the Mumbai attacks.

3        He wasn't.  He was talking about what other people

4    have concluded as a result of those attacks.

5        After the fourth bullet point, we've got one, two,

6    three, four, five -- five more, all of those are the same

7    bullet points that they used to suggest that -- the terrorism

8    enhancement involved in Count 11.  All Danes are responsible.

9    Long overdue.  The use of the term Denmark.  None of those

10   convert the *Jyllands-Posten* plot, which was against the private

11   newspaper, for the act of the newspaper, into an attack or

12   retaliation against government.

13       THE COURT:  Mr. Collins?

14       MR. COLLINS:  Judge, I don't know how you can say

15   based on that conversation that he was not celebrating the

16   attacks.

17       He wanted to give medals to the nine people who

18   attacked and killed all those people.  Medals.  And not just

19   any medal.  The highest posthumous award for military honor in

20   Pakistan.

21       And not just the attackers.  He also complimented the

22   architect of the attack.  Wanting to name him "Khalid bin

23   Walid."  And these are things that he admitted in his

24   post-arrest, Judge.  He admitted that he gave him that

25   honorific name.  And he admitted that he knew that Sajid was

1    leading attacks in Kashmir.

2            One of the main problems with the proposition the

3    defense is putting forward, Lashkar is not just the Mumbai

4    attacks.  Unfortunately, Lashkar is much, much more.  They have

5    a long history of acting to retaliate against and to influence

6    the Indian government.

7            And in the defendant's post-arrest statement, he

8    talked about he knew it.  He knew that they were conducting

9    actions in Kashmir.  And he called it a freedom fight.

10           But, Judge, the United States government has called it

11   terrorism, and they have banned that organization, a fact the

12   defendant knew when he was assisting Headley and the other

13   people involved in this activity.

14           There can be little question, Judge, that Lashkar had

15   its goals to cal -- to influence and to retaliate against the

16   Indian government.

17           The defendant wants to call it a freedom fight, but

18   he's wrong, Judge.

19           He knew that he was helping people that were involved,

20   not just in Mumbai, but in Kashmir as well.  He was passing

21   compliments to them.

22           Based on that evidence, Judge, there can be really no

23   question, probation is correct, that the enhancement applies to

24   Count 12.

25           MR. BLEGEN:  Judge, can I just briefly reply?  And I

1    had also forgot to mention something about probation's

2    conclusion.

3              THE COURT:  All right.  This is --

4              MR. BLEGEN:  The government can't at trial and they

5    can't now at sentencing expand on their Bill of Particulars.

6              If they wanted or had evidence or could prove that

7    Rana supported Lashkar related to some fight in Kashmir, they

8    were required to put it in the Bill of Particulars.  They did

9    not put it in the Bill of Particulars.  It was not proved at

10   trial.  It was not even alleged at trial.

11             All of the Bill of Particulars related to business

12   type stuff, which they -- you know, there was a dispute about

13   whether it's a real business or not, but business type stuff in

14   India.  That's what it was related to.  And that -- they can't

15   expand it now.  They couldn't expand it at trial and they

16   can't -- they cannot expand it then.

17             They've also said -- you know, they didn't address the

18   "they say" comment, but they've said that Rana said these

19   people deserve an award.  Well, we can go back and look at the

20   transcripts about this.

21             What Headley said was, I had previously said that, on

22   the internet or in one of these groups.  And Rana was repeating

23   it.  That was the line of questioning to Rana -- or, excuse me,

24   to Headley about that.  That's it.

25             They cannot get the terrorism enhancement based on

1    something that is not part of Rana's offense.

2        And they didn't charge or put in their Bill of

3    Particulars that there was some material support that somehow

4    assisted Lashkar in its fight in Kashmir.  They didn't charge

5    it.

6        THE COURT:  Okay.  I'm going to find, like I did on

7    Count 11, that the enhancement does not apply.

8        It seems to me that the jury concluded, based on their

9    interrogatory answer, that Rana -- defendant Rana was not

10   involved in the death of any member in -- which obviously

11   included India, that it limited the finding that he assisted

12   Lashkar in the one area that they did find that he was involved

13   in, and that was the matter involving the newspaper, which,

14   again, for the same reasons I stated on Count 11, seems to me

15   apply here.

16       So the next area is the role in the offense.

17       MR. BLEGEN:  I think we covered that already, Judge.

18       THE COURT:  Is it different for --

19       MR. BLEGEN:  Oh.  I guess I could -- I mean, it's --

20       THE COURT:  Same arguments?

21       MR. BLEGEN:  Judge, our position is that the

22   conviction for Rana for Count 11 and 12 is for the

23   *Jyllands-Posten* plot.

24       I mean, I can --

25       THE COURT:  Correct.

1          MR. BLEGEN:  -- repeat the same arguments if you would

2     like but --

3          THE COURT:  I was going to say, I don't think he's

4     entitled to the adjustment for role in the offense because of

5     the limitation.  If it -- if it had to do with Kashmir and so

6     forth, if I found that he -- then I think possibly his role

7     would be minor or certainly lesser than the average.

8          So the next -- final point is whether there's a

9     grouping -- multiple count adjustment and whether they should

10    be grouped.

11         I think based on my rulings that they must be grouped

12    since all of the activity -- do you want to make an argument,

13    Mr. Collins, on that?

14         I think my rulings have kind of foreclosed, but I will

15    certainly hear from you.

16         MR. COLLINS:  Yeah, Judge, I think you have kind of

17    foreshadowed your position on it.  I understand that.  But I

18    think that looking at these offenses as though they were the

19    same ignores a tremendous amount of evidence, including the

20    defendant's own statements made in post-arrest.  And I don't

21    think that at this point, Judge, where we have to consider the

22    totality of the evidence, that we can do that.  And I believe

23    that they are separate and that probation correctly looked at

24    this.

25         And if I could go back just for a moment, Judge, as it

1    relates to your findings on the terrorism enhancement, I just

2    want to note that the sentencing guidelines contemplate an

3    upward departure in those situations where there's a finding

4    that activity was not calculated to influence a government.

5          And we would submit that your Honor take into account

6    the commentary in those guidelines.  We -- we include it in our

7    briefs at footnote 9 on page 23.

8          The Sentencing Commission noted the limited nature of

9    the definition of the terrorism enhancement, and it talked

10   about the appropriateness of applying an upward departure in a

11   situation that you have now found this to be.

12         And we would ask your Honor to take that into

13   consideration and depart upward accordingly.

14         THE COURT:  So the Court finds that the -- they should

15   be grouped, so there's no increase, so -- I believe, based upon

16   the guidelines, therefore, the highest of the two counts, which

17   would be Count 11, which would be 33.  Is that correct?

18         MR. BLEGEN:  Yes.

19         THE COURT:  Offense level 33, criminal history

20   category I, which gives a sentencing range of 135 to 168

21   months.

22         Am I -- am I accurate?

23         MR. BLEGEN:  Yes.

24         THE COURT:  Does the government agree with that?

25         MR. COLLINS:  Yes, your Honor.

1          THE COURT:  Okay.  Does the government wish to make a

2     recommendation as to the appropriate sentence?

3          MR. COLLINS:  Judge, I won't spend too much time

4     reiterating what I think what's already been discussed, and we

5     know your Honor's position about it.  But considering what was

6     presented to the jury, what they heard in terms of the evidence

7     and what was charged, we are talking about two very different

8     sets of criminal activity.

9          On the one hand, we have the defendant knowingly

10    joining a group that was plotting a specific attack, plotting

11    murder, murder that was going to be on a horrific scale in

12    Denmark.  And that conduct should stand alone and be punished

13    severely.

14         Separately, Judge, he supported a terrorist

15    organization and knowingly did so for years.  And we have to

16    see that as a separate crime and sentence it separately

17    accordingly.

18         Like I said, Judge, I won't go on because I know what

19    your Honor has already found as to those things.  But as we

20    noted in our briefs, the Supreme Court looks at these two

21    instances, and the Congress as well, looks at these two

22    instances of conduct very differently.

23         When you offer aid to an organization generally and

24    claim you don't specifically know what they're going to do with

25    it, that's a crime.  That's a serious crime that Congress

1    has -- has called for serious penalties on.  And the Supreme

2    Court has noted in upholding the constitutionality of that

3    statute that it's, indeed, a very serious crime.

4         Separate from that, when you involve yourself in a

5    plot to commit a murder overseas, that also is separately a

6    serious crime.

7         And the government would ask your Honor to recognize

8    the distinction between those two and sentence him accordingly.

9         There is little question, Judge -- and I know we've

10   talked about this at length -- that the nature of the crimes

11   that were being planned here was dastardly, as you mentioned a

12   moment ago.  There's not much worse than mass murder of this

13   scale.  And there can be little doubt that when it comes to the

14   nature and circumstances of this offense, it's a tremendously

15   aggravating factor in this case.

16        As to the characteristics of the defendant, your

17   Honor, we noted with the evidence, with the recordings that

18   were admitted in this case, that the defendant's portrayal of

19   himself as a kind and compassionate man is a false one.

20        The defendant laughed at the discussion of targets for

21   terrorist attacks.

22        He complimented those who engaged in horrific

23   terrorist attacks.

24        And, your Honor, I know we've noted it, but it bears

25   repeating:  The defendant agreed to become part of the plot to

1    commit murder or to provide support to the plot to commit

2    murder in Denmark after knowing what these individuals he

3    conspired with already had done.  He knew they had blood on

4    their hands.  And it didn't give him pause for an instant when

5    he decided to help them in the very same way he helped them

6    before.

7              That speaks volumes about who this defendant is.  And

8    that's the man who is standing before you.

9              The question of who we are going to sentence today is

10   a good one, Judge.  And I know that the defendant wants to

11   portray himself and he has letters from family and friends that

12   portray himself as a kind man.

13             But, your Honor, we have admitted recordings showing

14   you what truly this man is, and evidence specific as to not

15   just his contact with Headley, but his contact with other

16   individuals.  And we talked about that in the brief.

17             He had direct contact with both Pasha as well as

18   Major Iqbal.

19             This is not a situation where he simply is helping a

20   friend on one or two occasions.

21             This is somebody who made a reasoned judgment, knowing

22   what his friends already had done and the violence that was

23   involved, and agreed to help.

24             When you look at those two factors, Judge, they call

25   for a significant sentence in this case.  The nature of the

1    offense and the defendant's character.

2         But 3553 also talks about the need for just

3    punishment, the need for adequate deterrence, and the need to

4    promote the seriousness of the offense -- or need to reflect

5    the seriousness of the offense.

6         And those, Judge, are equally aggravating factors.

7         Defendants who want to think that they can avoid

8    detection and punishment by sitting at a safe distance and

9    supporting organizations and supporting terrorists the way that

10   this defendant did need to understand that there will be

11   significant penalties when they are caught, that what they do

12   has harm, what they do creates victims, victims who will suffer

13   the rest of their lives, because the Supreme Court has made

14   clear that when you offer support to terrorists like this, you

15   are making their job of carrying out attacks that much easier,

16   and you are making terrorist attacks more likely to occur.

17        And that's what the defendant did, Judge.

18        If I may have another moment, just one minute.  Okay?

19        THE COURT:  Mr. Blegen?

20        MR. BLEGEN:  I think he wanted a minute --

21        THE COURT:  Oh, excuse me.

22        MR. COLLINS:  If I could just have one minute.

23        THE COURT:  I'm sorry.

24     (Counsel conferring.)

25        MR. COLLINS:  Judge, in light of your findings on the

1    guidelines but also in light of our requests, as the guidelines

2    suggest for a departure from that, we still stand here before

3    you, Judge, and in light of the 3553 factors, ask you to impose

4    a severe sentence on this defendant for what took place, and

5    also to impose consecutive sentences on Counts 11 and 12.

6         THE COURT:  Thank you.  Mr. Blegen?

7         MR. BLEGEN:  Judge, I first wanted to address the

8    suggestion of an upward departure that the government has made.

9         If you look at Footnote 9, that's where they talk

10   about it in their briefing.  There is the suggestion of an

11   upward departure for -- where the motive was to intimidate or

12   coerce a civilian population.

13        The government then, maybe five or seven sentences

14   down, converts that into attempting to influence or retaliate

15   against civilian conduct.

16        There is no upward departure for retaliating against

17   civilian conduct.

18        There is a potential upward departure for attempting

19   to intimidate or coerce a civilian population.

20        For the same reasons, there was no intent to -- same

21   reasons as argued previously about the *Jyllands-Posten*, there

22   was no intent or attempt to coerce an entire civilian

23   population.  This, again, was limited to the newspaper and the

24   newspaper building.  So I would suggest that that upward

25   departure isn't applicable.

1          The government repeatedly said that a substantial

2   sentence is required.  The -- but they have not repeated their

3   request in the paperwork of a maximum sentence of 30 years.

4   And I don't think under the circumstances anybody could think

5   that such a sentence would be appropriate.  The guideline range

6   we would be at now is a level 33, and I think you said 135 to

7   168.

8          It is impossible to talk about Rana and this case

9   without also talking about Headley.  That's not an attempt to

10  shift Rana's blame to Headley.  Rana is here convicted, and

11  he's going to be sentenced.

12         But the simple fact of the matter is that no one who

13  sat through this trial would think, would conclude, that but

14  for going to the same school as Headley as a child, Rana would

15  be sitting here today.

16         Headley told us that he spent, seems like a good

17  portion of his life, trying to convert people to his way of

18  thinking, trying to convert people to believe that violence is

19  good and anger and hatred, teaching your kid to pretend to

20  shoot a rifle when he's young, that those kind of things, that

21  that's acceptable conduct and that's -- you know, that there's

22  some good reason to do that kind of stuff.  And it appears that

23  the jury concluded that at some point he got Rana, like he got

24  his brother in Pakistan, like he got his uncle, like he got his

25  wife, like he got pretty much everybody who came in contact

1   with him.  That must be what the jury concluded, that at some

2   point, despite the years of arguments and debates that they had

3   been having, that Headley, convincing guy that he is, got to

4   Rana.  That must be what the jury concluded.

5          But if he did that, he did it only in 2009, the time

6   around the *Jyllands-Posten* plot.

7          So, understandably, Rana should be punished for that,

8   but that doesn't mean we get to ignore his life leading up to

9   2009.

10         Rana had been a kind and compassionate person.  He

11  was.  Rana had raised his children not to be little terrorists.

12         You remember the story, Judge, where Headley's son is

13  at a soccer game and the coach said, "Shoot," and he lays down

14  on the ground and pretends he's shooting a rifle.

15         Rana's children are in school.  Western schools.

16  College.  High school.  Rana has not tried to infect his family

17  or anyone else with this kind of hatred that Headley tries to

18  spread.  He was a doctor.  He ran an immigration firm.  He

19  worked.  Worked tirelessly.  Didn't really make a lot of money.

20  Had dreams of expanding his businesses around the world.

21         That's how Headley got him in the first place

22  regarding Mumbai.  He had always wanted an office in Mumbai

23  because his clients are Indians.  That's who he was helping

24  immigrate.  He had also wanted an office in Europe, and

25  including in Denmark.  The government I think said earlier

1    today that it's absurd or incomprehensible to think that there

2    really was going to be an office in Denmark.  Well, that's

3    contrary to the evidence.

4            Rana suggested that his business partner, Ray Sanders,

5    go with to Denmark because there really was going to be an

6    office there.

7            Headley said in his testimony, when asked about

8    that -- I said something like, "The guy you were going to

9    have -- Rana wanted to go along with you on a terrorist mission

10   to Denmark?"

11           And Headley said, "No.  He was talking about the

12   actual office, not a terrorist mission."

13           That's the office in Denmark.  That's what Rana wanted

14   to do.

15           And if you recall, there was a tape towards the end

16   where Headley is telling Pasha, Well, we're going to need some

17   money for an office in Denmark.

18           So to suggest that Rana didn't have these goals and

19   these other thoughts different from Headley is not -- doesn't

20   fit with the evidence.  He did want to.

21           There's a couple of other factors that should, in my

22   belief, my belief, mitigate the sentence in this case.

23           One, not only is Rana separated from his children and

24   his family, his wife, who is still with him -- not with him

25   physically, but they're still married to this day -- and his

1  children, not only is he separated by jail, but we just learned

2  about a week and a half ago that his wife is being denied entry

3  into the United States.  She's a Canadian citizen.  And

4  apparently, we don't know the reason why, but in trying to come

5  back, she was denied.

6          So he's going to spend whatever amount of years you

7  give imprisonment without being able to physically see his

8  wife.  His children can see him occasionally.  One is not a

9  citizen.  I don't really know whether she's going to be let in.

10  But his two other children, a daughter and a son, are here in

11  the United States and can see him.  One of them is away in

12  college, so he doesn't get to see him very often.

13          I left the pleading I need at the table, Judge.

14          Rana's health is also terrible.  He suffered a heart

15  attack in the MCC.  His heart function has been limited.  He

16  suffered another episode where he literally passed out and they

17  had to take him to the hospital again.

18          The government has, for its part, responded by saying

19  there's a brand new case from the Seventh Circuit where in a

20  single paragraph, a couple of sentences, Seventh Circuit says,

21  Well, there is -- you can get medical attention in prison.

22          I do not believe that the Seventh Circuit was

23  intending to undercut, whatever, 50 years of American juris

24  prudence that says you can take a defendant's health condition

25  into account when deciding how long of a sentence to give them.

1          And I will suggest that, you know, the health care in

2     the prison is not necessarily going to be as good as you can

3     get on the outside.

4          In this case, Rana was complaining of severe pain,

5     lying on the floor of the MCC and crying, before they decided

6     to take him to the hospital, for something like 17 hours.  He

7     had a severe heart attack.  He had a stent put in.

8          His health is not good.  His kidney function has been

9     seriously deteriorated because of that.  He's in bad health.

10         And so in our view, whatever sentence you give him

11    should take into account the fact that his life has been -- is

12    going to be shortened from his health conditions.  He's

13    currently getting -- just turned 52 years old.

14         So that -- that health is a factor that can and should

15    be taken into account.

16         One of the other issues we raised is his 13 months

17    that he spent in the hole, essentially, upon being arrested.

18         The government suggests that maybe we should have had

19    to provide an affidavit of those conditions.

20         These are the standard conditions of what's called the

21    Segregated Housing Unit.  I don't think anybody disputes them.

22         He is -- he was without -- he didn't get to go outside

23    for 13 months.  He's kept in a room, whenever he's out, by

24    himself, solitary, with no one to talk to, which as -- clearly

25    weighs on your mind and, you know, obviously he was happy to

1    see us whenever we could get over to visit him.

2           He -- the conditions -- I've been up there myself to

3    visit people.  The conditions are -- I'm not suggesting, you

4    know, prison should be a spa, but the conditions there are much

5    worse than the general population conditions.

6           And he eventually got moved into the general

7    population, but he spent 13 months in the hole, never getting

8    to go outside, having terrible conditions imposed upon him.  He

9    wasn't able to pray when he needed to because he literally

10   couldn't see outside and didn't know what time it was.

11   Eventually, we begged the MCC, and they gave him a wristwatch

12   so that he could know when to pray.  He missed Juma prayers,

13   which are the prayers -- they're important for Muslims to pray

14   once a week in a group, and various other conditions that were

15   not necessary to be imposed, because the SHU is designed for

16   punishing people who have broken the rules in the jail.

17          One of the guys who escaped from the MCC is now in the

18   SHU because he's being punished.

19          You don't get to see your family nearly as often.  You

20   don't get the phone calls nearly as often.  All of those things

21   were impacted on Rana through no fault of his own.

22          And, frankly, I complained to the MCC by letter and

23   every time I was over there, and they didn't listen to me at

24   all.

25          What I think eventually happened is he was so

1    unerringly polite to everyone that they figured he wasn't a

2    problem and they moved him out of there, and he has continued

3    to be not a problem and unerringly polite to everyone.

4              And, frankly, one of the things that impressed me was

5    the grace with which he handled the situation.

6              He would politely ask the guards and the warden if

7    they could change his conditions, if they could somehow get him

8    out of the SHU, that he didn't believe he needed to be there

9    for his own safety, but he didn't rant and rave and scream and

10   yell like a lunatic.  He handled things with grace.  And I was

11   very impressed by that.

12             He -- I -- the conditions, frankly, would have driven

13   me crazy, but he -- he was -- he was very strong about it.  And

14   he should get some credit, Judge, at sentencing for being in

15   there for -- for not having broken any of the MCC rules.

16             He is, no matter what your sentence is, is going to be

17   separated from his family for -- for a lengthy period of time.

18             He has young children who are devastated by this.  And

19   that doesn't excuse the conduct, but it is a mitigating factor,

20   and it is something that you can take into account as the

21   characteristics and circumstances of the offender.

22             He's not a future danger, Judge.

23             You have to send a message in general deterrence.

24   That's part of 3553.  But Rana is not a future danger.

25             He got sucked into this by Headley.

1      There's no suggestion he was out looking for jihadist

2   things to do on his own.

3      There's no suggestion that he was -- that his home or

4   his computer or anything else was filled with searches looking

5   for jihadi stuff.

6      I'm sure you saw the letter from Dr. Sageman, who says

7   he doesn't really meet that -- the criteria of one of those

8   kind of people.  He's not that kind of person.

9      He was someone who, according to the jury's verdict,

10   succumbed to the advances of Headley.

11      That's who he was.

12      Other than that, he has led a very full and productive

13   life.  And he is kind and generous, and the letters demonstrate

14   that.

15      He's not the kind of person who needs to be put in

16   jail until he dies, as the government has suggested, for 30

17   years.

18      He is an individual who a sentence that is reasonable

19   but not greater than necessary would be appropriate to punish

20   him for the crime.  It would reflect the seriousness of the

21   offense.  It would also reflect his -- even if you don't give

22   him a minor role, the fact that this is a material support

23   offense, it's not a direct involvement offense.  All of those

24   factors should lead the Court to impose a reasonable sentence.

25      I leave it to your judgment, obviously.  He's at 135

1    to 168.  But a reasonable sentence -- I would suggest a

2    sentence somewhat below that guideline range would be

3    appropriate, but we leave it to your judgment.

4         Judge, he is a -- he is a good man, and he got sucked

5    into something, but there's no risk that he's going to do it

6    again.  None.  There's no other friend out there who is going

7    to do this to him.

8         I just want to say one more thing about this

9    relationship between Headley and Rana.  And I know the

10   government will complain that I'm trying to blame it all on

11   Headley.  I'm really not.

12        But this is a man who Rana helped kick his heroin

13   addiction.  Headley was a heroin addict.  Rana told him, You

14   can't see my children or my family if you're going to be like

15   this.  And he helped him kick the addiction.

16        When Headley got arrested for selling heroin and

17   needed to get out on bond so that he could cooperate with the

18   government to catch other heroin dealers and reduce his

19   sentence, Rana convinced his wife to put his house up for him.

20        This is a guy, they have -- they have a relationship

21   going back to childhood.  Rana and Headley had a connection.

22   Headley abused that connection and tried to turn Rana into

23   something that he's not.

24        Your punishment should reflect the person that Rana is

25   and will continue to be without the influence of Headley.

1          THE COURT:  Mr. Rana, would you like to make a

2     statement on your own behalf, sir?

3          MR. BLEGEN:  Judge, we've discussed with Mr. Rana.

4     Obviously, he -- you know, he's convicted, and we understand

5     that, but he doesn't want to --

6          THE COURT:  All right.  I just wanted --

7          MR. BLEGEN:  The answer is no.

8          THE COURT:  He's aware that he has the right?

9          MR. BLEGEN:  Yes.  I'm sorry.  He knows.

10          MR. COLLINS:  Just one response.

11          Mr. Blegen mentioned a moment ago that it seems like

12     no one here could believe that the maximum is appropriate.  And

13     I just want to, for the record, tell you that the government

14     does, considering the seriousness of this crime, his

15     involvement, the fact that he's never accepted responsibility.

16     In fact, Mr. Blegen can say that he's not blaming Headley, but

17     that's all he's been doing.  And he's never focused on what he

18     has done and what he has said and never accepted

19     responsibility.

20          And far from keeping, you know, this relationship with

21     Headley away from his family, we pointed out to your Honor the

22     fact that Rana's own wife acknowledged that those two together,

23     and talk about kill him, kill him, because they don't do things

24     the way they do.  He's not keeping it away from her.  And she's

25     aware of it.  And that -- those private conversations show the

1    character of the man to be sentenced here today.

2             THE COURT:  Thank you.

3             The matters that I concluded, based upon presiding

4    over the trial and reading all of the matters that have been

5    provided to me, including the letters from family members and

6    friends and acquaintances and -- of defendant Rana, indicate

7    that we have, on the one hand, a very intelligent person who is

8    capable of providing assistance, is willing to provide

9    assistance, in a good way, to many, many people, and -- but

10   what is difficult to understand is a person with that

11   intelligence and that background and that history of helping

12   and so on and so forth, and even helping Mr. Headley, how that

13   type of person could get involved in such as, I think I

14   referred to as a dastardly plot, get sucked into a dastardly

15   plot that was proposed, to go into a private office of a

16   newspaper because of actions by the cartoonist, a mindset that

17   would even contemplate such an act is so contrary to what it

18   appears that Mr. Rana is.  And it's difficult to understand.

19            However, and I'm not tarring him with what other

20   people have done, but unfortunately there seems to be and

21   occasionally a mindset that allows people to do one thing and

22   then a completely opposite thing everywhere else.

23            So based upon the mindset, which I frankly don't

24   understand, we find that Mr. Rana got involved in this action,

25   which would have provided horrendous injury and death to a

1    number of people -- nobody knows exactly how many because,

2    fortunately, it didn't take place -- but that's something that

3    I just frankly don't understand.

4         Now, we get into the 3553 factors.  Certainly the

5    seriousness of the offense, this is about as serious as you

6    could get.  It only would have been more serious if it had

7    actually been carried out.  Fortunately, it was stopped prior

8    to it being carried out.

9         Adequate deterrence to criminal conduct -- I'm not

10   sure that anything I do today will deter conduct in the future

11   by people of a mindset to carry out terrorist activities.

12        It seems to me that the people who are bound and

13   determined to get involved in terrorist activities really don't

14   care what happens to them.  It seems that they will proceed to

15   do it.  I mean, here we're talking about carrying out an

16   activity in a -- which they expect the police to respond and

17   presumably they want to make sure they get everything done

18   before the police respond and kill all of the participants.  So

19   it's that type of mindset I don't think is going to be

20   deterred.

21        Now, of course deterrence, as long as Mr. Rana is in

22   custody, he personally is deterred from getting involved in any

23   kind of future conduct should some activity come his way.

24        So I have to take into consideration the -- one of the

25   factors under 3553 is to protect the public from further crimes

1    of the defendant.

2          I'm not sure anything I do would afford adequate

3    deterrence to criminal conduct of the nature that we have here,

4    but certainly by providing a long sentence will make sure that

5    Mr. Rana does not get involved in any kind of terrorist

6    activity in the future.

7          Now, there's sort of an unsaid feeling here that the

8    evidence was questionable as to Mr. Rana's conduct, whether he

9    was guilty, because Headley was shown to be a very manipulative

10   person who would certainly use the ability to lie in order to

11   carry out any activity he wanted and that perhaps the jury was

12   wrong in finding Mr. Rana guilty.

13         I think the jury, certainly you can show that they

14   bent over backwards to be fair because there was certainly

15   evidence which to certainly support the Count 9, which was the

16   Mumbai account.  And they very clearly determined that, by

17   listening to all the evidence and viewing Mr. Headley -- who

18   testified for I think seven days, I think five of which were

19   involved in the Mumbai matter -- that they were very able to

20   distinguish between what was perhaps preponderance of the

21   evidence as opposed to beyond a reasonable doubt.  And they

22   concluded that the involvement of Mr. Rana in the newspaper

23   matter was beyond a reasonable doubt.  And one of the items

24   that I thought was -- made it very clear that -- because

25   there's been talk about whether or not Mr. Rana -- Mr. Headley

1    was corroborated, the whole idea that Headley was being sent to

2    Copenhagen to take out an ad in a newspaper when you have --

3    you could do the same ad over the internet or get on the

4    telephone and call the newspaper and dictate the ad and save

5    many hours of flying time, many dollars, the cost of airline

6    transportation, the fact that Mr. Rana greatly assisted

7    Mr. Headley in going over there for the -- for the stated

8    purpose of making an ad in the newspaper, which -- after which

9    there had been discussion over the -- how awful it was that

10   that specific newspaper had published cartoons that were

11   blasphemous towards the Islamic religion, that they would even

12   place an ad in such a newspaper sort of defies any reason.  And

13   the fact that you would do it by actually paying to go all the

14   way over to Copenhagen and just for the sole purpose of taking

15   out an ad, seems to me to be about as corroborative of what

16   Mr. Headley testified to concerning the matters concerning --

17   concerning the newspaper that you could have.  And I -- I'm

18   sure that the jury was influenced by that particular matter.

19          There's not much more I can say.  I think that the

20   crime is serious.

21          There's a close question of whether or not -- I

22   suppose you could make a terrorist argument.  Certainly, the

23   government made an argument that terrorism was involved.  The

24   probation office felt that it was involved in Count 12 but not

25   on Count 11.  So it was a close question.  And I'm not saying

 1    that there -- certainly that there was anything frivolous about

 2    the contention that that should apply.  I happen to make

 3    findings that I believe are consistent with the facts in the

 4    case, certainly with the idea of lenity that I should not make

 5    that enhancement.  But it seems to me that -- and, again,

 6    the -- for anybody who thinks that any sentence that I'm going

 7    to give out is a slap on the wrist, I'm going to impose a

 8    sentence at the top of the guidelines.  168 months, to be

 9    followed by 5 years supervised release.  And the basis for the

10    high one is the fact that -- of the -- really, to reflect the

11    seriousness of the offense.  And, again, it's hard to -- well,

12    obviously the Mumbai matter was more serious because it was

13    actually carried out, but the -- this offense was so serious

14    that it seems to me that it warrants a sentence at the top of

15    the guideline.

16             So, accordingly, the Court will impose that sentence.

17             And the Court will recommend that Mr. Rana be housed

18    at an institution that can provide adequate medical care to

19    him.

20             Anything specific that should be in the ...

21             MR. BLEGEN:  Judge, I didn't understand the question.

22             THE COURT:  Anything specific?  Any specific

23    institution you wish him to be --

24             MR. BLEGEN:  Actually, we had intended to request that

25    you recommend an institution, a medical institution --

```
1              THE COURT:  Okay.  I've done that.  I will do that.
2              Now, Mr. Rana, you're entitled to appeal the sentence
3     I've just imposed.
4              Do you understand that, sir?
5              THE DEFENDANT:  Yes, sir.
6              THE COURT:  You have 14 days to file a notice of
7     appeal, and it must be a written notice of appeal.  And I
8     assume you probably will want to file one.
9              I will ask Mr. Blegen and your other lawyers to
10    discuss with you whether you wish to appeal and to file a
11    notice of appeal on your behalf.
12             Will you do that, Mr. Blegen, and the rest of --
13             MR. BLEGEN:  Yes.
14             THE COURT:  And if you can't afford an attorney while
15    on appeal, then one would be appointed to represent you.
16             Do you understand you have that right, sir?
17             THE DEFENDANT:  Yes.
18             THE COURT:  Anything further?
19             MR. COLLINS:  No, your Honor.
20             THE COURT:  Anything further?
21             THE CLERK:  That was on Count 11 and 12?
22             THE COURT:  Count 11 and 12, they were concurrent.
23             THE CLERK:  Assessment, fine.
24             THE COURT:  Oh, a $200 special assessment.
25             THE CLERK:  Okay.  Was there any forfeiture --
```

1          THE COURT:  I'll waive a fine for inability to pay.

2          MR. BLEGEN:  Thank you, Judge.

3          THE COURT:  I think that covers it.

4          MR. BLEGEN:  Yes.

5     (Ms. Kwong conferring with Mr. Collins.)

6          MR. COLLINS:  Your Honor, Mr. Rana is in the

7     United States without a legal status, and we would ask that a

8     special condition be imposed that he report to INS upon any

9     release from the Bureau of Prisons.

10         THE COURT:  If defendant is deported, I'll make that a

11    condition, that he not return to the United States without the

12    permission of the Attorney General or the Department of

13    Homeland Security if he is, in fact, deported at the conclusion

14    of the sentence.

15         MR. COLLINS:  Thank you, your Honor.

16         THE COURT:  If not, we'll stand adjourned.

17         COURT SECURITY OFFICER:  All rise.

18    (Proceedings concluded.)

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2         I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5

     /s/ GAYLE A. McGUIGAN                    January 18, 2013
6    Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter
7    _____        January 18, 2013
8    Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25